**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| RIMKUS CONSULTING GROUP, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. H-07-0405 |
| | § | |
| NICKIE G. CAMMARATA, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND OPINION**

On January 30, 2007, Rimkus Consulting Group, Inc. ("Rimkus") sued Nickie G. Cammarata seeking to enforce noncompetition and nonsolicitation covenants in an employment agreement Cammarata signed and to enjoin him from using or disclosing trade secrets and confidential information. This suit was filed after Cammarata had sued Rimkus in Louisiana seeking a declaratory judgment that the noncompetition and nonsolicitation provisions in the employment agreement were invalid. The employment agreement specified that Texas law applied; Cammarata lived in Louisiana and primarily worked in Louisiana. Under Louisiana law, noncompetition and nonsolicitation covenants are generally unenforceable as against that forum's public policy, as are forum-selection and choice-of-law clauses in employment agreements. On July 26, 2007, the Louisiana state court granted Cammarata's motion for partial summary judgment, concluding that Louisiana law rather than Texas law applied to the agreement and "that, pursuant to Louisiana law, the covenant not to compete clauses contained in Paragraphs 8(a) and the non-solicitation of customer(s)

clauses contained in Paragraphs 8(c) of the respective contracts are invalid and unenforceable." (Docket Entry No. 71, Ex. H). On February 6, 2008, Rimkus filed an amended complaint in this federal suit to add U.S. Forensic, Cammarata's new employer, as a defendant. (Docket Entry No. 81). On April 21, 2008, Cammarata counterclaimed, asserting that Rimkus violated the Texas Business and Commerce Code by seeking to enforce the noncompetition and nonsolicitation covenants knowing that they were unreasonably broad. (Docket Entry No. 125).

This court held a three-day hearing on Rimkus's preliminary injunction application. (Docket Entry Nos. 126, 130, 139, 143, 147). The following motions are pending in addition to Rimkus's preliminary injunction application:

- Cammarata has filed two motions to dismiss Rimkus's claims for breach of the noncompetition and nonsolicitation provisions on the basis of the preclusive effect of the Louisiana state court's ruling. (Docket Entry Nos. 71, 105). Rimkus has responded, (Docket Entry Nos. 78, 113); Cammarata has replied, (Docket Entry No. 79); and Rimkus has surreplied, (Docket Entry No. 80). Cammarata has filed supplemental briefs, (Docket Entry Nos. 104, 112, 144, 152), and Rimkus has filed a supplemental brief, (Docket Entry No. 142).

- Rimkus has moved to strike certain exhibits on Cammarata's exhibit list. (Docket Entry No. 131).

- Rimkus has moved to strike two witnesses on Cammarata's witness list. (Docket Entry No. 132).

- Rimkus has moved for default judgment against U.S. Forensic. (Docket Entry No. 127).

- Rimkus has moved for attorneys' fees incurred in attending an October 12, 2007 mediation. (Docket Entry No. 39). Cammarata has responded, (Docket Entry No. 41), and Rimkus has replied, (Docket Entry No. 43).

2

- Rimkus has moved to strike Cammarata's counterclaim as untimely. (Docket Entry No. 128). Cammarata has responded. (Docket Entry No. 148).

Based on a careful review of the preliminary injunction request, the parties' submissions and briefs, the arguments of counsel, the record, and the applicable law, this court denies Rimkus's request for a preliminary injunction. Cammarata's motions to dismiss Rimkus's claims are denied as moot. Rimkus's motions to strike are denied as moot. Rimkus's motion for default judgment is denied. Rimkus's motion for attorney's fees is denied. Rimkus's motion to strike Cammarata's counterclaim as untimely is granted. The reasons for these rulings are set out below.

## I.    The Evidence in the Preliminary Injunction Hearing

Rimkus presented testimony from Ralph Graham and Curtis Brown, both senior vice-presidents of Rimkus Consulting Group, Inc. Cammarata testified, as did Gary Bell, another ex-Rimkus employee and a cofounder with Cammarata of U.S. Forensic.

### A.    The Parties

Rimkus, a Texas company with its principal place of business in Houston, Texas, is a forensic engineering contractor. Forensic engineering is a specialized area of engineering. Rimkus has been in existence since 1983, one of the earliest firms to offer such forensic engineering contract work. Rimkus now has 30 offices in 18 states and performs forensic engineering services across the country. Rimkus analyzes unexpected accidents and occurrences that cause damage to people or property, generally for use in insurance disputes or litigation. Rimkus's work covers a broad range of property damage, including foundation

and roof damage, fire damage, storm, wind, and hail damage, plumbing leaks, mold evaluation, and construction-defect analysis. Rimkus also works on industrial and vehicle accidents. Rimkus's work is primarily used in insurance and liability claims, disputes, and litigation. According to the evidence at the hearing, competition among forensic engineering firms is based primarily on price.

Cammarata is a Louisiana resident with a bachelor of science degree in civil engineering. In October 1996, Rimkus hired Cammarata as a full-time salaried employee to provide forensic engineering services. Cammarata was hired at Rimkus's office in Houston, Texas, where he signed an Employment Agreement with Rimkus. Cammarata worked for Rimkus Consulting Group of Louisiana ("RCGL"), which Rimkus formed as a wholly owned subsidiary because Louisiana regulations about performing engineering services in that state required the formation of a separate company. Cammarata worked in RCGL's Metairie, Louisiana office. Cammarata received his paycheck and W-2 forms from RCGL but was provided access to Rimkus customer information, Rimkus business plans, and Rimkus operations information. Cammarata worked on civil engineering aspects of property damage claims. He did not work on personal injury claims, vehicle accidents, or industrial accidents. When he left Rimkus, Cammarata was the central region property manager. His geographic area of responsibility covered the central region from Louisiana to the Canadian border.

Cammarata resigned from Rimkus on November 15, 2006. With two other former Rimkus employees who worked at RCGL in Louisiana. Gary Bell and Mike DeHarde, Cammarata created and immediately began to work for U.S. Forensic. Like Rimkus, U.S.

Forensic provides investigative and forensic services, primarily to determine the cause, origin, and extent of losses from failures and accidents. The parties do not dispute that U.S. Forensic competes with Rimkus in providing investigative and forensic engineering services, although U.S. Forensic does not offer as broad a range of services as Rimkus. U.S. Forensic currently has offices in Louisiana, Mississippi, and Florida and employs engineers registered in twenty states. The majority of U.S. Forensic's clients are in Louisiana and the majority of the company's work is performed in that state.

Although Rimkus attempted to show that Cammarata and the other employees who left to found U.S. Forensic were competing against Rimkus even before they left, the evidence does not support that contention. Cammarata, Bell, and DeHarde were planning to leave and were setting up U.S. Forensic before they left their jobs with Rimkus. However, there is no evidence that Cammarata or the cofounders of U.S. Forensic actually began competing with Rimkus before they resigned.

### B. The Employment Agreement

Rimkus interviewed and hired Cammarata in the Houston office. Cammarata signed the Employment Agreement in that office. The Agreement was between the "Company," defined as Rimkus Consulting Group, Inc., and the "Employee," defined as Cammarata. The provisions at issue are the noncompetition, nonsolicitation, and nondisclosure clauses.

The Agreement's noncompetition provision states as follows:

> a. Employee will not, directly or indirectly, own, manage, finance, control, or participate in the ownership, financing, or control of, or be connected as a partner,

principal, agent, employee, independent contractor, management advisor, and/or management consultant with, or use or permit his name or resume to be used in connection with any business or enterprise performing consulting services similar to those which are carried on by the Company in the "Designated Geographic Area." For the purposes of this Agreement "Designated Geographic Area" shall mean any standard metropolitan statistical area (or if a client is not located in a standard metropolitan statistical area, then the city, town, or township in which such client is located and the counties or parishes contiguous thereto) in which a client or clients of the Company are located and from which such client or clients have engaged Company on not less than five (5) separate files or engagements during the five (5) calendar years proceeding termination of Employee's employment with Company.  If Company has received less than five (5) such assignments or engagements from a client in any Designated Geographic Area, then Employee shall be free to compete in such Designated Geographic Area.  "Client" shall mean any person or entity represented by the Company on an assignment or engagement, and shall include, but not be limited to, an owner, an operating entity, an insurance company, and independent adjustment firm, a governmental agency, [or] a law firm.  Employee further agrees that during the effective period of this Agreement and this covenant, he will not do any act which is intended, or reasonably expected, to have a detrimental effect on the business of the Company.  This covenant against competition shall be construed as a separate covenant covering competition within the State of Texas, or in any other State where the Company, directly or indirectly, whether through itself or its representative or agents, conducts business; . . .

(Docket Entry No. 1, Ex. A at 4–5).

The Agreement also contained a clause prohibiting solicitation of the Company's employees and of the Company's customers:

6

     b.     Employee agrees that after termination of employment with the Company, he will not, directly or indirectly, solicit, employ, or in any other fashion, hire persons who are, or were, employees, officers, or agents of the Company, until such person has terminated his employment with the Company for a period of eighteen (18) months;

     c.     Employee agrees, that for a period lasting until eighteen (18) months after termination of his employment, he will not at any time, directly or indirectly, solicit the Company's customers.

(Docket Entry No. 1, Ex. A at 5).

The Employment Agreement also contains a nondisclosure provision that states as follows:

     a.     The parties acknowledge and agree that the Company has spent and continues to spend considerable time, effort and money to maintain the Company's existing client and client contact data bases for its various clients, and to continue to add new client and client contacts respectively to the Company's client and client contact data bases.  This information is proprietary and a valuable asset to Company obtained at considerable time and expense.  Employee further acknowledges and confirms that prior to his employment by the Company, he did not have any definitive knowledge with respect to the Company's client base or the individuals employed by Company's clients who are responsible for letting work to the Company for the types of work Company performs.

     b.     Employee also agrees that all workpapers, documents, writings, materials, photographs, video tapes, drawings, job assignment sheets, time sheets, reports to or correspondence to or from clients, accounting data or reports or information of any nature or configuration, client and client contact lists, job or job status reports,

rolodex or business card files, computer software and data discs, invoices, daily and monthly reports or analysis sheets, client lists and data, evidentiary exhibits, graphics and other written presentations, contract files and client files in Employee's possession and/or used or intended for use by Employee in connection with his duties are the property of the Company and Employee agrees that, within twenty-four (24) hours of the termination of employment from the Company or within twenty-four (24) hours of demand by Company, all such items and any copies or reproductions thereof shall be returned to the Company by Employee, and Employee shall execute a certificate, substantially in the form of Exhibit "A" attached hereto, attesting his compliance with this provision;

c.      Employee agrees he shall not, except in the performance of his duties, make or cause to be made any copies, pictures, duplicates, facsimiles or other reproductions or recordings or any abstracts or summaries of any such workpapers, documents, writings, materials, photographs, video tapes, drawings, job assignment sheets, time sheets, reports to or correspondence to or from clients, accounting data or reports or information of any nature or configuration, client and client contact lists, job or job status reports, rolodex or business card files, or computer software and data discs, invoices, daily and monthly reports or analysis sheets, client lists and data, evidentiary exhibits, graphics and other written presentations, contract files and client files, or remove same from the premises of the Company except in the performance of his duties. Employee agrees to surrender all items to the Company within twenty-four (24) hours of the termination of employment or within twenty-four (24) hours of demand by Company, and Employee shall execute a certificate, substantially in the form of Exhibit "A" attached hereto, attesting to his compliance with this provision;

d.      In the course of his relationship with the Company because of the nature of his responsibilities and the

8

experience to be acquired at the Company, the Employee will acquire valuable and confidential information and trade secrets with respect to the Company's successful business operations, including, but not limited to, the Company's existing and contemplated business and financial methods and practices, plans, and special methods and processes involved in the operation of the Company's business, and lists of the Company's clients as reflected in part by the items described in 9b and 9c above. In addition, the Employee will develop, on behalf of the Company and at the Company's expense, a personal acquaintance with the Company's clients which acquaintance may constitute the Company's only, primary, or best contact with such clients. Also, Employee may develop or be exposed to confidential or trade secret information of the Company's clients or others with whom the Company does business. As a consequence thereof, the Employee will occupy a position of trust and confidence with respect to the Company's affairs, services and clients. Maintenance of the confidential and proprietary character of confidential or trade secret information of the Company, the Company's clients or others with whom the Company does business is important to the Company. Employee agrees that during the period he is engaged to work for the Company and after such engagement, for so long as such confidential information or trade secrets may remain confidential, secret or otherwise totally or partially protectable or proprietary, he will not use or divulge such information except as permitted or required by his duties in connection with his work with the Company.

(Docket Entry No. 1, Ex. A at 6–8).

The Agreement contained the following provision as to the applicable law:

This Agreement and all rights, obligations and liabilities arising hereunder shall be governed by, and construed and enforced in accordance with the laws of the State of Texas (excluding its

9

conflicts of law provisions) applicable to contracts made and to
be performed therein.

(Docket Entry No. 1, Ex. A at 11).

In this suit, Rimkus asserts that it is entitled to a preliminary injunction for 18 months

from the present date prohibiting Cammarata and U.S. Forensic from competing with Rimkus

in the defined geographic areas and from soliciting any Rimkus (or RCGL) customer.

Rimkus also asserts that it is entitled to a preliminary injunction prohibiting Cammarata and

U.S. Forensic from soliciting any Rimkus (or RCGL) employee for 18 months after that

employee leaves Rimkus or RCGL. Cammarata asserts that the provisions are unenforceable

because the Louisiana court judgment to that effect is entitled to Full Faith and Credit and

because the provisions are unreasonable in the length of time and the breadth of the

prohibitions imposed. Cammarata also asserts that he signed the Agreement with Rimkus

but worked only for RCGL and has only hired former RCGL employees.

Cammarata's primary arguments beyond the preclusive effect of the Louisiana court's

judgment are that the provisions are broader than necessary to protect Rimkus's legitimate

business interests in its confidential, proprietary, or secret information and its customer

relationships; that Cammarata has not taken or used any protected information in competing

with Rimkus through his work with U.S. Forensic; and that there is no basis to extend the

contractual period of the bar on competition – which expired mid-May 2008 – when Rimkus

itself delayed in seeking to enforce it.

10

### C.      Rimkus's Confidential, Proprietary, and Trade Secret Information

Rimkus presented testimony from two of its senior vice-presidents, Ralph Graham and Curtis Brown, about what Rimkus considers to be confidential, proprietary, or trade secret information and the steps taken to protect it.  Brown testified that Rimkus considers the following categories of information to be confidential, proprietary, or trade secrets:

1.      The client database.  This database includes client names, location, and contact person.  The database also includes information about the number of projects done for a client, how frequently that client uses Rimkus's services, the type and size of the projects done for that client, and how much time was spent on each project.  Rimkus uses the information for conflicts checks, among other purposes.  Access is restricted; an employee needs special permission to access the database for customers outside that employee's region or responsibility.

Cammarata had access to the client database in the Louisiana office where he worked, although he needed permission to access information about customers outside his region.  Cammarata could not access the database from his own laptop.  Cammarata testified that he did not print out any client list, did not download any client list, and did not take any written client list with him when he left.  Cammarata testified that he believed he had returned all the Rimkus property he had when he left.  He subsequently discovered that he had some reports in a box at his house but did not use them.

11

Some of the information on the Rimkus client database is publicly available in the *Casualty Adjuster's Guide* ("CAG"), which is a directory published for particular regions with the names and addresses of adjusters and others in the insurance business.  The CAG provides only contact information. It provides no information about the projects that an adjuster has given a company such as Rimkus.  The database does contain proprietary and confidential information about Rimkus customers, but it is information that becomes outdated quickly because of personnel changes and other changes that affect the business relationships.

2.   Pricing information.  The evidence shows that Rimkus set its pricing for most jobs  by area.  The prices for most jobs are not negotiated individually but disclosed to clients or prospective clients in the terms and conditions that Rimkus provides.  The terms and conditions do not require a client to keep the pricing information for a project confidential.

Rimkus reviews its prices and changes them annually.  A small group of clients have national agreements with Rimkus, called "master service agreements," which are negotiated annually or even more frequently.  There is no evidence that Cammarata took written information relating to Rimkus's pricing with him when he left.  There is no evidence as to U.S. Forensic's pricing.  There is no evidence as to any use by Cammarata of Rimkus's pricing information in his work for U.S. Forensic.

12

3.     Investigative methods, report formats, and operations manuals.  Graham and Brown both testified that the method Rimkus uses to investigate casualty losses and the format it uses to report the investigation results are confidential. The record, however, showed that neither is confidential, proprietary, or trade secret.  The investigative method used depends most heavily on the area of engineering expertise involved, which is not proprietary to Rimkus.   In investigating, Rimkus, like other firms and individuals engaged in forensic engineering, travels to the location, gathers and reviews the information, and comes to a conclusion about what occurred and why.

Rimkus attempted to characterize the way in which it puts its reports together as proprietary because it begins with a summary of the results and uses words that nonengineers can understand.  This amounts to a claim that using an executive summary and clear words is confidential, proprietary, or secret.  The record and law provide no support for the contention that such report formats are entitled to such protection.  Moreover, the reports are often designed to meet state and federal requirements for expert reports in litigation and are often included in publicly available court files.  Graham testified that Rimkus does not publish its investigative reports or its methods for producing such reports, but once Rimkus's reports are given to clients, they become the clients' property.  With Rimkus's knowledge and involvement, the reports are

often disseminated in presenting insurance claims and in pursuing or defending litigation.

Bell testified that U.S. Forensic has at least fifteen report formats and did not rely on Rimkus's reports in developing the U.S. Forensic report format. There is no basis in the record to conclude that the portions of the Rimkus operations manual describing investigative methods or report formats are confidential, proprietary, or secret.

There was scant testimony as to the Rimkus operations manual. The record is insufficient to conclude that it is confidential, proprietary, or a trade secret. There was no evidence that Cammarata had access to a recent operations manual.

4.      The business plan. Rimkus distributes an annual business plan to its officers, managers, marketers, and sales people. The business plan includes a mission statement and an executive summary that identifies growth areas and key business strategies for the upcoming year. The plan includes historical information, such as analyses of which offices have had the most growth over a one-, three- and five-year period, of the man-hours per file to show changes in particular markets, changes in particular regions, identification of markets other than law firms and insurance companies, and the seminars Rimkus attends for marketing purposes. The plan also includes projections, including staffing requirements for one, three and five years and what new offices should

14

be opened.  The plan includes Rimkus's growth plans and its perception of its own strengths, weaknesses, and opportunities.  The business plan does have confidential, proprietary, and secret information that could be valuable to competitors if obtained before the information became outdated or superseded. The business plan is revised annually.  Each year's business plan is distributed in January.

Cammarata left Rimkus in November 2006.  He had no access to the Rimkus 2007 business plan.  There is no evidence that he took the January 2006 business plan or any earlier business plan with him when he left. Although the business plan does contain sensitive, propriety, and confidential information, it is replaced annually.  There is no evidence that Cammarata had access to the Rimkus 2007 business plan or that he took, used, or disclosed information in the January 2006 or prior business plans in his work for U.S. Forensic.

**D.    Cammarata's Work for Rimkus and for U.S. Forensic**

Cammarata worked primarily in Louisiana while employed by Rimkus.  During his ten years of employment with Rimkus, Cammarata testified that he did no work in any Texas city.  He testified that he worked on two jobs in Gulfport, Mississippi and three jobs in Jackson, Mississippi.  That work was more than three years ago and the jobs each took less than one day.  Cammarata did some work in Alabama when he worked for Rimkus, but not in any of the counties or cities that would be covered by the Rimkus noncompete provision.

15

He worked on two jobs in Florida in areas covered by the Rimkus noncompete provision: one job in Panama City that took one day, and four jobs in Pensacola that took a total of three to four days.  (Docket Entry No. 150 at 14–17).  Most of Cammarata's work outside Louisiana during the time he worked at Rimkus was in Illinois, Arkansas, Nevada, and Lake City, Florida and Gulf Shores and Orange Beach, Alabama.

Since leaving Rimkus and becoming a partner of U.S. Forensic, Cammarata has not worked in any of the places that Rimkus identifies as noncompetition areas.  Cammarata has done one job in Texas since he began U.S. Forensic and none in Mississippi, Alabama, or Florida.  Most of his work and that of U.S. Forensic has been in Louisiana.  Cammarata has talked to the Mississippi State Bar and the Mississippi Claims Association to attempt to get work there in the future, as well as to a group of flood-claim adjusters in Florida.

Bell also testified that most U.S. Forensic clients are in Louisiana and most of U.S. Forensic's work is performed in Louisiana.  U.S. Forensic solicits clients through its website, attending conferences, and telephone calls to clients listed in the *Casualty Adjusters Guide*.  There is no evidence in the record that Cammarata directly solicited Rimkus clients or did work for clients he had worked with at Rimkus outside Louisiana.

## II.    The Effect of the Louisiana Court Ruling

### A.    The Procedural History

On the date he resigned from Rimkus, November 15, 2006, Cammarata sued Rimkus in Louisiana state court.  Cammarata sought a declaratory judgment that the noncompetition and nonsolicitation covenants in the Employment Agreement were unenforceable.  In

16

January 2007, Rimkus sued Cammarata in this federal case, alleging that Cammarata had violated the noncompetition covenant, had solicited business from Rimkus clients, had solicited Rimkus employees, and had misappropriated Rimkus's trade secrets. Rimkus sought to enjoin Cammarata from continuing to work in competition with Rimkus during the period of the noncompetition provision, from soliciting Rimkus employees and customers, and from using Rimkus trade secrets. Rimkus also seeks damages. (Docket Entry No. 1, Ex. A at 4–5).

The Louisiana state court issued an order on March 26, 2007, stating that "it is the ruling of this court that it will apply Louisiana law to the claims of the plaintiffs." (Docket Entry No. 19, Ex. D). On July 26, 2007, the Louisiana state court issued a final judgment that "pursuant to Louisiana law, the covenant not to compete clauses contained in Paragraphs 8(a) and the non-solicitation of customer(s) clauses contained in Paragraphs 8(c) of the respective contracts are invalid and unenforceable." (Docket Entry No. 71, Ex. H). Rimkus appealed. On March 25, 2008, the Louisiana Fifth Circuit Court of Appeal affirmed the trial court's decision that Louisiana law applied to the parties' agreement and that the noncompetition and nonsolicitation covenants were unenforceable. *Bell v. Rimkus Consulting Group, Inc. of La.*, 983 So.2d 927 (La. Ct. App. 2008).

In finding that Louisiana law applied to the 1996 employment agreement despite the choice- of-law clause specifying that Texas law would apply, the Louisiana court of appeals stated:

Forum selection clauses will be upheld unless they contravene strong public policy of the forum in which the suit is brought. LA. C.C. art. 3450. LA. R.S. 23:921A(2), a provision which was added by the legislature in 1999, is an expression of strong Louisiana public policy concerning forum selection clauses. . . .

Louisiana law expressly provides that conventional obligations are governed by the law of the state whose policies would be most seriously impaired if its law were not applied to the issue. Further, issues of conventional obligations may be governed by law chosen by the parties, *except to the extent that law contravenes the public policy of the state whose law would be applicable under La. C.C. art 3537*.

As previously stated herein, Louisiana has a longstanding public policy to prohibit or severely restrict non-competition provisions in employment agreement which curtail an employee's right to earn his livelihood. These agreements are in derogation of the common right, and they must be strictly construed against the party seeking their enforcement. Application of Texas law to this dispute would thwart Louisiana's longstanding public policy and interest in this type of matter.

According to well established Louisiana law and jurisprudence, the forum selection and choice of law provisions contained in the 1995 and 1996 employment contracts are null and void. Thus, the agreements in this case are governed by Louisiana law.

*Bell*, 983 So.2d at 932–33 (citations omitted).[1]

---

[1]Article 3540 of the Louisiana Civil Code states:

All other issues of conventional obligations are governed by the law expressly chosen or clearly relied upon by the parties, except to the extent that law contravenes the public policy of the state whose law would otherwise be applicable under Article 3537.

LA. C.C. art 3450.

Article 3537 of the Louisiana Civil Code states:

Rimkus asked this court for a hearing on the preliminary injunction application on November 5, 2007, almost a year after Cammarata had left his job and begun competing with Rimkus.  A hearing on the preliminary injunction application was set for January 7, 2008. This hearing was rescheduled multiple times due to scheduling conflicts and discovery

---

> Except as otherwise provided in this Title, an issue of conventional obligations is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue.
>
> That state is determined by evaluating the strength and pertinence of the relevant policies of the involved states in the light of: (1) the pertinent contacts of each state to the parties and the transaction, including the place of negotiation, formation, and performance of the contract, the location of the object of the contract, and the place of domicile, habitual residence, or business of the parties; (2) the nature, type, and purpose of the contract; and (3) the policies referred to in Article 3515, as well as the policies of facilitating the orderly planning of transactions, of promoting multistate commercial intercourse, and of protecting one party from undue imposition by the other.

LA. C.C. art. 3557.

> Section 921(A) of the Louisiana Revised Statutes states:
>
> A. (1) Every contract or agreement, or provision thereof, by which anyone is restrained from exercising a lawful profession, trade, or business of any kind, except as provided in this Section, shall be null and void.
>
> (2) The provisions of every employment contract or agreement, or provisions thereof, by which any foreign or domestic employer or any other person or entity includes a choice of forum clause or choice of law clause in an employee's contract of employment or collective bargaining agreement, or attempts to enforce either a choice of forum clause or choice of law clause in any civil or administrative action involving an employee, shall be null and void except where the choice of forum clause or choice of law clause is expressly, knowingly, and voluntarily agreed to and ratified by the employee after the occurrence of the incident which is the subject of the civil or administrative action.

LA. R.S. 23:921(A).

disputes between the parties.  The hearing was held on April 24 and 25, 2008, and May 1, 2008.

### B.    Cammarata's Motions to Dismiss

Cammarata has moved to dismiss Rimkus's claims for breach of the noncompetition and nonsolicitation covenants as barred by the Full Faith and Credit Clause and *res judicata*. (Docket Entry Nos. 71, 105).  Citing 28 U.S.C. § 1738 and *Lance v. Dennis*, 546 U.S. 459 (2006), Cammarata argues that in determining whether to accord a state court's final judgment preclusive effect, a federal court applies the rendering state's preclusion law. Cammarata argues that because the elements of *res judicata* under Louisiana state law are met, "the issue of what law should apply in this case, as well as the determination of the validity of the non-competition and non-solicitation provisions of Mr. Cammarata's 1996 Employment Contract are barred by *res judicata* and must be dismissed." (Docket Entry No. 71 at 6).

Rimkus responds that the preclusive effect of the Louisiana state-court judgment "is limited to the enforceability under Louisiana law of Cammarata's promises not to compete with Rimkus and not to solicit Rimkus customers" because "[t]here was no decision as to Rimkus's claims that Cammarata has breached and continues to breach those promises pursuant to Texas law."  (Docket Entry No. 78 at 1).  Rimkus contends that the Louisiana court "was asked solely to declare whether the noncompete provisions were unenforceable under Louisiana law," not to decide the issue before this court, "whether the provisions of the employment agreement are enforceable under Texas law" as chosen by the parties in the

20

Employment Agreement.  (Docket Entry No. 80 at 3–4).  Rimkus argues that the Louisiana state court's choice-of-law decision was "based on a special Louisiana statute making choice-of-law provisions invalid under special circumstances."  (Docket Entry No. 113 at 6).  Rimkus contends that the Louisiana state court did not decide the issue before this court—whether the choice-of-law provision is valid under Texas choice-of-law principles.  Rimkus argues that because Louisiana and Texas apply different legal standards to the choice-of-law analysis, the legal issues presented in this case are not the same as the issues decided by the Louisiana state court, making *res judicata* inapplicable.

The Full Faith and Credit Clause of the United States Constitution and its implementing statute, 28 U.S.C. § 1738, governs the preclusive effect of a state-court judgment in a subsequent federal action.[2] Final judgments of state courts "have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which

---

[2]The Full Faith and Credit Clause states:

> Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State.  And the Congress may by general Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof.

U.S. CONST. art IV, § 1.

> Title 28 U.S.C. § 1738 states in relevant part:

> The records and judicial proceedings of any court of any . . . State, Territory or Possession . . . shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have now by law or usage in the courts of such State, Territory or Possession from which they are taken.

they are taken." *Id.*  Under Full Faith and Credit, "[a] final judgment in one State, if rendered by a court with adjudicatory authority over the subject matter and persons governed by the judgment, qualifies for recognition throughout the land.  For claim and issue preclusion (res judicata) purposes, in other words, the judgment of the rendering State gains nationwide force."  *Baker v. General Motors Corp*., 522 U.S. 222, 233 (1998) (footnote and citations omitted).

A federal court applies the rendering state's preclusion law to determine whether to accord a state court's final judgment preclusive effect.  28 U.S.C. § 1738; *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984); *see also Norris v. Hearst Trust*, 500 F.3d 454, 460–61 (5th Cir. 2007).  This rule applies even if the rendering state's judgment is based on public policy offensive to the enforcing state.  *Baker*, 522 U.S. at 233–34.  Because enforcing states decide the scope of a judgment, a rendering state can "determine the extraterritorial effect of its judgement . . . only . . . indirectly by prescribing the effect of its judgments within the State."  *Thomas v. Washington Gas Light Co.*, 448 U.S. 261, 270, (1980).  "To vest the power of determining the extraterritorial effect of a State's own . . . judgments in the State itself risks the very kind of parochial entrenchment on the interests of other States that it was the purpose of the Full Faith and Credit Clause and other provisions of Art. IV of the Constitution to prevent."  *Id*. at 272.

Under Louisiana law, "[t]he doctrine of res judicata precludes subsequent litigation when all of the following are satisfied: (1) the judgment is valid; (2) the judgment is final; (3) the parties in the two matters are the same; (4) the cause or causes of action asserted in

the second suit existed at the time of the final judgment in the first litigation; and (5) the cause or causes of action asserted in the second suit arose out of the transaction or occurrence that was the subject matter of the first litigation." *Smith v. State*, 899 So.2d 516, 529–30 (La. 2005) (citations omitted). A final judgment is "conclusive, in any subsequent action between [the plaintiff and defendant], with respect to any issue actually litigated and determined if its determination was essential to that judgment." LA. REV. STAT. § 13:4231 (2006).

The primary dispute affecting the Full Faith and Credit and preclusion analysis in this case is whether the issues decided by the Louisiana state court are the same as the issues before this court, such that the Louisiana judgment precludes further litigation of those issues in this court. Citing several federal cases holding that "a court's ruling on a 'choice-of-law' issue should be afforded *res judicata* effect in any other proceeding between the same parties attempting to relitigate that issue," Cammarata argues that the choice-of-law issue "was fully litigated" in the Louisiana state court and that the *Bell* court found that the Texas choice-of-law provision in the Employment Agreement was unenforceable under Louisiana law. (Docket Entry No. 104 at 1). Rimkus argues that the Louisiana court decided only that Louisiana law applied in Louisiana because under Louisiana law, such noncompetition and nonsolicitation covenants and forum selection or choice-of-law provisions are invalid. Rimkus contends that the Louisiana state court considered whether the contractual choice-of-law provision and the noncompetition and nonsolicitation covenants are enforceable in Louisiana, and that *res judicata* does not preclude this court from considering whether the parties' choice of Texas law is enforceable in a jurisdiction that does not invalidate a choice-

23

of-law or forum-selection clause and, if so, whether the provisions are enforceable under Texas law.

The Louisiana state court's judgment clearly precludes relitigation of the issue of whether the forum-selection and choice-of-law provision, as well as the noncompetition and nonsolicitation covenants, are unenforceable in Louisiana, under Louisiana law. The more difficult issue is whether the Louisiana state court's judgment precludes this Texas court from considering whether Texas choice-of-law rules apply and the enforceability of the contractual choice-of-law provision and the covenants under Texas law.

Courts have struggled with the application of Full Faith and Credit and preclusion in the context of parallel or successive actions involving choice-of-law, forum selection, noncompetition, and nonsolicitation contractual provisions, which are prohibited under the public policy of some states and permitted, with varying restrictions, in other states. "An especially difficult problem is presented by choice-of-law determinations. If successive actions are brought between the same parties . . . in different forums with different choice-of-law principles, the question [of issue preclusion] is more difficult." 18 CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 4417 (2d ed. 2002). In *Keener v. Convergys Corp.*, 342 F.3d 1264 (11th Cir. 2003), the appellate court held that a district court abused its discretion by enjoining the enforcement of an agreement nationwide, when the agreement, invalid under Georgia law and public policy, had selected another state's law. The plaintiff, Keener, had been employed by an Ohio corporation, worked in Illinois and Ohio, and signed an agreement designating Ohio

24

law as its governing law.  Keener then accepted a job at a competitor located in Georgia.  He brought an action in federal district court in Georgia and sought declaratory and injunctive relief as to the validity and enforceability of the agreement.  The appellate court found that the agreement was unenforceable under Georgia law but that the district court should have limited the injunction prohibiting its enforcement to Georgia.  *Id.* at 1269–70.  The court noted that while "Georgia cannot in effect apply its public policy decisions nationwide—the public policy of Georgia is not that everywhere," *id.* at 1269, the agreement "is unenforceable under Georgia law, in Georgia."  *Id.* at 1270.  The court later clarified that this restrictive language referred to Georgia's "power to enforce nationwide, by way of a nationwide injunction, its public policy interests."  *Palmer & Cay, Inc. v. Marsh & McLennan Cos., Inc.*, 404 F.3d 1297, 1308–10 (11th Cir. 2005).  It did not, however, apply to a declaratory judgment that the agreement was unenforceable.  Examining the Georgia law of preclusion in a fashion consistent with Full Faith and Credit – while recognizing that Full Faith and Credit did not apply to the enforceability of an earlier federal-court judgment – the court concluded that the declaratory judgment finding the agreement unenforceable under Georgia law was not limited to Georgia.  *Palmer & Cay*, 404 F.3d at 1308–10.  In that case, the court found Georgia cases specifically holding that under the Georgia law of claim and issue preclusion, a final declaratory judgment with respect to a noncompetition agreement precludes subsequent claims or issues from being relitigated in other states.  *See, e.g.*, *Hostetler v. Answerthink*, 599 S.E.2d 271, 275 (2004).  The parties in this case have not cited similar Louisiana case law.  To the contrary, the Louisiana cases on preclusion emphasize

25

that the issue in the rendering court and the later court must be identical. *See, e.g.*, *Anaya v. Legg Mason Wood Walker, Inc.*, --- So.2d ----, 2008 WL 2080746, at *9 (La. Ct. App. May 14, 2008) ("[O]nce a court decides an issue of fact or law necessary to its judgment, that decision precludes re-litigation *of the same issue* in a different cause of action between the same parties." (emphasis added, quoting *Segal v. Smith, Jones & Fawer, L.L. P.*, 838 So.2d 62, 65 (La. Ct. App. 2003))); *Am. Nat'l Gen. Ins. Co. v. Howard*, 981 So.2d 863, 865 (La. Ct. App. 2008) ("[T]he Court should assess whether the suits involve the same parties, in the same capacities, addressing the same issues, and with the same object.").

For the reasons outlined below, this court does not resolve the issue of whether, under Full Faith and Credit, the Louisiana court's ruling that Louisiana law applies despite the choice of Texas law in the parties' Employment Agreement invalidates the choice-of-law, noncompetition, and nonsolicitation provisions in all states. It is clear, and Rimkus admits, that at a minimum the Louisiana court determined that in Louisiana, the contractual forum-selection, choice-of-law, noncompetition, and nonsolicitation provisions are unenforceable. That ruling is entitled to preclusive effect in this court. This court finds and concludes that even assuming – without deciding – that it is free to analyze whether the noncompetition and nonsolicitation provisions are enforceable under the Texas law the parties chose, Rimkus is not entitled to the preliminary injunction it seeks. As a result, Rimkus's request for a preliminary injunction is denied. Cammarata's motions to dismiss Rimkus's claims as barred by *res judicata* are denied as moot.

## III.  Rimkus's Motion for a Preliminary Injunction

A.      **The Texas Choice-of-Law Analysis**

In diversity cases, district courts apply the choice-of-law rules of the forum state.  *See Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Int'l Interests, L.P. v. Hardy*, 448 F.3d 303, 306 5th Cir. 2006) (citing *Mayo v. Hartford Life Ins. Co.*, 354 F.3d 400, 403 (5th Cir. 2004)).  In the Employment Agreement, Cammarata agreed that disputes arising out of that Agreement would be adjudicated in Harris County, Texas and that Texas law would govern.  (Docket Entry No. 1, Ex. A at 11).  Texas determines the enforceability of choice-of-law provisions under the RESTATEMENT (SECOND) OF CONFLICT OF LAWS ("RESTATEMENT ").  *See DeSantis v. Wackenhut*, 793 S.W.2d 670, 677–78 (Tex. 1990) (stating that because the issue of whether a noncompetition agreement is enforceable "is not 'one which the parties could have resolved by an explicit provision in their agreement,'" section 187(2) governs the enforceability of such an agreement (quoting RESTATEMENT § 187 cmt. d (1971))).

Section 187 of the RESTATEMENT states:

> (1)  The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue.

> (2)  The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either

27

(a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

(b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

(3) In the absence of a contrary indication of intention, the reference is to the local law of the state of the chosen law.

RESTATEMENT § 187. Under section 187(2), the parties' contractual choice of Texas law controls unless 1) Texas has no substantial relationship to the parties or the transaction, or 2) another state has a materially greater interest than Texas in the enforceability of the agreement, and that state's law would apply "in the absence of an effective choice of law by the parties" under section 188.

Section 188 of the RESTATEMENT states:

(1) The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6.

(2) In the absence of an effective choice of law by the parties (see § 187), the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place of contracting,

(b) the place of negotiation of the contract,

28

(c)  the place of performance,

(d)  the location of the subject matter of the contract, and

(e)   the domicil, residence, nationality, place of incorporation and place of business of the parties.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

(3)  If the place of negotiating the contract and the place of performance are in the same state, the local law of this state will usually be applied, except as otherwise provided in §§ 189-199 and 203.

RESTATEMENT § 188.

The record shows that Texas has a substantial relationship to the parties and the transaction.  The parties signed the employment agreement in Texas.  Rimkus is headquartered in Texas.  Both Rimkus and U.S. Forensic advertise and do business in Texas. During his employment with Rimkus, Cammarata received work assignments from Texas and traveled to Texas for training and other employment-related purposes.

Cammarata argues that Louisiana law should apply because the Louisiana court has already determined that Louisiana law, not Texas law, governs the employment agreement. In reaching this decision, the Louisiana court of appeals noted that "Louisiana law expressly provides that conventional obligations are governed by the law of the state whose policies would be most seriously impaired if its law were not applied to the issue." *Bell*, 983 So.2d at 933.  To the extent that the Louisiana state court's judgment does not preclude this court from considering the enforceability of the noncompetition and nonsolicitation covenants

under Texas law, the Texas choice-of-law provision in the Employment Agreement is enforceable. Louisiana does not have a materially greater interest than Texas in the enforceability of the Employment Agreement outside Louisiana.

Because Texas has a substantial relationship with the parties and the transaction and no other state has a materially greater interest in the enforceability of the Agreement, the parties' contractual choice of law is enforceable under the Texas choice-of-law rules.

### B.      Analysis

To obtain a preliminary injunction, Rimkus must show: (1) a substantial likelihood of success on the merits, (2) a substantial threat that plaintiffs will suffer irreparable harm if the injunction is not granted, (3) that the threatened injury outweighs any damage that the injunction might cause the defendant, and (4) that the injunction will not disserve the public interest. *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008). "A preliminary injunction is an 'extraordinary remedy' and should only be granted if the plaintiffs have clearly carried the burden of persuasion on all four requirements." *Id.*; *see also Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002) (citing *Walling v. Metcalfe*, 863 S.W.2d 56, 57 (Tex. 1993); *Sun Oil Co. v. Whitaker*, 424 S.W.2d 216, 218 (Tex. 1968)). An injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard. *Butnaru*, 84 S.W.3d at 204 (citing *Canteen Corp. v. Republic of Tex. Props., Inc.*, 773 S.W.2d 398, 401 (Tex. App.—Dallas 1989, no writ)). A plaintiff seeking a preliminary, as opposed to a permanent, injunction must show that the irreparable injury will occur "during the pendency of the

30

litigation" unless the preliminary injunction issues. *Justin Inds., Inc. v. Choctaw Secs., L.P.*, 920 F.2d 262, 268 n.7 (5th Cir. 1990); *see also Alabama v. United States Army Corps of Eng'rs*, 424 F.3d 1117, 1128 (11th Cir. 2005). For the reasons explained below, the scope of the restrictions defeats Rimkus's showing a substantial likelihood of success on the merits and the delay in seeking enforcement defeats Rimkus's showing of irreparable harm.

### 1. *The Noncompetition Covenant*

Under Texas law, a noncompetition covenant is enforceable "if it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made to the extent that it contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee." TEX. BUS. & COM. CODE § 15.50. For a noncompetition covenant to be ancillary to or part of an otherwise enforceable agreement, the employer must establish that: "(1) the consideration given by the employer in the otherwise enforceable agreement must give rise to the employer's interest in restraining the employee from competing; and (2) the covenant must be designed to enforce the employee's consideration or return promise for the otherwise enforceable agreement." *Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 649 (Tex. 2006) (quoting *Light v. Centel Cellular Co.*, 883 S.W.2d 642, 647 & n.15 (Tex. 1994)). An agreement must give rise to an "interest worthy of protection" by a noncompetition covenant, such as business goodwill and confidential or proprietary information. *Id.* (citing *Light*, 883 S.W.2d at 647). An employer's promise to provide an employee with confidential or proprietary information and

an employee's reciprocal promise not to disclose such confidential information "would meet the requirement that the covenant be designed to enforce the employee's consideration provided in the agreement." *Id.* (citing *Light*, 883 S.W.2d at 647).

a.    *Is the Noncompetition Covenant Ancillary to or Part of an Otherwise Enforceable Agreement?*

Cammarata's employment with Rimkus was at will.  Cammarata had the right to terminate his employment at any time with two weeks of advance notice; Rimkus had the right to terminate Cammarata's employment at any time for "cause" or because of a reduction in work force.  (Docket Entry No. 1, Ex. A at 2–3).  In cases involving at-will employment in which the employer is at liberty to fire the employee before providing the promised confidential or proprietary information, the Texas Supreme Court has held that a noncompetition covenant becomes enforceable if, after the employment agreement is made, "the employer performs his promise under the agreement and a unilateral contract is formed . . . [and] all other requirements under the [Covenants Not to Compete Act] are met." *Alex Sheshunoff*, 209 S.W.3d at 655.

An employer's promise to provide confidential or proprietary information can support an enforceable noncompetition covenant because such a  promise does give rise to the employer's interest in restraining the employee from competing.  *See Alex Sheshunoff*, 209 S.W.3d at 650–61.  In an at-will employment relationship, the employer's promise to provide confidential or proprietary information is executory—and an employees' promise not to compete is unenforceable—until the employer performs by providing the promised

32

information.  *See id.*  The *Alex Sheshunoff* court found that an employer's noncompetition

covenant was enforceable because by the time the employee left his job, the employer had

provided confidential information and specialized training to the employee as promised in

the parties' employment agreement and the employee "had promised in return to preserve the

confidences of his employer."  *Id.*  The covenant prohibited the employee from calling on the

employer's clients for one year after the termination of his employment.

The Employment Agreement stated that in consideration for Cammarata's agreement

not to compete with Rimkus for 18 months after his employment ended, Rimkus would

provide him access "to customer names and files, and the methods and techniques of the

Company, in-company and external training provided by Company, [and] trade secrets and

other proprietary and confidential information."  (Docket Entry No. 1, Ex. A at 4).  The

record shows that during his employment with Rimkus, Cammarata received training and

was given access to confidential information, such as Rimkus's client database.  Because

Rimkus provided Cammarata with promised training and confidential information, by the

time Cammarata left Rimkus, "the [parties' non-competition] agreement had become an

enforceable unilateral contract."  *Alex Sheshunoff*, 209 S.W.3d at 655; *see also Hardy v.*

*Mann Frankfort Stein & Lipp Advisors, Inc.*, No. 01-05-01080-CV, --- S.W.3d ----, 2007 WL

1299661, at *10–11 (Tex. App.—Houston [1st Dist.] May 3, 2007, pet. filed).

> b.    *Are the Noncompetition Covenant's Restrictions Reasonable?*

The noncompetition covenant states that "so long as [Cammarata] is employed by

[Rimkus] and for eighteen (18) months after such employment for any reason," Cammarata

will not compete with Rimkus in the "Designated Geographic Area." (Docket Entry No. 1,

Ex. A at 4). The Employment Agreement defines the "Designated Geographic Area" as

follows:

> any standard metropolitan statistical area (or if a client is not
> located in a standard metropolitan statistical area, then the city,
> town or township in which client is located and the counties or
> parishes contiguous thereto) in which a client or clients of the
> Company are located and from which such client or clients have
> engaged [Rimkus] on not less than five (5) separate files or
> engagements during the five (5) calendar years proceeding
> termination of [Cammarata's] employment with [Rimkus].

(*Id.*, Ex. A at 5).

Rimkus explained that prohibiting competition only in areas where it had done five

projects in the prior five years was an effort to impose a reasonable geographic limitation on

the prohibition. Doing five projects in the preceding five years meant that Rimkus had an

ongoing association with one or more clients or was building such an association in the area.

The geographic limitation was a narrower approach than an industry-wide prohibition.

Rimkus introduced evidence as to what "designated geographic areas" were covered in

Florida, Mississippi, Alabama, and Texas. The record showed that U.S. Forensic had an

ability to compete in these states. The record also showed that U.S. Forensic and Cammarata

have done very little work outside Louisiana since U.S. Forensic began operating in

November 2006.

Texas courts have found that noncompetition covenants that cover areas where the

employee did not actually work or clients whom the employee did not actually serve during

his employment are overbroad and unenforceable.  *See, e.g.*, *Wright v. Sport Supply Group, Inc.*, 137 S.W.3d 289, 298 (Tex. App.—Beaumont 2004, no pet.) ("[A] covenant not to compete that extends to clients with whom a salesman had no dealings during his employment is unenforceable.") (citing *John R. Ray & Sons, Inc. v. Stroman*, 923 S.W.2d 80, 85 (Tex. App.—Houston [14th Dist.] 1996, writ denied)); *Butler v. Arrow Mirror & Glass, Inc.*, 51 S.W.3d 787, 793–94 (Tex. App.—Houston [1st Dist.] 2001, no pet.) ("A covenant not to compete with a broad geographical scope is unenforceable, particularly when no evidence establishes the employee actually worked in all areas covered by the covenant.") (citing *Evan's World Travel, Inc. v. Adams*, 978 S.W.2d 225, 232–33 (Tex. App.—Texarkana 1998, no pet.); *Evans*, 978 S.W.2d at 233 (finding that a noncompetition covenant that restricted the employee from working in "any State in which [the employer] . . . has conducted its business'" during the employee's term of employment was "greater than necessary to protect [the employer's] legitimate business interest); *accord Curtis v. Ziff Energy Group, Ltd.*, 12 S.W.3d 114, 119 (Tex. App.—Houston [14th Dist.] 1999, no pet.) ("Generally, a reasonable area for purposes of a covenant not to compete is considered to be the territory in which the employee worked while in the employment of his employer" (citing *Zep Mfg. Co. v. Harthcock*, 824 S.W.2d 654, 660 (Tex. App.—Dallas 1992, no pet.))).

The record contains lists of the cities and standard metropolitan statistical areas that Rimkus asserts are covered by the Employment Agreement.  (Plaintiff's Exhibits 2, 3). These lists  include multiple cities and counties in Texas, Mississippi, Alabama, and Florida. Cammarata testified, and Rimkus did not dispute, that he worked primarily in Louisiana

while employed by Rimkus.  (Docket Entry No. 150 at 14).  Cammarata testified that during his ten years of employment with Rimkus, he did no work in Texas; he did two jobs in Gulfport, Mississippi and three jobs in Jackson, Mississippi, each job taking less than one day; he did no work in any of the listed Alabama counties or cities that would be covered by the noncompetition provision; he did one job in Panama City, Florida that took one day; and he did four jobs in Pensacola, Florida that took a total of three to four days.  (*Id.* at 14–17).  Cammarata also performed a total of approximately ten jobs during the ten years in locations outside Louisiana including Chicago, Illinois; Arkansas; Las Vegas, Nevada; Lake City, Florida; and Gulf Shores and Orange Beach, Alabama.  (*Id.* at 47).

Since leaving Rimkus and becoming a partner of U.S. Forensic, Cammarata has not worked in the places that Rimkus identifies as noncompetition areas.  Cammarata has done one job in Texas since he began U.S. Forensic, but none in Mississippi, Alabama, or Florida. Most of his work and that of U.S. Forensic generally has been in Louisiana.  Cammarata has talked to the Mississippi State Bar and the Mississippi Claims Association to attempt to get work there in the future, as well as to a group of flood-claim adjusters in Florida, but his work and that of U.S. Forensic has largely been confined to Louisiana.

Because the Employment Agreement covers many areas outside Louisiana where Cammarata did not work while employed by Rimkus, under Texas law the noncompetition covenant is broader in geographical scope than necessary to protect Rimkus's legitimate business interests.  *See Wright*, 137 S.W.3d at 298; *Butler v. Arrow Mirror & Glass, Inc.*, 51 S.W.3d at 793–94; *Curtis v. Ziff Energy Group, Ltd.*, 12 S.W.3d 114; *Evans*, 978 S.W.2d at

36

233; *John R. Ray & Sons*, 923 S.W.2d at 85. The noncompetition prohibition does not merely restrict Cammarata from working where he previously worked for Rimkus, but every place where Rimkus has done five jobs in the previous five years.

Instead of invalidating overbroad covenants not to compete, Texas courts attempt to reform the unenforceable provisions to make them reasonable as to time, geographical area, or scope of activity to be restrained. *See Butler*, 51 S.W.3d at 794. In this case, to be reasonable, the geographic range of a reformed noncompetition covenant would be limited to certain cities in Mississippi and Florida.

Cammarata also challenges the 18-month period as unreasonable. Rimkus asks this court not only to find that period reasonable, but to apply it from the date the injunction is issued rather than from the date of Cammarata's resignation from Rimkus.

Texas courts have upheld covenants restricting competition for periods between one and two years, *see, e.g.*, *Alex Sheshunoff*, 209 S.W.3d at 657 (enforcing covenant prohibiting employee from providing consulting services to employer's clients for one year and from selling competing product for two years); *Property Tax Assocs. v. Staffeldt*, 800 S.W.2d 349, 350 (Tex. App.—El Paso, writ denied) (finding two-year restriction to be reasonable), but only if the evidence showed a need for such a lengthy period. In this case, even if the evidence supported an 18-month period, the delay in seeking an injunction to enforce the prohibition weighs heavily against its issuance. The 18-month period from Cammarata's departure from Rimkus expired in mid-May 2008. The issue is whether the 18-month period

37

was reasonable and whether this court should use its equitable authority to extend the prohibition to 18 months from the present date.

Both Graham and Brown testified on behalf of Rimkus that Rimkus's business plan, pricing information, client information, and operations manual are considered confidential, proprietary, and secret.  Both testified that this information would give a competitor an advantage and that Cammarata had access to this information during his employment.

The business plan does contain confidential, proprietary, and trade-secret information. It contains Rimkus's business goals and strategies for the next three- and five-year periods, as well as man-hour data forecasts, efficiency analyses, and staffing requirements.  Brown testified that the business plan is revised annually and that each year's business plan is distributed in January.  Cammarata left Rimkus in November 2006 and had no access to the Rimkus 2007 business plan.

Pricing information is also confidential but revised at least annually.  Graham testified that Rimkus's pricing information is revised annually and that the pricing structure for master service agreements for certain clients is subject to revision even more frequently.

Rimkus's client database contained confidential information, mixed with publicly available information from sources such as the *Casualty Adjuster's Guide.*  That information is changed to reflect new jobs, personnel changes, and other events.  That information also becomes outdated in approximately 18 months.

Some of the information Rimkus characterized as confidential or proprietary does not fit within this category under Texas law.  Rimkus asserted that its investigation methods and

38

its report formats are confidential and proprietary, but the record shows that the way in which Rimkus does its investigations and the format in which it presents its reports are not confidential, proprietary, or a trade secret.  Rimkus relies on professional engineers to apply the techniques and skills of the relevant engineering discipline.  Although Rimkus argued that its use of an "executive summary" in the beginning of its reports and its effort to use nontechnical language was confidential and proprietary, the evidence does not support this assertion.  Not only are these common characteristics of many kinds of reports, they are not kept confidential.  Rimkus reports are presented to clients and become the clients' property. Rimkus reports are often disseminated to parties to insurance disputes and litigation.  Every time a report is filed in court, the format is publicly disclosed.

Rimkus also claimed that its operations manual was confidential and proprietary. There was inadequate information presented to conclude that the operations manual is confidential, proprietary, or a trade secret.  Moreover, Cammarata testified that Rimkus collected its operations manual from "any employees that had them" in 2001 or 2002 and that he never received another copy.  (Docket Entry No. 150 at 28).

The record showed that Rimkus's business plan, pricing terms, and client database are confidential, proprietary, and contain trade secret information.  The record also showed that these materials and information become outdated in approximately 12 to 18 months and no longer provide a competitive advantage.  Even if the 18-month period from the date Cammarata left Rimkus was a reasonable period for the noncompetition clause based on the need to protect confidential and proprietary information, Rimkus has not shown that it is

39

entitled to a preliminary injunction enforcing that clause for 18 months from the present date. The record shows that Rimkus delayed in seeking a preliminary injunction to prevent Cammarata from competing against Rimkus. Cammarata resigned from Rimkus on November 15, 2006. On same day, he and the two other cofounders of U.S. Forensic, Gary Bell and Mike DeHarde, sued Rimkus in Louisiana state court, seeking a declaratory judgment that the noncompetition covenant in the Employment Agreement they had signed was unenforceable. Rimkus did not file suit against Cammarata to enforce the noncompetition and nonsolicitation covenants until January 30, 2007. Rimkus did not request a preliminary injunction hearing in this court until November 5, 2007, almost one year after Cammarata resigned and began competing through U.S. Forensic. After a hearing was set for January 7, 2008, it was continued multiple times due to requests by both parties and discovery disputes.[3] The hearing took place on April 24 and 25 and May 1, 2008, two weeks before the covenant's expiration date.

Rimkus's delay in seeking injunctive relief in this court weighs heavily against a finding of irreparable injury. *See Gonannies, Inc. v. Goaupair.Com, Inc.*, 464 F. Supp. 2d 603, 609 (N.D. Tex. 2006) ("Delay in seeking a remedy is an important factor bearing on the

---

[3] Cammarata asked this court to continue the hearing until January 10, 2008. (Docket Entry No. 54). Rimkus then asked this court to continue the hearing until February 4, 2008. (Docket Entry No. 63). The hearing was set for February 15, 2008. (Docket Entry No. 65). On February 15, 2008, this court heard discovery disputes between the parties and rescheduled the preliminary injunction hearing for March 24, 2008 or April 1, 2008, depending on this court's docket. (Docket Entry No. 91). This court subsequently held multiple discovery hearings by telephone and in person on March 12, 14, and 21, 2008 and April 15, 2008. (Docket Entry Nos. 101, 109, 110). At the March 24, 2008 hearing, the preliminary injunction hearing was reset for April 24, 2008. (Docket Entry No. 110).

need for a preliminary injunction.  Absent a good explanation, a substantial period of delay militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief.  Evidence of an undue delay in bringing suit may be sufficient to rebut the presumption of irreparable harm.") (citation omitted). Rimkus's delay in seeking injunctive relief in this court consumed most of the covenants' stated period.  *See Gaylord Broadcasting Co. v. Cosmos Broadcasting Co.*, 746 F.2d 251, 254 (5th Cir. 1984) (holding that an employer "cannot enforce specifically the terms of the now-lapsed covenant to compete" because the employer's right to enforce the covenant had already expired); *MedX, Inc. v. Ranger*, 788 F. Supp. 288, 291 (E.D. La. 1992) (noting that "[t]here is substantial support among the Federal courts of appeals for the proposition that it is inappropriate to grant an injunction to enforce an agreement by a former employee not to compete after the period during which the employee agreed not to compete has expired" (internal punctuation omitted) (citing *Econ. Lab., Inc. v. Donnolo*, 612 F.2d 405, 408 (9th Cir. 1979)).

Cammarata points out that in the declaratory-judgment action in Louisiana state court, Rimkus requested a preliminary injunction against Mike DeHarde on January 9, 2007 and asked that its preliminary injunction request be set for hearing immediately.  On January 10, 2007, the Louisiana district court set a hearing on Rimkus's request for injunctive relief for January 17, 2008.  Cammarata also notes that on February 27, 2007, Rimkus sought and obtained an *ex parte* temporary restraining order against Gary Bell in a separate Texas state-court action.  Rimkus's actions in seeking timely injunctive relief against the other founders

41

of U.S. Forensic highlight Rimkus's delay in pursuing injunctive relief against Cammarata in this suit. These actions are consistent with the fact that U.S. Forensic and Cammarata are basically doing business in Louisiana; that their competitive activities in Texas, Alabama, Florida, and Mississippi are very limited; and that there was no threat of irreparable harm to Rimkus from those activities during the period of the contractual restrictions on competition and on solicitation.

Rimkus did not file this suit against Cammarata for two and a half months after Cammarata sought a declaratory judgment in Louisiana state court as to the Employment Agreement's enforceability. Rimkus did not request a preliminary injunction hearing in this suit until approximately one year after Cammarata had resigned and begun working for U.S. Forensic. The hearing was continued for at least three months due to requests by both parties and discovery disputes. To enforce the 18-month restriction from the present date is not necessary to protect Rimkus's confidential, proprietary, or secret information. The record shows that this information is now outdated and cannot provide Cammarata an unfair competitive advantage. There is no justification to extend the prohibition on competition beyond the contractual period based on litigation delay.

Based on the record, Rimkus's application for a preliminary injunction enforcing the noncompetition covenant in the parties' Employment Agreement is denied.

### 2. *The Nonsolicitation Covenants*

Although this court considers the covenants not to solicit either Rimkus employees or Rimkus customers separately from the covenant not to compete, the nonsolicitation

42

provisions in the parties' Employment Agreement form part of the noncompetition covenant and fall under the heading, "Covenant not to Compete."  To the extent that the nonsolicitation provisions constitute a separate covenant, such a nonsolicitation covenant is also a restraint on trade and competition and must meet the criteria of section 15.50 of the Texas Business and Commerce Code to be enforceable.  *See Shoreline Gas, Inc. v. McGaughey*, No. 13-07-364-CV, 2008 WL 1747624, at \*10 (Tex. App.—Corpus Christi April 17, 2008, no pet.) ("[N]on-solicitation agreements are subject to the same analysis as covenants not to compete. . . . A non-solicitation agreement is sufficiently analogous to a covenant not to compete such that the provisions of the Act must apply fully to such agreements.") (citations omitted); *Miller Paper Co. v. Roberts Paper Co.*, 901 S.W.2d 593, 599–600 (Tex. App.—Amarillo 1995, no pet.) ("Both [nonsolicitation covenants and noncompetition covenants] prevent the employee from soliciting customers or business enjoyed by the employer.  Both contain geographic and durational parameters.  Both effectively restrict competition.  Moreover, both allegedly serve to protect goodwill."); *accord Guy Carpenter & Co., Inc. v. Provenzale*, 334 F.3d 459, 465 (5th Cir. 2003) (noting that "non-solicitation covenants restrain trade and competition" and are governed by section 15.50).  The nonsolicitation covenants will be enforceable if they are "ancillary to or part of an otherwise enforceable agreement at the time the agreement" and contain reasonable "limitations as to time, geographical area, and scope of activity to be restrained" that "do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee."  TEX. BUS. & COM. CODE § 15.50.

>        a.      *Are the Nonsolicitation Covenants Ancillary to or Part of an*
>                *Otherwise Enforceable Agreement?*

As noted above, because Rimkus provided Cammarata with training and confidential information, by the time Cammarata left Rimkus, "the [parties' nonsolicitation] agreement had become an enforceable unilateral contract." *Alex Sheshunoff*, 209 S.W.3d at 655.

>        b.      *Are the Nonsolicitation Covenant Restrictions Reasonable?*

The nonsolicitation covenant states as follows:

>    b.     Employee agrees that after terminate of employment with
>           the Company, he will not, directly or indirectly, solicit,
>           employ or in any other fashion, hire persons who are, or
>           were, employees, officers or agents of the Company,
>           until such person has terminated his employment with the
>           Company for a period of eighteen (18) months);
>
>    c.     Employee agrees, that for a period lasting until eighteen
>           (18) months after termination of his employment, he will
>           not at any time, directly or indirectly, solicit the
>           Company's customers . . . .

(Docket Entry No. 1, Ex. A at 5).

Based on the record and applicable Texas law, the covenant not to solicit Rimkus's customers is unreasonable because it applies to all Rimkus customers. Texas courts have held that nonsolicitation covenants that cover clients with whom the employee had no contact while working for the employer are overbroad and not reasonably necessary to protect the employer's legitimate business interest in maintaining its client base. *See Peat Marwick Main & Co. v. Haass*, 818 S.W.2d 381, 387–88 (Tex. 1981) ("Inhibiting departing partners from engaging accounting services for clients who were acquired after the partner left, or

with whom the accountant had no contact while associated with the firm, does not further and is not reasonably necessary to protect that interest [in preventing the former partner or employee from establishing rapport with the clients and upon termination taking part of the client base with him].  We hold that the [nonsolicitation] provision is overbroad and unreasonable."); *Hardy v. Mann Frankfort Stein & Lipp Advisors, Inc.*, --- S.W.3d ----, 2007 WL 1299661, at *12 (Tex. App.—Houston [1st Dist.] May 3, 2007, pet. filed) (finding that a restrictive covenant preventing an employee from calling or soliciting "any Clients of the Firm" for 24 months to be overbroad because it did not "require a connection between the clients and the person who is restricted by the covenant"); *Wright v. Sport Supply Group, Inc.*, 137 S.W.3d 289, 298 (Tex. App.—Beaumont 2004, no pet.) (refusing to enforce an agreement that prohibited an employee from doing business with the employer's "customers, suppliers, clients, licensors, licensees, distributors, dealers, or independent salespersons" because the agreement was not limited "just to customers with whom [the employee] had dealings while he was employed by [the employer]"); *Hargrave v. Giuffre*, No. 09-98-007 CV, 1999 WL 1270783, at *1 (Tex. App.—Beaumont Dec. 30, 1999, no pet.) (finding a nonsolicitation covenant to be unreasonable "with regard to the scope of activity to be restrained in that it is not limited to those clients whom [the employee] serviced or had dealings with while at the agency"); *John R. Ray & Sons, Inc. v. Stroman*, 923 S.W.2d 80, 85 (Tex. App.—Houston [14th Dist.] 1996, writ denied) ("In the case of covenants applied to a personal services occupation . . . a restraint on client solicitation is overbroad and unreasonable when it extends to clients with whom the employee had no dealings during his

45

employment.") (citations omitted).  Because the covenant not to solicit customers extends to all Rimkus clients, the covenant is broader than necessary to protect Rimkus's legitimate business interest in protecting its client base and is unenforceable.

The record does not support this court's reformation of the nonsolicitation covenant. The record shows that Cammarata's work for Rimkus involved primarily Louisiana clients and the nonsolicitation prohibition is unenforceable in Louisiana.  The record also shows no basis for extending the prohibition beyond the contractual period.

The record also shows that the Rimkus or RCGL employees Cammarata solicited or employed for U.S. Forensic live and work in Louisiana.  The covenant not to solicit is unenforceable in Louisiana.  Because Cammarata solicited few clients and solicited no Rimkus employees outside Louisiana, Rimkus has failed to show either a probable right to the preliminary injunctive relief it seeks or a probable, imminent, irreparable injury.

Based on the current record, Rimkus's request for a preliminary injunction enforcing the nonsolicitation provisions in the parties' Employment Agreement is denied.

### 3.    *Trade Secrets and Confidential Information*

"To state a claim for trade secret misappropriation under Texas law, a plaintiff must (1) establish that a trade secret existed; (2) demonstrate that the trade secret was acquired by the defendant through a breach of a confidential relationship or discovered by improper means; and (3) show that the defendant used the trade secret without authorization from the plaintiff." *Gen. Univ. Sys., Inc. v. HAL, Inc.*, 379 F.3d 131, 149–50 (5th Cir. 2004).  The parties primarily dispute whether the information that Rimkus claims is confidential is

46

entitled to trade secret protection and whether Cammarata used this information without Rimkus's authorization.  These two issues are examined separately below.

### a.    The Existence of a Trade Secret

At the preliminary injunction stage, "the trial court . . . determines whether the applicant [for preliminary injunction] has established that the information is entitled to trade secret protection until a trial on the merits."  *Fox v. Tropical Warehouses, Inc.*, 121 S.W.3d 853, 858 (Tex. App.—Forth Worth 2004, no pet.).  A preliminary injunction applicant meets its burden by showing a probability of success in proving that its confidential information is entitled to trade secret protection.  *Mabrey v. SandStream, Inc.*, 124 S.W.3d 302, 311 & n.21 (Tex. App.—Fort Worth 2003, no pet.).

The Texas Supreme Court has stated that "a trade secret is any formula, pattern, device or compilation of information which is used in one's business and presents an opportunity to obtain an advantage over competitors who do not know or use it."  *In re Bass*, 113 S.W.3d 735, 739 (Tex. 2003) (quoting *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 455 (Tex. 1994)).  To determine whether there is a trade secret protected from disclosure or use, a court must examine six "relevant but nonexclusive" criteria: "(1) the extent to which the information is known outside the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken to safeguard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated

by others." *Gen. Univ. Sys.*, 379 F.3d at 150 (citing *In re Bass*, 113 S.W.3d at 739–40); *see also Computer Assocs. Int'l, Inc.*, 918 S.W.2d at 455; *T-N-T Motorsports, Inc. v. Hennessey Motorsports, Inc.*, 965 S.W.2d 18, 22 (Tex. App.—Houston [1st Dist.] 1998, pet. dism'd). Although the party claiming a trade secret need not satisfy all six factors "'because trade secrets do not fit neatly into each factor every time,'" *Gen. Univ. Sys.*, 379 F.3d at 150 (citing *In re Bass*, 113 S.W.3d at 740), it is "the burden of the party claiming secrecy status to prove secrecy," *Stewart & Stevenson Servs., Inc. v. Serv-Tech, Inc.*, 879 S.W.2d 89, 99 (Tex. App.—Houston [14th Dist.] 1994, writ denied).

Customer lists, pricing information, client information, customer preferences, buyer contacts, and marketing strategies have all been recognized as trade secrets. *See Global Water Group, Inc. v. Atchley*, 244 S.W.3d 924, 928 (Tex. App.—Dallas 2008, pet. denied) (citing *T-N-T Motorsports*, 965 S.W.2d at 22). The record shows that Rimkus has expended significant time, effort, and money to develop and protect the information contained in its client database, pricing structure, and annual business plan. Brown testified that Rimkus's customer database contains information about all of Rimkus's jobs and clients. The database details each client's location and contact person, how frequently the clients use Rimkus's services, and information about each project performed for that client, including the project type, the resources devoted to the project, and how much the client was billed. Employee access to Rimkus's customer database is limited.

Brown also testified that Rimkus revises its pricing information annually in committee meetings at which attendance is limited. Rimkus's pricing varies based on the type of project

48

and the client's location.  Rimkus also has national pricing agreements with specific clients that may be revised more often.  Because forensic engineering firms compete by price, a firm's pricing information would give a competitor an advantage in bidding for projects.

Brown testified that Rimkus distributes a business plan annually to its managerial employees.  The plan contains Rimkus's marketing strategies for the next one to five years and includes a synopsis of the state of Rimkus's business and of the industry as a whole.  It contains a mission statement and an executive summary that identifies growth areas and potential new niche markets, key business strategies for the upcoming year, man-hour data forecasts, market and efficiency analyses, and a three-year and five-year outlook for Rimkus's business.

The record shows that Rimkus's customer database, pricing information, and the marketing strategies contained in its annual business plan are confidential and not widely known to others in the industry.  *See Trilogy Software, Inc. v. Callidus Software, Inc.*, 143 S.W.3d 452, 467 (Tex. App.—Austin 2004, pet. denied) (noting that trade secrets are "not generally known or readily ascertainable by independent investigation") (citation omitted). Rimkus takes significant measures to safeguard this information, which would provide competitors with an advantage in the field.  Rimkus has cultivated its customer database, pricing structure, and market strategies with significant effort, and it would be difficult for another firm to acquire or duplicate the same information.  Rimkus has shown that its customer database, pricing information, and annual business plan are entitled to trade secret protection.

49

Rimkus's investigative methods and report formats are, by contrast, not trade secrets under Texas law. Graham testified that there are no industry standards for evaluating property damage in forensic engineering. Rimkus was one of the first companies to offer forensic engineering services. On cross-examination, Graham admitted that the investigative methods used for a particular job depend on the area of expertise required for the project and an investigator's substantive knowledge in that area. Rimkus has not shown that its investigative methods are proprietary, rather than a product of the knowledge, skill, and experience common in the industry. *See Trilogy*, 143 S.W.3d at 467 ("[I]nformation that is generally known and readily available is not protectable."). Rimkus has not shown that its investigative methods required extensive development, such that a competitor would have difficulty in developing similar methods. Based on the current record, Rimkus's investigative methods do not warrant trade secret protection. Nor does the record support an inference that Rimkus's investigative report format constitutes a protectable trade secret. Graham testified that in response to client preferences, Rimkus developed a report format that first provides a brief summary of the investigation's findings and conclusions before providing a more detailed explanation of the investigation. The reports also use simplified language that laypeople will be able to understand better. Graham distinguished this format from other engineering reports that provide an abstract of the investigation at the beginning and do not discuss the investigation's findings and conclusions until the end. Although Graham testified that Rimkus's report format is not published, he admitted that he has seen reports from other competitors in the industry that are similar to Rimkus's reports. He also

testified that Rimkus's reports can and have been used in litigation and that they are designed to comply with procedural rules for expert reports. Rimkus points to no evidence showing that its report format is unique or unknown to others in the industry, such that competitors would have difficulty in duplicating a similar format. *See Trilogy*, 143 S.W.3d at 167. Rimkus has not shown that its report format is entitled to trade secret protection.[4]

> c.     *Did Cammarata Use Rimkus's Trade Secrets Without Authorization?*

Although Rimkus has shown that its customer database, pricing information, and annual business plan are entitled to trade-secret protection, Rimkus has failed to show a probable right to the injunctive relief it seeks there is no evidence that Cammarata or U.S. Forensic have used Rimkus's trade secrets.  Rimkus primarily argues that U.S. Forensic could not have grown as quickly as it did if Cammarata had not taken and used Rimkus's trade secrets and confidential information.  Brown testified that it took Rimkus three years to perform a thousand jobs and eleven years to open six offices.  In contrast, U.S. Forensic has opened six service locations within approximately one and a half years.

U.S. Forensic's growth does not support the argument that Cammarata used Rimkus's trade secrets without authorization.  As both Graham and Brown acknowledged, the industry has grown significantly since Rimkus first started doing business in 1983.  U.S. Forensic

---

[4] Rimkus asserted that its operations manual constitutes confidential information.  The record is sparse as to the information contained in the manual.  The only evidence in the record is that Cammarata did not have access to such a manual after 2002.  There is no basis to find the manual a trade secret or that it could provide a competitive advantage to Cammarata or U.S. Forensic.

began operating at a time and in an area of the country—the Gulf Coast—that had a large demand for forensic engineering services because of natural-disaster-related claims and litigation. Rimkus points to no evidence showing that U.S. Forensic's growth is a result of Cammarata's unauthorized use of Rimkus's trade secrets, rather than a result of the growth of the industry as a whole and heavy regional demand for such services.

Much of Rimkus's confidential information is time-sensitive and becomes outdated within 12 to 18 months. Cammarata testified, and Rimkus did not dispute, that he did not download or otherwise take any information from Rimkus's customer database or, after resigning from Rimkus, immediately record his recollections as to which adjusters listed in the *Casualty Adjusters Guide* were Rimkus clients. Cammarata further testified that he did not take from Rimkus any pricing information or the 2006 business plan when he left Rimkus in November 2006. He stated that he had no access to Rimkus's 2007 business plan, which Rimkus distributed to its employees in January 2007. Rimkus revises its business plan and pricing information annually. Bell testified that U.S. Forensic has expended significant effort to develop its own client base. Bell stated that he relies heavily on the *Casualty Adjusters Guide*, which is published annually, and that he makes calls to adjusters listed in the Guide "every day." Bell further testified that he researches potential customers on the Internet, including web pages maintained by state governments that list licensed insurers and adjusters. U.S. Forensic sends representatives to trade shows and industry conferences and maintains a website that provides a 1-800 phone number.

The obligation not to use confidential or proprietary information acquired during an employment relationship in a manner adverse to the employer does not bar a former employee from using the general knowledge, skill, and experience that the employee acquired during the employment to compete with the employer. *See Sharma v. Vinmar Int'l, Ltd.*, 221 S.W.3d 405, 425 (Tex. App.—Houston [14th Dist.] 2007, no pet.); *Anderson Chem. Co., Inc. v. Green*, 66 S.W.3d 434, 442 (Tex. App.—Amarillo 2001, no pet.).  Rimkus has not shown that Cammarata used Rimkus's trade secrets without authorization.

Based on the current record, Rimkus's request for a preliminary injunction preventing Cammarata from possessing, distributing, or using Rimkus's trade secrets or proprietary or confidential information is denied.

## IV.    The Remaining Motions

Rimkus's motions to strike certain exhibits in Cammarata's exhibit list and to strike two witnesses in Cammarata's witness list are denied as moot.  Cammarata did not attempt to admit the exhibits in question and the witnesses did not testify at the preliminary injunction hearing.

Rimkus's motion for a default judgment against U.S. Forensic is denied as moot.  U.S. Forensic has filed an answer.

Rimkus's motion for attorneys' fees incurred in a mediation attempt is denied. Rimkus has not shown a sufficient basis to support the award of attorneys' fees.

Rimkus's motion to strike Cammarata's counterclaim as untimely is granted. Cammarata filed his answer to Rimkus's original complaint on January 3, 2008.  He filed his

counterclaim asserting a cause of action under TEX. BUS. & COM. CODE § 15.51(c) against Rimkus on April 21, 2008.  In his counterclaim, Cammarata seeks attorneys' fees incurred in defending an action to enforce noncompetition and nonsolicitation covenants that the party seeking enforcement knew contained unreasonable restrictions as to the time, geographical area, and scope of activity to be restrained.  Cammarata's counterclaim is compulsory under Federal Rule of Civil Procedure 13(a) because it arises out of the same transaction or occurrence that is the subject matter of Rimkus's claim.  Under Federal Rule of Civil Procedure 13, a party must state compulsory counterclaims in the party's pleading.  Because Cammarata failed timely to amend his answer to assert his counterclaim as a matter of course under Rule 15(a)(1), he had to seek Rimkus's written consent or this court's leave to amend his answer under Rule 15(a)(2) and failed to do so.  Rimkus's motion to strike Cammarata's counterclaim is granted.

## V.     Conclusion

Rimkus's request for a preliminary injunction is denied.  Cammarata's motions to dismiss Rimkus's claims are denied as moot.  Rimkus's motions to strike are denied as moot. Rimkus's motion for default judgment is denied as moot.  Rimkus's motion for attorney's fees is denied.  Rimkus's motion to strike Cammarata's counterclaim is granted.

Cammarata's motion to abstain is denied.

SIGNED on August 13, 2008, at Houston, Texas.

Lee H. Rosenthal
United States District Judge