**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| RIMKUS CONSULTING GROUP, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-07-0405 |
| | § | |
| NICKIE G. CAMMARATA, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND OPINION

Spoliation of evidence—particularly of electronically stored information—has assumed a level of importance in litigation that raises grave concerns. Spoliation allegations and sanctions motions distract from the merits of a case, add costs to discovery, and delay resolution. The frequency of spoliation allegations may lead to decisions about preservation based more on fear of potential future sanctions than on reasonable need for information. Much of the recent case law on sanctions for spoliation has focused on failures by litigants and their lawyers to take adequate steps to preserve and collect information in discovery.[1] The spoliation allegations in the present case are different. They are allegations of willful misconduct: the intentional destruction of emails and other electronic information at a time when they were known to be relevant to anticipated or pending litigation. The alleged spoliators are the plaintiffs in an earlier-filed, related case and the defendants in this case.

---

[1] *See, e.g.*, *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, No. 05 Civ. 9016, 2010 WL 184312 (S.D.N.Y. Jan. 15, 2010).

The allegations include that these parties—referred to in this opinion as the defendants—concealed and delayed providing information in discovery that would have revealed their spoliation.  The case law recognizes that such conduct is harmful in ways that extend beyond the parties' interests and can justify severe sanctions.[2]

Given the nature of the allegations, it is not surprising that the past year of discovery in this case has focused on spoliation.  The extensive record includes evidence that the defendants intentionally deleted some emails and attachments after there was a duty to preserve them.  That duty arose because the defendants were about to file the related lawsuit in which they were the plaintiffs.  The individuals who deleted the information testified that they did so for reasons unrelated to the litigation.  But the individuals gave inconsistent testimony about these reasons and some of the testimony was not supported by other evidence.  The record also includes evidence of efforts to conceal or delay revealing that emails and attachments had been deleted.  There is sufficient evidence from which a reasonable jury could find that emails and attachments were intentionally deleted to prevent their use in anticipated or pending litigation.

The record also shows that much of what was deleted is no longer available.  But

---

[2]  *See, e.g.*, *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir. 2006) ("Dismissal is an available sanction when 'a party has engaged deliberately in deceptive practices that undermine the integrity of judicial proceedings' because 'courts have inherent power to dismiss an action when a party has willfully deceived the court and engaged in conduct utterly inconsistent with the orderly administration of justice.'" (quoting *Anheuser-Busch, Inc. v. Natural Beverage Distribs.*, 69 F.3d 337, 348 (9th Cir. 1995))); *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001) ("The policy underlying this inherent power of the courts [to impose sanctions for spoliation] is the need to preserve the integrity of the judicial process in order to retain confidence that the process works to uncover the truth.").

some of the deleted emails were recovered from other sources.  While some of the recovered deleted emails were adverse to the defendants' positions in this litigation, some were favorable to the defendants.  The record also shows that despite the deletions of emails subject to a preservation duty, there is extensive evidence available to the plaintiff to prosecute its claims and respond to the defenses.  These and other factors discussed in more detail below lead to the conclusion that the most severe sanctions of entering judgment, striking pleadings, or imposing issue preclusion are not warranted.  Instead, the appropriate sanction is to allow the jury to hear evidence of the defendants' conduct—including deleting emails and attachments and providing inaccurate or inconsistent testimony about them—and to give the jury a form of adverse inference instruction.  The instruction will inform the jury that if it finds that the defendants intentionally deleted evidence to prevent its use in anticipated or pending litigation, the jury may, but is not required to, infer that the lost evidence would have been unfavorable to the defendants.  In addition, the plaintiff will be awarded the fees and costs it reasonably incurred in identifying and revealing the spoliation and in litigating the consequences.

The opinion first sets out the pending motions.  Before analyzing the spoliation allegations, related sanctions motions, and the summary judgment motions (which are also impacted by the spoliation allegations), the opinion sets out some of the analytical issues that spoliation sanctions raise.  The relevant factual and procedural history is then set out and the evidence on breach of the duty to preserve, the degree of culpability, relevance, and prejudice is examined.  The opinion then analyzes the evidence to determine the appropriate response.

The defendants' motion for summary judgment based on claim and issue preclusion arising from the related, earlier-filed, state-law case are then analyzed in detail. That motion is denied in part because of the spoliation and withholding of evidence relevant to that case. Finally, the opinion examines the parties' cross-motions for summary judgment on the defendants' counterclaims for attorneys' fees.

The opinion results in narrowing and defining the issues to be tried. A pretrial conference is set for **February 26, 2010, at 10:00 a.m.** to set a schedule for completing any remaining pretrial work and a trial date.

## I.    The Pending Motions

In November 2006, Rimkus Consulting Group, Inc. ("Rimkus") was sued in Louisiana state court by Nickie G. Cammarata and Gary Bell, who had just resigned from the Rimkus office in Louisiana. Cammarata, Bell, and other ex-Rimkus employees had begun a new company, U.S. Forensic, L.L.C., to compete with Rimkus in offering investigative and forensic engineering services primarily for insurance disputes and litigation. In the Louisiana suit, Cammarata and Bell sought a declaratory judgment that the forum-selection, choice-of-law, noncompetition, and nonsolicitation provisions in agreements they had signed with Rimkus were unenforceable. In January and February 2007, Rimkus sued Cammarata and Bell in separate suits in Texas, alleging that they breached the noncompetition and nonsolicitation covenants in their written employment agreements and that they used Rimkus's trade secrets and proprietary information in setting up and operating U.S. Forensic. U.S. Forensic is a defendant in the *Cammarata* case. The Texas *Cammarata* and *Bell* cases

4

were consolidated in this court.  (Docket Entry Nos. 211, 216).

Two sets of motions are pending.[3]  One set is based on Rimkus's allegations that the defendants spoliated evidence.  Rimkus moves for sanctions against the defendants and their counsel and asks that they be held in contempt.  (Docket Entry Nos. 313, 314).  Rimkus alleges that the defendants and their counsel "conspiratorially engaged" in "wholesale discovery abuse" by destroying evidence, failing to preserve evidence after a duty to do so had arisen, lying under oath, failing to comply with court orders, and significantly delaying or failing to produce requested discovery.  (Docket Entry No. 313 at 1).  Rimkus asks this court to strike the defendants' pleadings and to enter a default judgment against them or give an adverse inference jury instruction.  Rimkus also seeks monetary sanctions in the form of the costs and attorneys' fees it incurred because of the defendants' discovery abuses.

In response, the defendants acknowledge that they did not preserve "some arguably relevant emails" but argue that Rimkus cannot show prejudice because the missing emails "would be merely cumulative of the evidence already produced."  (Docket Entry No. 345 at 6).  Rimkus filed supplements to its motions for contempt and sanctions, (Docket Entry Nos. 342, 343, 410, 414, 429, 431, 439, 445), and the defendants responded, (Docket Entry No.

---

[3]  Some of the pending motions can be disposed of in short order.  The defendants' Motion for Leave to File Replies to Plaintiff's Supplemental Responses to Motion for Summary Judgment, (Docket Entry No. 375), is granted.  Rimkus's Motion for Leave to File Third Amended Complaint, Application for Temporary Restraining Order, Temporary Injunction, and Permanent Injunction, (Docket Entry No. 387), Motion for Leave to File Memorandum of Law in Excess of 25 Pages, (Docket Entry No. 388), Motion to Supplement Response to Defendants' Motion for Summary Judgment, (Docket Entry No. 389), Motion to Supplement Motion for Sanctions and Response to Defendants' Motion for Summary Judgment, (Docket Entry No. 394), Motion for Leave to File Second Supplement to Motion for Sanctions and Response to Motion for Summary Judgment, (Docket Entry No. 412), Motion for Leave to File to Supplement the Record, (Docket Entry No. 413), and Motion for Leave to File Brief in Excess of Page Limitations, (Docket Entry No. 438), are granted.

5

350, 435).[4]

The second set of motions is based on the defendants' assertion that they are entitled to summary judgment on the merits based on the preclusive effects of the judgment and rulings they obtained in the lawsuit they filed in the Louisiana state court before Rimkus sued them in Texas. (Docket Entry No. 309). The defendants argue that the claims in this Texas suit should be dismissed under *res judicata*, or in the alternative, that they are entitled to judgment as a matter of law on Rimkus's claims for misappropriation of trade secrets, tortious interference, unfair competition, civil conspiracy, disparagement, and breach of fiduciary duty. (*Id.*). Cammarata also moved for summary judgment on his counterclaim for attorneys' fees under Texas Business & Commerce Code § 15.51(c). (*Id.*). Rimkus responded, (Docket Entry Nos. 321, 324), the defendants replied, (Docket Entry No. 349),

---

[4] At a motion hearing held on August 6, 2009, this court addressed several discovery disputes. The parties were instructed to report on the status of recovering additional electronically stored information that the defendants had stated they could not provide in discovery because it had been deleted or was on computers that were no longer available. The court permitted Rimkus to reopen the depositions of Bell and Cammarata and to supplement the summary judgment record. (Docket Entry No. 356). Rimkus filed supplemental responses to the motion for summary judgment, (Docket Entry Nos. 362, 374), and the defendants filed supplemental replies, (Docket Entry Nos. 376, 377). On August 28, 2009, Rimkus submitted information showing that Gary Bell maintained a previously undisclosed personal e-mail address to which he forwarded information obtained from Rimkus. At a discovery conference held on September 2, 2009, this court allowed Rimkus to subpoena Google to obtain emails Bell sent and received. (Docket Entry No. 380). Rimkus also notified the court that Cammarata had testified in his recent deposition about electronic files on his personal home computer that he had not produced. Cammarata subsequently produced these files to Rimkus as well as numerous boxes of paper documents that Cammarata asserted could be relevant to this case. Rimkus also notified the court that Cammarata and Bell had testified in their reopened depositions that they used a copyrighted powerpoint presentation on behalf of U.S. Forensic. Based on these developments, this court allowed the parties to supplement the summary judgment record and Rimkus to file an amended complaint to add a copyright infringement claim. (Docket Entry No. 381). Rimkus filed supplemental briefs with attached exhibits on September 23, 2009. (Docket Entry Nos. 389, 393, 394). Rimkus also filed an amended complaint. (Docket Entry Nos. 401, 403). The defendants filed a response to the supplemental filings, (Docket Entry No. 408), and Rimkus replied, (Docket Entry No. 423).

Rimkus filed a surreply, (Docket Entry No. 353), and several supplemental responses, (Docket Entry Nos. 362, 374, 394, 410, 429, 439, 445), and the defendants filed supplemental replies, (Docket Entry Nos. 376, 377). Rimkus argues that preclusion does not apply and that the summary judgment evidence reveals multiple disputed fact issues that preclude summary judgment on the merits of its claims.

Rimkus moved for partial summary judgment on the defendants' counterclaims for attorneys' fees under Texas Business & Commerce Code § 15.51(c). (Docket Entry Nos. 302, 305). The defendants responded, (Docket Entry Nos. 317, 322), and Rimkus replied, (Docket Entry No. 352). Rimkus also moved to extend the pretrial motions deadline, asserting that an extension is warranted because discovery is incomplete. (Docket Entry No. 306). The defendants responded, (Docket Entry No. 323), and Rimkus replied, (Docket Entry No. 351).

Both sets of motions are addressed in this memorandum and opinion. Based on a careful review of the pleadings; the motions, responses, and replies; the parties' submissions; the arguments of counsel; and the applicable law, this court grants in part and denies in part Rimkus's motions for sanctions. An adverse inference instruction on the deletion of emails and attachments will be given to the jury at trial. The motion for contempt is denied as moot because it seeks relief that would be duplicative of the sanctions. Rimkus is also awarded the reasonable attorneys' fees and costs it incurred in investigating the spoliation, including fees and costs for obtaining emails through third-party subpoenas, taking additional depositions, and filing and responding to motions on sanctions.

As to the summary judgment motions, this court denies Rimkus's motion to extend the motions-filing deadline, grants in part and denies in part the defendants' motion for summary judgment based on preclusion (based in part on spoliation that concealed and delayed producing relevant information in the Louisiana case), and grants Rimkus's motions for partial summary judgment on the defendants' counterclaims for attorneys' fees. Summary judgment is granted dismissing Rimkus's claims for disparagement, tortious interference, and damages for breach of the noncompetition and nonsolicitation provisions. Summary judgment is denied on Rimkus's claims for misappropriation of trade secrets, breach of fiduciary duty to the extent it is based on misappropriation, unfair competition, and civil conspiracy.  With respect to the counterclaim for attorneys' fees, Cammarata's motion for summary judgment is denied and Rimkus's motions for summary judgment are granted.

The reasons for these rulings are explained in detail below.

## II.    The Framework for Analyzing Spoliation Allegations

In her recent opinion in *Pension Committee of the University of Montreal Pension Plan v. Banc of America Securities, LLC*, No. 05 Civ. 9016, 2010 WL 184312 (S.D.N.Y. Jan. 15, 2010), Judge Scheindlin has again done the courts a great service by laying out a careful analysis of spoliation and sanctions issues in electronic discovery.[5]  The focus of *Pension Committee* was on when negligent failures to preserve, collect, and produce

---

[5]   *See Zubulake v. UBS Warburg LLC* (*Zubulake IV*), 220 F.R.D. 212 (S.D.N.Y. 2003); *Zubulake v. UBS Warburg LLC* (*Zubulake III*), 216 F.R.D. 280 (S.D.N.Y. 2003); *Zubulake v. UBS Warburg LLC* (*Zubulake II*), 230 F.R.D. 290 (S.D.N.Y. 2003); *Zubulake v. UBS Warburg LLC* (*Zubulake I*), 217 F.R.D. 309 (S.D.N.Y. 2003).

documents—including electronically stored information—in discovery may justify the severe sanction of a form of adverse inference instruction. Unlike *Pension Committee*, the present case does not involve allegations of negligence in electronic discovery. Instead, this case involves allegations of intentional destruction of electronically stored evidence. But there are some common analytical issues between this case and *Pension Committee* that deserve brief discussion.

### A.    The Source of Authority to Impose Sanctions for Loss of Evidence

Allegations of spoliation, including the destruction of evidence in pending or reasonably foreseeable litigation, are addressed in federal courts through the inherent power to regulate the litigation process if the conduct occurs before a case is filed or if, for another reason, there is no statute or rule that adequately addresses the conduct.[6]  *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 43–46 (1991); *Natural Gas Pipeline Co. of Am. v. Energy Gathering, Inc.*, 2 F.3d 1397, 1408 (5th Cir. 1993) (summary calendar).  If an applicable statute or rule can adequately sanction the conduct, that statute or rule should ordinarily be applied, with its attendant limits, rather than a more flexible or expansive "inherent power." *Chambers*, 501 U.S. at 50; *see Klein v. Stahl GMBH & Co. Maschinefabrik*, 185 F.3d 98, 109 (3d Cir. 1999) ("[A] trial court should consider invoking its inherent sanctioning powers only where no sanction established by the Federal Rules or a pertinent statute is 'up to the task' of remedying the damage done by a litigant's malfeasance . . . ."); *Natural Gas Pipeline Co.*

---

[6]   In diversity suits, federal courts apply federal evidence rules rather than state spoliation law.  *Condrey v. SunTrust Bank of Ga.*, 431 F.3d 191, 203 (5th Cir. 2005).

*of Am.*, 2 F.3d at 1410 ("When parties or their attorneys engage in bad faith conduct, a court should ordinarily rely on the Federal Rules as the basis for sanctions.").

When inherent power does apply, it is "interpreted narrowly, and its reach is limited by its ultimate source—the court's need to orderly and expeditiously perform its duties." *Newby v. Enron Corp.*, 302 F.3d 295, 302 (5th Cir. 2002) (footnote omitted) (citing *Chambers*, 501 U.S. at 43). In *Chambers*, the inherent power was linked to the bad-faith conduct that affected the litigation. *See* 501 U.S. at 49. If inherent power, rather than a specific rule or statute, provides the source of the sanctioning authority, under *Chambers*, it may be limited to a degree of culpability greater than negligence.

Rule 37(b)(2)(A) provides:

> If a party or a party's officer, director, or managing agent--or a witness designated under Rule 30(b)(6) or 31(a)(4)--fails to obey an order to provide or permit discovery, including an order under Rule 26(f), 35, or 37(a), the court where the action is pending may issue further just orders. They may include the following:
>> (i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;
>> (ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;
>> (iii) striking pleadings in whole or in part;
>> (iv) staying further proceedings until the order is obeyed;
>> (v) dismissing the action or proceeding in whole or in part;
>> (vi) rendering a default judgment against the disobedient party; or
>> (vii) treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

FED. R. CIV. P. 37(b)(2)(A).  In addition, a court has statutory authority to impose costs, expenses, and attorneys' fees on "any attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously."  28 U.S.C. § 1927.

Rule 37(e) applies to electronically stored information lost through "routine good-faith operation" of an electronic information system rather than through intentional acts intended to make evidence unavailable in litigation.  Rule 37(e) states:  "Absent exceptional circumstances, a court may not impose sanctions under these rules on a party for failing to provide electronically stored information lost as a result of the routine, good-faith operation of an electronic information system."  FED. R. CIV. P. 37(e).

The alleged spoliation and proposed sanctions in this case implicate the court's inherent authority, including for spoliation occurring before this case was filed or before discovery orders were entered and Rule 37, for failures to comply with discovery orders.

### B.      When Deletion Can Become Spoliation

Spoliation is the destruction or the significant and meaningful alteration of evidence. *See generally* THE SEDONA CONFERENCE, THE SEDONA CONFERENCE GLOSSARY: E-DISCOVERY & DIGITAL INFORMATION MANAGEMENT (SECOND EDITION) 48 (2007) ("Spoliation is the destruction of records or properties, such as metadata, that may be relevant to ongoing or anticipated litigation, government investigation or audit.").  Electronically stored information is routinely deleted or altered and affirmative steps are often required to preserve it.  Such deletions, alterations, and losses cannot be spoliation unless there is a duty

11

to preserve the information, a culpable breach of that duty, and resulting prejudice.

Generally, the duty to preserve arises when a party "'has notice that the evidence is relevant to litigation or . . . should have known that the evidence may be relevant to future litigation.'"[7]   Generally, the duty to preserve extends to documents or tangible things (defined by Federal Rule of Civil Procedure 34) by or to individuals "likely to have discoverable information that the disclosing party may use to support its claims or defenses." *See, e.g.*, *Zubulake IV*, 220 F.R.D. at 217–18 (footnotes omitted).

These general rules are not controversial.   But applying them to determine when a duty to preserve arises in a particular case and the extent of that duty requires careful analysis of the specific facts and circumstances.   It can be difficult to draw bright-line distinctions between acceptable and unacceptable conduct in preserving information and in conducting discovery, either prospectively or with the benefit (and distortion) of hindsight.   Whether preservation or discovery conduct is acceptable in a case depends on what is *reasonable*, and that in turn depends on whether what was done—or not done—was *proportional* to that case

---

[7]   *John B. v. Goetz*, 531 F.3d 448, 459 (6th Cir. 2008) (omission in original) (quoting *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001)); *see O'Brien v. Ed Donnelly Enters., Inc.*, 575 F.3d 567, 587–88 (6th Cir. 2009) (remanding to the district court to consider whether it was reasonably foreseeable that the missing documents would be needed in future litigation); *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 959 (9th Cir. 2006) ("A party's destruction of evidence qualifies as willful spoliation if the party has 'some notice that the documents were *potentially* relevant to the litigation before they were destroyed.'" (quoting *United States v. Kitsap Physicians Serv.*, 314 F.3d 995, 1001 (9th Cir. 2002) (emphasis added))); *Zubulake v. UBS Warburg LLC* (*Zubulake IV*), 220 F.R.D. 212, 216 (S.D.N.Y. 2003) ("The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." (quoting *Fujitsu Ltd.*, 247 F.3d at 436)); THE SEDONA PRINCIPLES: SECOND EDITION, BEST PRACTICES RECOMMENDATIONS & PRINCIPLES FOR ADDRESSING ELECTRONIC DOCUMENT PRODUCTION 70 cmt. 14.a (2007) ("[T]he common law duty of preservation arises when a party, either plaintiff or defendant, reasonably anticipates litigation.").

and consistent with clearly established applicable standards.[8]  As Judge Scheindlin pointed out in *Pension Committee*, that analysis depends heavily on the facts and circumstances of each case and cannot be reduced to a generalized checklist of what is acceptable or unacceptable.[9]

Applying a categorical approach to sanctions issues is also difficult, for similar reasons.  Determining whether sanctions are warranted and, if so, what they should include, requires a court to consider both the spoliating party's culpability and the level of prejudice to the party seeking discovery.  Culpability can range along a continuum from destruction intended to make evidence unavailable in litigation to inadvertent loss of information for reasons unrelated to the litigation.  Prejudice can range along a continuum from an inability to prove claims or defenses to little or no impact on the presentation of proof.  A court's response to the loss of evidence depends on both the degree of culpability and the extent of prejudice.  Even if there is intentional destruction of potentially relevant evidence, if there is no prejudice to the opposing party, that influences the sanctions consequence.  And even if there is an inadvertent loss of evidence but severe prejudice to the opposing party, that too will influence the appropriate response, recognizing that sanctions (as opposed to other

---

[8]  *See* THE SEDONA PRINCIPLES: SECOND EDITION, BEST PRACTICES RECOMMENDATIONS & PRINCIPLES FOR ADDRESSING ELECTRONIC DOCUMENT PRODUCTION  17 cmt. 2.b. (2007) ("Electronic discovery burdens should be proportional to the amount in controversy and the nature of the case.  Otherwise, transaction costs due to electronic discovery will overwhelm the ability to resolve disputes fairly in litigation.").

[9]  *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, No. 05 Civ. 9016, 2010 WL 184312, at *3 (S.D.N.Y. Jan. 15, 2010).  For example, the reasonableness of discovery burdens in a $550 million case arising out of the liquidation of hedge funds, as in *Pension Committee*, will be different than the reasonableness of discovery burdens in a suit to enforce noncompetition agreements and related issues, as in the present case.

13

remedial steps) require some degree of culpability.

## C. Culpability

As a general rule, in this circuit, the severe sanctions of granting default judgment, striking pleadings, or giving adverse inference instructions may not be imposed unless there is evidence of "bad faith." *Condrey v. SunTrust Bank of Ga.*, 431 F.3d 191, 203 (5th Cir. 2005); *King v. Ill. Cent. R.R.*, 337 F.3d 550, 556 (5th Cir. 2003); *United States v. Wise*, 221 F.3d 140, 156 (5th Cir. 2000). "'Mere negligence is not enough' to warrant an instruction on spoliation." *Russell v. Univ. of Tex. of Permian Basin*, 234 F. App'x 195, 208 (5th Cir. 2007) (unpublished)(quoting *Vick v. Tex. Employment Comm'n*, 514 F.2d 734, 737 (5th Cir. 1975); *see also King*, 337 F.3d at 556 ("King must show that ICR acted in 'bad faith' to establish that it was entitled to an adverse inference.") *Vick v. Tex. Employment Comm'n*, 514 F.2d at 737 ("The adverse inference to be drawn from destruction of records is predicated on bad conduct of the defendant. Moreover, the circumstances of the act must manifest bad faith. Mere negligence is not enough, for it does not sustain an inference of consciousness of a weak case." (quotation omitted)).

Other circuits have also held negligence insufficient for an adverse inference instruction. The Eleventh Circuit has held that bad faith is required for an adverse inference instruction.[10] The Seventh, Eighth, Tenth, and D.C. Circuits also appear to require bad

---

[10]   *See Penalty Kick Mgmt. Ltd. v. Coca Cola Co.*, 318 F.3d 1284, 1294 (11th Cir. 2003) ("[A]n adverse inference is drawn from a party's failure to preserve evidence only when the absence of that evidence is predicated on bad faith." (quoting *Bashir v. Amtrak*, 119 F.3d 929, 931 (11th Cir. 1997))).

faith.[11]  The First, Fourth, and Ninth Circuits hold that bad faith is not essential to imposing severe sanctions if there is severe prejudice, although the cases often emphasize the presence of bad faith.[12]  In the Third Circuit, the courts balance the degree of fault and prejudice.[13]

---

[11]   *See*, *e.g.*, *Turner v. Pub. Serv. Co. of Colo.*, 563 F.3d 1136, 1149 (10th Cir. 2009) ("Mere negligence in losing or destroying records is not enough because it does not support an inference of consciousness of a weak case." (quoting *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1407 (10th Cir. 1997))); *Faas v. Sears, Roebuck & Co.*, 552 F.3d 633, 644 (7th Cir. 2008) ("In order to draw an inference that the [destroyed documents] contained information adverse to Sears, we must find that Sears intentionally destroyed the documents in bad faith."); *Greyhound Lines, Inc. v. Wade*, 485 F.3d 1032, 1035 (8th Cir. 2007) ("A spoliation-of-evidence sanction requires 'a finding of intentional destruction indicating a desire to suppress the truth.'" (quoting *Stevenson v. Union Pac. R.R. Co.*, 354 F.3d 739, 746 (8th Cir. 2004))); *Wyler v. Korean Air Lines Co.*, 928 F.2d 1167, 1174 (D.C. Cir. 1991) ("Mere innuendo . . . does not justify drawing the adverse inference requested . . . .").

[12]   *See*, *e.g.*, *Hodge v. Wal-Mart Stores, Inc.*, 360 F.3d 446, 450 (4th Cir. 2004) (holding that an inference cannot be drawn merely from negligent loss or destruction of evidence but requires a showing that willful conduct resulted in the loss or destruction); *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 593 (4th Cir. 2001) (holding that dismissal is "usually justified only in circumstances of bad faith" but "even when conduct is less culpable, dismissal may be necessary if the prejudice to the defendant is extraordinary, denying it the ability to adequately defend its case"); *Sacramona v. Bridgestone/Firestone, Inc.*, 106 F.3d 444, 447 (1st Cir. 1997) ("Certainly bad faith is a proper and important consideration in deciding whether and how to sanction conduct resulting in the destruction of evidence.  But bad faith is not essential.  If such evidence is mishandled through carelessness, and the other side is prejudiced, we think that the district court is entitled to consider imposing sanctions, including exclusion of the evidence."); *Allen Pen Co. v. Springfield Photo Mount Co.*, 653 F.2d 17, 23–24 (1st Cir. 1981) ("In any event, Allen Pen has not shown that the document destruction was in bad faith or flowed from the consciousness of a weak case.  There is no evidence that Springfield believed the lists would have damaged it in a lawsuit.  Without some such evidence, ordinarily no adverse inference is drawn from Springfield's failure to preserve them."); *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993) ("Short of excluding the disputed evidence, a trial court also has the broad discretionary power to permit a jury to draw an adverse inference from the destruction or spoliation against the party or witness responsible for that behavior.").

[13]   *See*, *e.g.*, *Bensel v. Allied Pilots Ass'n*, No. 02-2917, 2009 WL 4884052 (D.N.J. Dec. 17, 2009) (declining to apply a spoliation inference or other sanction for the loss of information resulting from the defendant's failure to impose litigation holds in a timely manner); *Mosaid Techs. Inc. v. Samsung Elecs. Co.*, 348 F. Supp. 2d 332, 335 (D.N.J. 2004) (noting that "[t]hree key considerations that dictate whether such sanctions are warranted are: '(1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future'" and holding that bad faith was not required for an adverse inference instruction as long as there was a showing of relevance and prejudice (quoting *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 79 (3d. Cir. 1994))).

The court in *Pension Committee* imposed a form of adverse inference instruction based on a finding of gross negligence in preserving information and in collecting it in discovery.[14]   The court applied case law in the Second Circuit, including the language in *Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99, 108 (2d Cir. 2002), stating that "[t]he sanction of an adverse inference may be appropriate in some cases involving the negligent destruction of evidence because each party should bear the risk of its own negligence."   That language has been read to allow severe sanctions for negligent destruction of evidence.   *See, e.g.*, *Rogers v. T.J. Samson Cmty. Hosp.*, 276 F.3d 228, 232 (6th Cir. 2002); *Lewis v. Ryan*, 261 F.R.D. 513, 521 (S.D. Cal. 2009) (noting that California district courts had followed the Second Circuit's approach in *Residential Funding*).   In the Fifth Circuit and others, negligent as opposed to intentional, "bad faith" destruction of evidence is not sufficient to give an adverse inference instruction and may not relieve the party seeking discovery of the need to show that missing documents are relevant and their loss prejudicial.   The circuit differences in the level of culpability necessary for an adverse inference instruction limit the applicability of the *Pension Committee* approach.   And to the extent sanctions are based on inherent power, the Supreme Court's decision in *Chambers* may also require a degree of culpability greater than negligence.

---

[14]  The finding of gross negligence in *Pension Committee* was in part based on the finding that the spoliating party submitted declarations describing discovery efforts that were either lacking in detail or intentionally vague in ways the court characterized as misleading.  *Pension Committee*, No. 05 Civ. 9016, 2010 WL 184312, at *10–11.  Counsel's misrepresentations to the court can result in severe sanctions.  *See, e.g.*, *Coleman (Parent) Holdings, Inc. v. Morgan Stanley & Co.*, 20 So. 3d 952, 954 (Fla. Dist. Ct. App. 2009) (trial court entered a partial default judgment and deemed certain allegations as established facts based in part on misrepresentations by counsel to the court about when they learned that emails existed on backup tapes; on appeal, the judgment was set aside on other grounds).

### D.    Relevance and Prejudice:  The Burden of Proof

It is well established that a party seeking the sanction of an adverse inference instruction based on spoliation of evidence must establish that: (1) the party with control over the evidence had an obligation to preserve it at the time it was destroyed; (2) the evidence was destroyed with a culpable state of mind; and (3) the destroyed evidence was "relevant" to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense. *See Zubulake v. UBS Warburg LLC* (*Zubulake IV*), 220 F.R.D. 212, 220 (S.D.N.Y. 2003).  The "relevance" and "prejudice" factors of the adverse inference analysis are often broken down into three subparts: "(1) whether the evidence is relevant to the lawsuit; (2) whether the evidence would have supported the inference sought; and (3) whether the nondestroying party has suffered prejudice from the destruction of the evidence." *Consol. Aluminum Corp. v. Alcoa, Inc.*, 244 F.R.D. 335, 346 (M.D. La. 2006) (citing *Concord Boat Corp. v. Brunswick Corp.*, No. LR-C-95-781, 1997 WL 33352759, at *7 (E.D. Ark. Aug. 29, 1997)).  Courts recognize that "[t]he burden placed on the moving party to show that the lost evidence would have been favorable to it ought not be too onerous, lest the spoliator be permitted to profit from its destruction."  *Chan v. Triple 8 Palace, Inc.*, No. 03CIV6048(GEL)(JCF), 2005 WL 1925579, at *7 (S.D.N.Y. Aug. 11, 2005).

*Pension Committee* recognized the difficulty and potential for unfairness in requiring an innocent party seeking discovery to show that information lost through spoliation is relevant and prejudicial.  Those concerns are acute when the party seeking discovery cannot replace or obtain extrinsic evidence of the content of deleted information.  But in many

17

cases—including the present case—there are sources from which at least some of the allegedly spoliated evidence can be obtained.  And in many cases—including the present case—the party seeking discovery can also obtain extrinsic evidence of the content of at least some of the deleted information from other documents, deposition testimony, or circumstantial evidence.

Courts recognize that a showing that the lost information is relevant and prejudicial is an important check on spoliation allegations and sanctions motions.  Courts have held that speculative or generalized assertions that the missing evidence would have been favorable to the party seeking sanctions are insufficient.[15]  By contrast, when the evidence in the case as a whole would allow a reasonable fact finder to conclude that the missing evidence would have helped the requesting party support its claims or defenses, that may be a sufficient showing of both relevance and prejudice to make an adverse inference instruction

---

[15]  *See Mintel v. Neergheen*, No. 08-cv-3939, 2010 WL 145786, at *8 (N.D. Ill. Jan. 12, 2010) (holding that although data on a laptop was destroyed after the filing of the lawsuit, no evidence was presented that the data destroyed was relevant); *Pandora Jewelry, LLC v. Chamilia, LLC*, No. CCB-06-3041, 2008 WL 4533902, at *9 (D. Md. Sept. 30, 2008) (denying an adverse inference instruction because the plaintiff did not offer proof "that the lost materials would have produced evidence favorable to the required showing of injury"; the plaintiff could not "point to even a single diverted customer or any evidence of damage to its reputation . . . stemming from any of the [emails] at issue"); *Consol. Aluminum Corp.*, 244 F.R.D. at 346 ("Although Consolidated has generally asserted that the destroyed information is relevant to this litigation 'based simply on the time frame and the individuals involved,' a court cannot infer that destroyed documents would contradict the destroying party's theory of the case, and corroborate the other's party's theory, simply based upon temporal coincidence.  While Consolidated is not held to 'too specific a level of proof' regarding the destroyed documents, it must provide some evidence that the documents would have aided it in the manner alleged in their inferences in order for such sanction to be imposed."); *Sovulj v. United States*, No. 98 CV 5550, 2005 WL 2290495, at *5 (E.D.N.Y Sept. 20, 2005) (denying an adverse inference instruction when there was only "pure speculation" that the missing evidence was relevant); *Convolve, Inc. v. Compaq Computer Corp.*, 223 F.R.D. 162, 176 (S.D.N.Y. 2004) (denying an adverse inference instruction when the substance of the deleted communication was only described in the most general terms), *clarified on other grounds*, 2005 WL 1514284 (S.D.N.Y. June 24, 2005).

appropriate.[16]

In *Pension Committee,* the court followed the approach that even for severe sanctions, relevance and prejudice may be presumed when the spoliating party acts in a grossly negligent manner. *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. §., LLC*, No. 05 Civ. 9016, 2010 WL 184312, at *5 (S.D.N.Y. Jan. 15, 2010). The presumption of relevance and prejudice is not mandatory. *Id.* at *5. The spoliating party may rebut the presumption by showing that the innocent party had access to the evidence allegedly destroyed or that the evidence would not have been helpful to the innocent party. *Id.* When the level of culpability is "mere" negligence, the presumption of relevance and prejudice is not available; the *Pension Committee* court imposed a limited burden on the innocent party to present some extrinsic evidence. *Id.*

The Fifth Circuit has not explicitly addressed whether even bad-faith destruction of evidence allows a court to presume that the destroyed evidence was relevant or its loss prejudicial. Case law in the Fifth Circuit indicates that an adverse inference instruction is not proper unless there is a showing that the spoliated evidence would have been relevant. *See Condrey v. SunTrust Bank of Ga.*, 431 F.3d 191, 203 & n.8 (5th Cir. 2005) (holding that an

---

[16]   *See*, *e.g.*, *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 155–57 (4th Cir. 1995) (holding that an adverse inference instruction was appropriate because the plaintiff's expert willfully destroyed parts of a boat at issue in a products-liability action before the defendant and its experts were able to examine it); *Broccoli v. Echostar Commc'ns Corp.*, 229 F.R.D. 506, 511–12 (D. Md. 2005) (noting that the defendant did not preserve vital employment and termination documents, including emails in which plaintiff had made complaints to his supervisors about being sexually harassed and the internal investigative file into those complaints, and imposing an adverse inference instruction); *GE Harris Ry. Elecs., L.L.C. v. Westinghouse Air Brake Co.*, No. 99-070-GMS, 2004 WL 5702740, at *4–5 (D. Del. Mar. 29, 2004) (holding that an adverse inference was warranted when the defendant deleted relevant emails and electronic files and the emails the plaintiff was able to recover from other sources were probative of the defendant's liability).

adverse inference was not appropriate because there was no evidence of bad faith but also noting that even if bad faith had been shown, an adverse inference would have been improper because relevance was not shown); *Escobar v. City of Houston*, No. 04-1945, 2007 WL 2900581, at *17–18 (S.D. Tex. Sept. 29, 2007) (denying an adverse inference instruction for destruction of emails in a police department following a shooting because the plaintiffs failed to show bad faith and relevance).   One opinion states that bad-faith destruction of evidence "alone is sufficient to demonstrate relevance."  *See Consol. Aluminum Corp. v. Alcoa, Inc.*, 244 F.R.D. 335, 340 n.6 (M.D. La. 2006).  But that opinion also went on to state that "before an adverse inference may be drawn, there must be some showing that there is in fact a nexus between the proposed inference and the information contained in the lost evidence" and that "some extrinsic evidence of the content of the emails is necessary for the trier of fact to be able to determine in what respect and to what extent the emails would have been detrimental."  *Id.* at 346.  In the present case, the party seeking sanctions for deleting emails after a duty to preserve had arisen presented evidence of their contents.  The evidence included some recovered deleted emails and circumstantial evidence and deposition testimony relating to the unrecovered records.  There is neither a factual nor legal basis, nor need, to rely on a presumption of relevance or prejudice.

### E.   Remedies:  Adverse Inference Instructions

Courts agree that a willful or intentional destruction of evidence to prevent its use in litigation can justify severe sanctions.  Courts also agree that the severity of a sanction for failing to preserve when a duty to do so has arisen must be proportionate to the culpability

involved and the prejudice that results.  Such a sanction should be no harsher than necessary to respond to the need to punish or deter and to address the impact on discovery.[17]  "[T]he judge [imposing sanctions] should take pains neither to use an elephant gun to slay a mouse nor to wield a cardboard sword if a dragon looms.  Whether deterrence or compensation is the goal, the punishment should be reasonably suited to the crime."  *Anderson v. Beatrice Foods Co.*, 900 F.2d 388, 395 (1st Cir. 1990).  A measure of the appropriateness of a sanction is whether it "restore[s] the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party."  *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999) (quotation omitted); *see also Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001) ("[T]he applicable sanction should be molded to serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine." (quoting *West*, 167 F.3d at 779)).

Extreme sanctions—dismissal or default—have been upheld when "the spoliator's conduct was so egregious as to amount to a forfeiture of his claim" and "the effect of the spoliator's conduct was so prejudicial that it substantially denied the defendant the ability to defend the claim."  *Sampson v. City of Cambridge, Maryland*, 251 F.R.D. 172, 180 (D. Md. 2008) (quoting *Silvestri*, 271 F.3d at 593); *see Leon v. IDX Sys. Corp.*, 464 F.3d 951, 959 (9th Cir. 2006) ("The prejudice inquiry 'looks to whether the [spoiling party's] actions

---

[17]  *See* FED. R. CIV. P. 37(e) (sanctions may not be imposed for the inability to produce electronically stored information lost because of the routine, good-faith operation of a party's computer system); *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 79 (3d Cir. 1994); *Dillon v. Nissan Motor Co., Ltd.*, 986 F.2d 263, 267 (8th Cir. 1993).

impaired [the non-spoiling party's] ability to go to trial or threatened to interfere with the rightful decision of the case.'" (alteration in original) (quoting *United States ex rel. Wiltec Guam, Inc. v. Kahaluu Constr. Co.*, 857 F.2d 600, 604 (9th Cir. 1988))).

When a party is prejudiced, but not irreparably, from the loss of evidence that was destroyed with a high degree of culpability, a harsh but less extreme sanction than dismissal or default is to permit the fact finder to presume that the destroyed evidence was prejudicial.[18] Such a sanction has been imposed for the intentional destruction of electronic evidence.[19] Although adverse inference instructions can take varying forms that range in harshness, and although all such instructions are less harsh than so-called terminating sanctions, they are properly viewed as among the most severe sanctions a court can administer.

In *Pension Committee*, the court stated that it would give a jury charge for the grossly

---

[18] *See FDIC v. Hurwitz*, 384 F. Supp. 2d 1039, 1099–1100 (S.D. Tex. 2005) (citing *Nation-Wide Check Corp. v. Forest Hills Distribs., Inc.*, 692 F.2d 214, 217–18 (1st Cir. 1982)).

[19] *See, e.g.*, *Se. Mech. Servs., Inc. v. Brody*, — F. Supp. 2d —, 2009 WL 2883057 (M.D. Fla. 2009) (holding that an adverse inference jury instruction was appropriate when a party wiped several Blackberry devices that may have contained emails, telephone records, text messages, and calendar entries relevant to the case); *Goodman v. Praxair Servs., Inc.*, 632 F. Supp. 2d 494, 523–24 (D. Md. 2009) (holding that an adverse jury instruction was proper when a party destroyed a laptop and the party's agent deleted emails after the duty to preserve arose and allowing the opposing side to seek recovery of costs associated with the sanctions motion); *Technical Sales Assocs., Inc. v. Ohio Star Forge Co.*, Nos. 07-11745, 08-13365, 2009 WL 728520, at *9 (E.D. Mich. Mar. 19, 2009) (holding that monetary sanctions were appropriate where a party deleted emails and electronic files after the litigation began and after the party became aware that the adverse party would be seeking a forensic examination but deferring until trial the decision of whether adverse inference jury instructions were appropriate); *Super Future Equities, Inc. v. Wells Fargo Bank Minn., N.A.*, No. 3:06-CV-0271-B, 2008 WL 3261095, at *13–14 (N.D. Tex. Aug. 8, 2008) (imposing an adverse inference jury instruction and awarding attorneys' fees and costs against a party for, among other things, intentionally wiping a hard drive so that files would be unrecoverable, damaging backup data, and deleting emails and documents from a web site); *Doe v. Norwalk Cmty. Coll.*, 248 F.R.D. 372, 381–82 (D. Conn. 2007) (imposing an adverse inference jury instruction and awarding attorneys' fees and costs against a party that failed to preserve hard drives and emails).

negligent plaintiffs that: (1) laid out the elements of spoliation; (2) instructed the jury that these plaintiffs were grossly negligent in performing discovery obligations and failed to preserve evidence after a preservation duty arose; (3) told the jury that it could presume that the lost evidence was relevant and would have been favorable to the defendant; (4) told the jury that if they declined to presume that the lost evidence was relevant or favorable, the jury's inquiry into spoliation was over; (5) explained that if the jury did presume relevance or prejudice, it then had to decide if any of the six plaintiffs had rebutted the presumption; and (6) explained the consequences of a rebutted and an unrebutted presumption.[20] The court

---

[20]   The court provided the text of the charge:

The Citco Defendants have argued that 2M, Hunnicutt, Coronation, the Chagnon Plaintiffs, Bombardier Trusts, and the Bombardier Foundation destroyed relevant evidence, or failed to prevent the destruction of relevant evidence. This is known as the "spoliation of evidence."

Spoliation is the destruction of evidence or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation. To demonstrate that spoliation occurred, the Citco Defendants bear the burden of proving the following two elements by a preponderance of the evidence:

*First*, that *relevant* evidence was destroyed after the duty to preserve arose. Evidence is relevant if it would have clarified a fact at issue in the trial and otherwise would naturally have been introduced into evidence; and

*Second*, that if relevant evidence was destroyed after the duty to preserve arose, the evidence lost would have been favorable to the Citco Defendants.

I instruct you, as a matter of law, that each of these plaintiffs failed to preserve evidence after its duty to preserve arose. This failure resulted from their gross negligence in performing their discovery obligations. As a result, you may presume, if you so choose, that such lost evidence was relevant, and that it would have been favorable to the Citco Defendants. In deciding whether to adopt this presumption, you may take into account the egregiousness of the plaintiffs' conduct in failing to preserve the evidence.

However, each of these plaintiffs has offered evidence that (1) no evidence was lost; (2) if evidence was lost, it was not relevant; and (3) if evidence was lost and it was relevant, it would not have been favorable to the Citco Defendants.

noted that it was "important to explain that the jury is bound by the Court's determination that certain plaintiffs destroyed documents after the duty to preserve arose" but that "the jury is not instructed that the Court has made any finding as to whether that evidence is *relevant* or whether its loss caused any *prejudice* to the [] Defendants." *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. §., LLC*, No. 05 Civ. 9016, 2010 WL 184312, at *23 n.251. The "jury must make these determinations because, if the jury finds both relevance and prejudice, it then may decide to draw an adverse inference in favor of the [] Defendants which could have an impact on the verdict," and "[s]uch a finding is within the province of the jury not the court." *Id.*

As explained in more detail below, based on the record in this case, this court makes the preliminary findings necessary to submit the spoliation evidence and an adverse inference instruction to the jury. But the record also presents conflicting evidence about the reasons

---

If you decline to presume that the lost evidence was relevant or would have been favorable to the Citco Defendants, then your consideration of the lost evidence is at an end, and you will *not* draw any inference arising from the lost evidence.

However, if you decide to presume that the lost evidence was relevant and would have been favorable to the Citco Defendants, you must next decide whether any of the following plaintiffs have rebutted that presumption: 2M, Hunnicutt, Coronation, the Chagnon Plaintiffs, Bombardier Trusts, or the Bombardier Foundation. If you determine that a plaintiff has *rebutted* the presumption that the lost evidence was either relevant or favorable to the Citco Defendants, you will *not* draw any inference arising from the lost evidence against that plaintiff. If, on the other hand, you determine that a plaintiff has *not rebutted* the presumption that the lost evidence was both relevant and favorable to the Citco Defendants, you may draw an inference against that plaintiff and in favor of the Citco Defendants—namely that the lost evidence would have been favorable to the Citco Defendants.

Each plaintiff is entitled to your separate consideration. The question as to whether the Citco Defendants have proven spoliation is personal to each plaintiff and must be decided by you as to each plaintiff individually.

*Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, No. 05 Civ. 9016, 2010 WL 184312, at *23–24 (S.D.N.Y. Jan. 15, 2010) (footnote omitted).

the defendants deleted the emails and attachments; evidence that some of the deleted emails and attachments were favorable to the defendants; and an extensive amount of other evidence for the plaintiff to use. As a result, the jury will not be instructed that the defendants engaged in intentional misconduct. Instead, the instruction will ask the jury to decide whether the defendants intentionally deleted emails and attachments to prevent their use in litigation. If the jury finds such misconduct, the jury must then decide, considering all the evidence, whether to infer that the lost information would have been unfavorable to the defendants. Rather than instruct the jury on the rebuttable presumption steps, it is sufficient to present the ultimate issue: whether, if the jury has found bad-faith destruction, the jury will then decide to draw the inference that the lost information would have been unfavorable to the defendants.[21]

## III.   Background

### A.      Factual and Procedural History

Rimkus is a forensic engineering contractor with its principal place of business in Houston, Texas. Founded in 1983, Rimkus has thirty offices in eighteen states and works across the country. Rimkus analyzes unexpected accidents and occurrences that cause

---

[21] This is similar to the approach courts use in other contexts involving threshold burden-shifting analyses by the judge followed by a trial in which the jury is instructed on the ultimate question. *See, e.g.*, *Kanida v. Gulf Coast Med. Personnel LP*, 363 F.3d 568, 576 (5th Cir. 2004) ("This Court has consistently held that district courts should not frame jury instructions based upon the intricacies of the *McDonnell Douglas* burden shifting analysis. Instead, we have held that district courts should instruct the jury to consider the ultimate question of whether a defendant took the adverse employment action against a plaintiff because of her protected status." (citations omitted)); *Olitsky v. Spencer Gifts, Inc.*, 964 F.2d 1471, 1478 (5th Cir. 1992) ("Instructing the jury on the elements of a prima facie [ADEA] case, presumptions, and the shifting burden of proof is unnecessary and confusing. Instead, the court should instruct the jury to consider the ultimate question of whether the defendant terminated plaintiff because of his age.").

damage to people or property, primarily in connection with insurance disputes or litigation, and provides reports and testimony.

In 1995, Rimkus hired Bell, a Louisiana resident, as a marketing representative.  In October 1996, Rimkus hired Cammarata, also a Louisiana resident, as a full-time salaried employee, to provide forensic engineering services.  Both Bell and Cammarata were hired at Rimkus's office in Houston, Texas, where they signed an Employment Agreement.  The Employment Agreement was between the "Company," defined as Rimkus Consulting Group, Inc., and the "Employee," defined as Bell or Cammarata. The Agreement's noncompetition provision stated as follows:

> a. Employee will not, directly or indirectly, own, manage, finance, control or participate in the ownership, financing or control of, or be connected as a partner, principal, agent, employee, independent contractor, management advisor and/or management consultant with, or use or permit his name or resume to be used in connection with any business or enterprise performing consulting services similar to those which are carried on by the Company in the "Designated Geographic Area".  For the purposes of this Agreement "Designated Geographic Area" shall mean any standard metropolitan statistical area (or if a client is not located in a standard metropolitan statistical area, then the city, town or township in which such client is located and the counties or parishes contiguous thereto) in which a client or clients of the Company are located and from which such client or clients have engaged Company on not less than five (5) separate files or engagements during the five (5) calendar years proceeding termination of Employee's employment with Company.  If Company has received less than five (5) such assignments or engagements from a client in any Designated Geographic Area, then Employee shall be free to compete in such Designated Geographic Area. . . .

26

> This covenant against competition shall be construed as
> a separate covenant covering competition within the
> State of Texas, or in any other State where the Company,
> directly or indirectly, whether through itself or its
> representative or agents, conducts business; . . . [.]

(Docket Entry No. 1, Ex. A at 4–5).  The Agreement also contained a clause prohibiting

posttermination solicitation of Rimkus's employees and of Rimkus's customers:

> b.  Employee agrees that after termination of employment
> with the Company, he will not, directly or indirectly,
> solicit, employ or in any other fashion, hire persons who
> are, or were, employees, officers or agents of the
> Company, until such person has terminated his
> employment with the Company for a period of eighteen
> (18) months;
>
> c.  Employee agrees, that for a period lasting until eighteen
> (18) months after termination of his employment, he will
> not at any time, directly or indirectly, solicit the
> Company's customers[.]

(*Id.* at 5).  The Agreement stated that "any dispute or other proceeding to enforce the terms

of this Agreement shall be adjudicated by a court of competent jurisdiction in Harris County,

Texas" and that the "Agreement and all rights, obligations and liabilities arising hereunder

shall be governed by, and construed and enforced in accordance with the laws of the State

of Texas (excluding its conflicts of law provisions) applicable to contracts made and to be

performed therein."  (*Id.* at 11).

Bell and Cammarata worked for Rimkus Consulting Group of Louisiana ("RCGL"),

a wholly owned subsidiary of Rimkus.  Both men worked in RCGL's Metairie, Louisiana

office.  They received their paychecks and W-2 forms from RCGL but were provided access

27

to Rimkus customer information, Rimkus business plans, Rimkus operations information, and Rimkus work for their clients.

In 2004, Bell became central region property manager and a vice-president of Rimkus. He was responsible for the area from Louisiana to the Canadian border.  On July 14, 2005, Rimkus and Bell entered into a "Common Stock Purchase Agreement."  Under the Common Stock Purchase Agreement, Bell purchased 2,000 shares of Rimkus stock.  The Agreement was between the "Corporation," defined as Rimkus Consulting Group, Inc., and the "Shareholder," defined as Bell.  The Common Stock Purchase Agreement contained a noncompetition clause, which provided as follows:

> Each Shareholder, recognizing that a covenant not to compete is required to protect the business interests of the Corporation, agrees that unless the Corporation consents in writing to the contrary, such Shareholder shall not engage directly or indirectly as an employee, agent, shareholder, officer, director, partner, sole proprietor or in any other fashion in a competing business in any of the geographic areas in which the Corporation is then conducting business, during his period of employment by the Corporation and for five (5) years after the Closing of the purchase transaction. . . .  The covenant is in addition to any non-competition agreement contained in any employment agreement between each Shareholder and the Corporation. Each Shareholder has entered into an Employment Agreement with the Corporation which contains such a non-competition agreement.  Shareholders and the Corporation agree that, for purposes of this Agreement, the non-competition provisions extending the period to a five-year period commencing with the date of any Terminating event will prevail over the period as specified in the Employment Agreement between each Shareholder and the Corporation.

(Docket Entry No. 321, Ex. C at 10–11).

28

The Common Stock Purchase Agreement also addressed confidential information:

> [C]onfidential information pertaining to the Corporation's customers and business and marketing methods, including, but not limited to, customer or client lists and trade secrets which may be available to them is valuable, special and unique except as such may be in the public domain. Accordingly, each Shareholder hereby agrees that he will not at any time disclose any of such information to any person, firm, corporation, association or other entity for any reason or purpose whatsoever or make use in any other way to his advantage of such information.

(*Id.* at 11). The Agreement also stated that Rimkus and Bell "each agree[d] to refrain from any conduct, by word or act, that will reflect negatively on the character or conduct of the other." (*Id.* at 10).

On September 27, 2006, Bell resigned from Rimkus effective October 31. Cammarata resigned on November 15, 2006. On that date, Bell, Cammarata, and Mike DeHarde, another employee who had also worked at RCGL in Louisiana, formed and immediately began to work for U.S. Forensic. Like Rimkus, U.S. Forensic provides investigative and forensic engineering services, primarily to determine the cause, origin, and extent of losses from failures and accidents. The parties do not dispute that U.S. Forensic competes with Rimkus in providing investigative and forensic engineering services, although U.S. Forensic does not offer as broad a range of services as Rimkus. U.S. Forensic currently has offices in Louisiana, Mississippi, Florida, and Tennessee and employs engineers registered in twenty states.

In this litigation, Rimkus alleges that Bell breached his fiduciary duty as an officer of

Rimkus by preparing to form U.S. Forensic before he left Rimkus in October 2006.  Rimkus alleges that Bell, Cammarata, and DeHarde planned and made preparations to set up U.S. Forensic and compete against Rimkus long before they resigned.  The record shows that Bell registered the domain name "www.usforensic.com" on February 28, 2006.  (Docket Entry No. 321, Ex. F).  During the summer of 2006, Bell met with a lawyer, contracted with a company to host a web site, filed a trademark application, and prepared a corporate logo for U.S. Forensic.  (*Id.*, Exs. G, H, R, S).  On October 1, 2006, Bell created U.S. Forensic résumés for himself, Cammarata, and DeHarde. (*Id.*, Ex. I).  Corporate formation documents for U.S. Forensic were filed with the Louisiana Secretary of State on October 5, 2006.  (*Id.*, Ex. J).  On October 13, 2006, Bell's wife filed an application for U.S. Forensic to practice engineering in the State of Louisiana.  (*Id.*, Ex. T).

Bell testified in his deposition that he did not agree to form a new company until after he had resigned from Rimkus.  (*Id.*, Ex. D, Deposition of Gary Bell, at 423:13–:18).  Bell testified that he told DeHarde and Cammarata he was leaving and "they said they were leaving, and – and so we talked about maybe we should do something together.  And, I – I think, it was that vague, you know, maybe we should do something together, maybe we talked a little bit about it, you know, after hours or something here, might have a phone call about it, and – but no real – once – once I left, that's when we kind of really kicked it into high gear." (*Id.* at 424:13–:22).  On September 30, 2006, Bell emailed Cammarata, DeHarde, and Bill Janowsky, an engineer at another Louisiana firm, to inform them that Rimkus had made him some lucrative offers to entice him to retract his resignation but that he would go

forward with the plan to form U.S. Forensic if they were still committed to doing so. (Docket Entry No. 324, Ex. KK).  Bell stated, "Without each of you, it will not be worth leaving.  If one guy falls [sic] to come along, the whole thing will be completely different." (*Id.*).  He continued:

> We have a dream team.  I really believe that Rimkus is making these ridiculous offers more because of who I could possibly recruit than anything I can actually do myself.  But fear not.  I have committed to each of you and for that reason alone I would not abandon you in our dream.  I just wanted to give each of you one last chance to bail with no hard feelings.  Tell me now or meet me on Ridgelake on November 15 with your sleeves rolled up.

(*Id.*).  The record does not include emails responding to this message.  Rimkus alleges that this email and any responses were not produced in discovery because the defendants intentionally deleted them.

On November 11, 2006, Bell emailed Cammarata, DeHarde, and Janowsky[22] asking for their names, addresses, and social security numbers to set up a payroll tax account for U.S. Forensic.  (*Id.*, Ex. B).  Bell stated in the email that he had received his COBRA package from Rimkus along with a form letter stating that Rimkus expected him to honor his agreements, including his noncompetition covenant.  (*Id.*).  Bell continued: "However, the designated geographic area is the MSA of any city in which Rimkus has received assignments from in the five years prior.  We are in good shape and I'll bet they know it.  We need to serve them on Monday to prevent them from filing in Texas.  Larry [Demmons] will

---

[22]   The email does not disclose the recipients, but because the message asked for the "partners'" names, addresses, and social security numbers, the recipients were presumably Cammarata, DeHarde, and Janowsky.

correct the pleading and get it in — then I call Markham.[23]  Damn the torpedoes — full speed ahead!"  (*Id.*).  Rimkus argues that the defendants' plan to file a preemptive lawsuit is evidence of a bad-faith attempt to prevent Rimkus from obtaining relief in Texas under Texas law.  The presence of the plan is important to the duty to preserve relevant records.

Bell responds that none of these actions breached his fiduciary duty to Rimkus.  Bell contends that even a fiduciary relationship between an officer and the corporation he serves does not preclude the officer from preparing for a future competing business venture. Rimkus acknowledges that general preparations for future competition do not breach fiduciary duty but argues that Bell's preparatory actions, combined with his misappropriation of trade secrets, solicitation of Rimkus's customers, and luring away Rimkus's employees—all while still employed by Rimkus—breached the fiduciary duty he owed as a Rimkus corporate officer.

Rimkus alleges that both Bell and Cammarata misappropriated client lists, pricing information, and other confidential Rimkus business information to which they had access while working at Rimkus and that they used this information to solicit Rimkus clients for U.S. Forensic.  The record shows that Bell and Cammarata emailed some Rimkus clients in November and December 2006.  Some of these emails refer to prior work done for the clients while Bell and Cammarata worked for Rimkus.  All these emails offer U.S. Forensic as an alternative to Rimkus.  It appears that the emails sent to Rimkus clients soliciting business for U.S. Forensic were first produced by an internet service provider pursuant to a third-party

---

[23]  This is presumably a reference to Gary W. Markham, Rimkus's former Chief Operating Officer.

subpoena.  The defendants either did not produce such emails or delayed doing so until late in the discovery.

The parties vigorously dispute how Bell and Cammarata obtained the contact information necessary to send these solicitation emails to Rimkus clients.   Bell and Cammarata assert that they did not misappropriate confidential client or other information from Rimkus.  Cammarata testified at a hearing that he did not download or print any Rimkus client list and did not take any written client list with him when he left.   Cammarata submitted an affidavit stating that when he resigned from Rimkus, he did not take any electronic or paper copies of Rimkus client lists or client-contact information and that he has "never used any Rimkus client lists or client contact information in [his] work for U.S. Forensic." (Docket Entry No. 309, Ex. Y, Affidavit of Nick Cammarata ¶¶ 11–12).  Bell also submitted an affidavit stating that when he resigned from Rimkus, he did not take any electronic or paper copies of Rimkus pricing information, investigative methods, report formats, operations manual, business plan, client lists, or client-contact information.  (*Id.*, Ex. V, Affidavit of Gary Bell  ¶¶ 39–49).  Bell stated that he has "never used any Rimkus client lists or client contact information in [his] work for U.S. Forensic."  (*Id.* ¶ 40).  Bell also stated that he did not use his memory of Rimkus client-contact information to solicit business for U.S. Forensic.  (*Id.* ¶ 41).  Bell stated in his affidavit that he has used only publicly available information, primarily from the Casualty Adjuster's Guides and the internet, to identify people to contact to solicit potential clients for U.S. Forensic.  (*Id.*).

The Casualty Adjuster's Guide is a compilation of the names, addresses, phone

33

numbers, and email addresses of insurance and adjusting companies and certain employees.

A separate guide is published for different geographical regions in the United States.  Each

guide is updated annually.  Other publicly available guides, including "The Claims Pages,"

the "Texas Legal Directory," and the "Louisiana Blue Book," contain similar information.

Bell stated in his affidavit that when he formed U.S. Forensic, he "used the Casualty

Adjusters Guide, the Louisiana Blue Book and other publicly available publications to find

the names, addresses, phone numbers and email addresses of potential clients for U.S.

Forensic." (*Id.* ¶ 13).  Bell also stated in his affidavit that he obtained contact information

of potential clients for U.S. Forensic when he attended industry conventions and seminars.

(*Id.* ¶ 15).  Bell testified in his deposition about his primary sources for new client-contact

information: "I would say, primarily, the internet was my – the – the main thing that I used

right off the bat.  As I got names, or as I called people and got other information, it would

grow from there.  But you can find all the adjusters available online, you can find them in the

Casualty Adjusters book, you can find them wherever.  It depends on where I'm trying to get

business, maybe.  But the internet is the best source, it's the most complete source.  You can

specify your search to – you know, to insurance adjusters that are working for the company,

who are not working for the company, you can get insurance claims office by state, you can

adjusters' license by state." (Docket Entry No. 314, Ex. 6, Deposition of Gary Bell, Vol. 1

at 59:5–:21).  Bell submitted an example of the sources of client-contact information

available on the internet.  (Docket Entry No. 309, Ex. V-8 pts. 1,2).

　　　　Rimkus asserts that the testimony by Bell and Cammarata describing how they

34

obtained client-contact information and denying that they took Rimkus confidential information when they resigned is false.   Rimkus contends that Bell and Cammarata could not have obtained contact information for the individuals they emailed to solicit business unless they took the information with them when they left Rimkus.   Rimkus points to an email Bell sent on December 10, 2006, in which he asked for a copy of the 2006 Louisiana Casualty Adjuster's Guide because he did not yet have one.   (Docket Entry No. 324, Ex. E). Rimkus also points to an October 1, 2006 email forwarded to Bell from an employee at Rimkus.   This email contained contact information for insurance adjusters at Lexington Insurance, a Rimkus client.   (Docket Entry No. 321, Ex. Q).[24]   And, according to Rimkus, many of the insurance adjusters Bell and Cammarata contacted in November and December 2006 are not listed in the Louisiana Casualty Adjuster's Guide.

In late August 2009, Rimkus submitted information showing that Gary Bell maintained a previously undisclosed personal email address to which he forwarded information from Rimkus.   In his March 8, 2009 deposition, Bell testified that the only email addresses he used during 2006 were glb@rimkus.com and garylbell@bellsouth.net.   (Docket Entry No. 314, Deposition of Gary Bell, Vol. 2 at 247:10–:19).   The deposition continued:

> Q:    Are there any others?
>
> A:    I don't believe so.
>
> Q:    You don't have like a Hotmail address?

---

[24]   Rimkus alleges that Bell forwarded the October 1 email on October 5, 2006.   The copy of the email submitted to the court does not clearly reflect a forward on October 5, 2006, but portions of the screen shot submitted are not legible.   (Docket Entry No. 321, Ex. Q).

A:      (Shakes head)

Q:      A Gmail address?

A:      No. I don't believe so.

(*Id.* at 247:20–248:1).

In August 2009, Rimkus completed a forensic analysis of its own computer system and discovered a "cookie" showing that on September 30, 2006—three days after Bell officially resigned from Rimkus but before his last day of work—Bell accessed his BellSouth email address from his Rimkus work computer to forward documents to the email address garylbell@gmail.com. Rimkus filed the forwarded documents under seal. These documents are income statements for Rimkus's Pensacola, New Orleans, Lafayette, and Indianapolis offices, as well as an employee break-even analysis. The income statements contain the August 2006 budget for each of those offices, including revenues, administrative costs, sales and marketing costs, and the total net income or loss. Rimkus asserts that these documents are confidential and accessible only by certain executive employees. Rimkus argues that the September 30, 2006 email Bell forwarded to himself is evidence of trade secret misappropriation. At a discovery hearing held on September 2, 2009, this court allowed Rimkus to subpoena Google, an email provider, to obtain emails Bell sent and received using the email address "garylbell@gmail.com."

On November 15, 2006—the date Cammarata resigned from Rimkus and U.S. Forensic began operating—Bell and Cammarata sued Rimkus in Louisiana state court, seeking a declaratory judgment that the forum-selection, choice-of-law, noncompetition, and

36

nonsolicitation provisions in the Employment Agreement and the noncompetition provision in the Common Stock Purchase Agreement were unenforceable. In January 2007, Rimkus sued Cammarata in this court, seeking to enjoin Cammarata from competing with Rimkus during the period set out in the Employment Agreement's noncompetition provision, from soliciting Rimkus employees and customers, and from using Rimkus trade secrets. Rimkus also sought damages for Cammarata's alleged breach of the Employment Agreement and misappropriation of trade secrets. (Docket Entry No. 1).

Rimkus sued Bell in Texas state court in February 2007, alleging breach of the covenants in the Common Stock Purchase Agreement. Bell removed to this court in March 2007. The suit against Bell, *Rimkus Consulting Group*, *Inc. v. Gary Bell*, Civ. A. No. H-07-910, was consolidated with the suit against Cammarata. (Docket Entry No. 211).

In the Louisiana state court suit Bell and Cammarata filed, the judge issued an order on March 26, 2007, stating that Louisiana law applied to their claims.[25] (Docket Entry No. 19, Ex. D). On July 26, 2007, the judge issued a final judgment stating that "pursuant to Louisiana law, the covenant not to compete clauses contained in Paragraphs 8(a) and the non-solicitation of customer(s) clauses contained in Paragraphs 8(c) of the respective contracts are invalid and unenforceable." (Docket Entry No. 71, Ex. H). The noncompetition clause in Bell's Common Stock Purchase Agreement was, however, held to be enforceable. Both sides appealed.

On January 4, 2008, the Louisiana Fifth Circuit Court of Appeal reversed the trial

---

[25]   DeHarde was also a plaintiff in the Louisiana lawsuit.

court's ruling on Bell's Common Stock Purchase Agreement and held that the noncompetition clause in that Agreement was invalid and unenforceable.  On March 25, 2008, the Louisiana Fifth Circuit Court of Appeal affirmed the trial court's decision that Louisiana law applied to the parties' agreements and that the Texas forum-selection and choice-of-law clauses and the noncompetition and nonsolicitation covenants in the Employment Agreement were unenforceable.  *Bell v. Rimkus Consulting Group, Inc. of La.*, 07-996 (La. App. 5 Cir. 3/25/08); 983 So. 2d 927.  In holding that Louisiana law applied to the 1996 Employment Agreement despite the Texas choice-of-law clause, the Louisiana Court of Appeal stated:

> Forum selection clauses will be upheld unless they contravene strong public policy of the forum in which the suit is brought.  LA. C.C. art. 3450.  LA. R.S. 23:921 A(2), a provision which was added by the legislature in 1999, is an expression of strong Louisiana public policy concerning forum selection clauses. . . .

>  . . . Louisiana law expressly provides that conventional obligations are governed by the law of the state whose policies would be most seriously impaired if its law were not applied to the issue.  Further, issues of conventional obligations may be governed by law chosen by the parties, *except to the extent that law contravenes the public policy of the state whose law would be applicable under La. C.C. art 3537.*

> As previously stated herein, Louisiana has a longstanding public policy to prohibit or severely restrict non-competition provisions in employment agreements which curtail an employee's right to [] earn his livelihood.  These agreements are in derogation of the common right, and they must be strictly construed against the party seeking their enforcement. Application of Texas law to this dispute would thwart Louisiana's longstanding public policy and interest in this type

38

of matter.

> According to well established Louisiana law and jurisprudence, the forum selection and choice of law provisions contained in the 1995 and 1996 employment contracts are null and void.  Thus, the agreements in this case are governed by Louisiana law.

*Id.* at pp. 9–10; 983 So.2d at 932–33 (citations omitted).[26]   On March 17, 2008, the

---

[26]  Article 3540 of the Louisiana Civil Code states:

> All other issues of conventional obligations are governed by the law expressly chosen or clearly relied upon by the parties, except to the extent that law contravenes the public policy of the state whose law would otherwise be applicable under Article 3537.

LA. CIV. CODE art. 3540.

Article 3537 of the Louisiana Civil Code states:

> Except as otherwise provided in this Title, an issue of conventional obligations is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue.

> That state is determined by evaluating the strength and pertinence of the relevant policies of the involved states in the light of: (1) the pertinent contacts of each state to the parties and the transaction, including the place of negotiation, formation, and performance of the contract, the location of the object of the contract, and the place of domicile, habitual residence, or business of the parties; (2) the nature, type, and purpose of the contract; and (3) the policies referred to in Article 3515, as well as the policies of facilitating the orderly planning of transactions, of promoting multistate commercial intercourse, and of protecting one party from undue imposition by the other.

LA. CIV. CODE art. 3557.

Section 921(A) of the Louisiana Revised Statutes states:

>  A. (1) Every contract or agreement, or provision thereof, by which anyone is restrained from exercising a lawful profession, trade, or business of any kind, except as provided in this Section, shall be null and void.

> (2) The provisions of every employment contract or agreement, or provisions thereof, by which any foreign or domestic employer or any other

Louisiana state trial court declared that the nonsolicitation-of-employees clause in the defendants' Employment Agreements was "ambiguous and unenforceable." (Docket Entry No. 105, Ex. D).

In this federal suit, Cammarata filed two motions to dismiss Rimkus's claims for breach of the noncompetition and nonsolicitation provisions in the Employment Agreement. Cammarata based his motions to dismiss on the preclusive effect of the Louisiana state court ruling invalidating the noncompetition, nonsolicitation, forum-selection, and choice-of-law provisions in the Employment Agreement. (Docket Entry Nos. 71, 105). In ruling on Rimkus's application for a preliminary injunction, this court concluded that the Louisiana court's judgment "clearly precludes relitigation of the issue of whether the forum-selection and choice-of-law provision, as well as the noncompetition and nonsolicitation covenants, are unenforceable in Louisiana, under Louisiana law." (Docket Entry No. 159, August 13, 2008 Memorandum and Opinion at 24). This court decided that, even if Texas law applied and the noncompetition and nonsolicitation provisions were enforceable outside Louisiana, Rimkus was not entitled to the preliminary injunctive relief it sought. Under Texas law, the noncompetition covenant was broader in geographical scope than necessary to protect

---

person or entity includes a choice of forum clause or choice of law clause in an employee's contract of employment or collective bargaining agreement, or attempts to enforce either a choice of forum clause or choice of law clause in any civil or administrative action involving an employee, shall be null and void except where the choice of forum clause or choice of law clause is expressly, knowingly, and voluntarily agreed to and ratified by the employee after the occurrence of the incident which is the subject of the civil or administrative action.

LA. REV. STAT. § 23:921(A).

Rimkus's legitimate business interests and the nonsolicitation covenant was broader than necessary because it applied to all Rimkus customers, not merely those Cammarata had worked with or solicited business from while working for Rimkus.

Cammarata again moved to dismiss based on *res judicata*, asking this court to determine the preclusive effect of the Louisiana court's ruling outside Louisiana. (Docket Entry No. 169). Cammarata's motions to dismiss were granted "insofar as Rimkus seeks damages for Cammarata's postemployment competitive activities inside Louisiana on the basis that those activities breached his Employment Agreement." (Docket Entry No. 260, March 24, 2009 Memorandum and Opinion at 27). The motions to dismiss were denied with respect to Cammarata's activities outside Louisiana. (*Id.*). This court held that the Louisiana state court's rulings that the forum-selection, choice-of-law, noncompetition, and nonsolicitation contract provisions were unenforceable in Louisiana under Louisiana law did not make those provisions invalid in all states. (*Id.* at 25).

In response to the declaratory judgment complaint Bell and Cammarata filed in Louisiana state court on November 15, 2006, Rimkus filed an answer and a "Reconventional Demand."[27] Rimkus asserted that "the entirety of this Reconventional Demand should be governed according to the laws of the State of Texas." (Docket Entry No. 309, Ex. B at 6). Rimkus's reconventional demand asserted causes of action for breach of the Employment Agreement's noncompetition, nonsolicitation, and confidentiality provisions, breach of the Common Stock Purchase Agreement, breach of fiduciary duty, and disparagement. (*Id.*).

---

[27] Under Louisiana civil procedure, a reconventional demand is similar to a counterclaim.

After the Louisiana state court ruled that the noncompetition and nonsolicitation clauses in the Employment Agreements were unenforceable under Louisiana law, Bell, Cammarata, and DeHarde moved for summary judgment on the remaining claims asserted in Rimkus's reconventional demand in the Louisiana lawsuit. The summary judgment motion cited only Texas cases and sought judgment as a matter of Texas law. Rimkus responded to the motion and argued that summary judgment was inappropriate under Texas law. The Louisiana state trial court heard oral argument from the parties on the viability of these claims under Texas law. On May 11, 2009, the Louisiana court issued an order stating that "after reviewing the evidence, the law and arguments of counsel . . . IT IS ORDERED, ADJUDGED, AND DECREED that the Motion for Summary Judgment is GRANTED, and the reconventional demands of the plaintiffs-in-reconvention, Rimkus Consulting Group, Inc. and Rimkus Consulting Group, Inc. of Louisiana, are DISMISSED WITH PREJUDICE, each party to bear its own costs." (Docket Entry No. 309, Ex. G). The defendants in this case, Bell and Cammarata, argue that the Louisiana state court's ruling dismissing these claims is entitled to preclusive effect.

**B.    Discovery**

In the fall of 2007, Rimkus sought "documents, including emails, related to Cammarata's and Bell's communications with one another and with other U.S. Forensic, L.L.C. members concerning the creation and inception of U.S. Forensic, L.L.C., their roles with the company, and contact with clients." (Docket Entry No. 313 at 4). Rimkus deposed Cammarata in October 2007. In response to a subpoena duces tecum issued for that

deposition, Cammarata produced two emails relevant to the formation of U.S. Forensic.  In November 2007, Rimkus served the defendants with a request to produce all such documents, including all emails sent among those setting up or working for U.S. Forensic before January 1, 2007.  The defendants objected to this request as overbroad because it could include irrelevant personal emails and "day-to-day emails regarding the operation of U.S. Forensic's business," but stated that they "searched several times for any such responsive emails and turned over any responsive emails in their possession."  (Docket Entry No. 345 at 47).  Rimkus asserts that from November 2007 to June 11, 2009, despite repeated requests, the defendants did not produce any emails.   In June 2009, the defendants produced approximately sixty emails sent by the defendants and others involved with U.S. Forensic during the fall of 2006.  (Docket Entry No. 313 at 4).

In the spring of 2009, Rimkus noticed the depositions of Gary Bell, William Janowsky, and Michael DeHarde.  Each was served with a subpoena duces tecum seeking any email communications about U.S. Forensic's formation.  On March 7, 2009, Bell testified in his deposition that he had "printed out the things that [he] thought might be responsive, and sent it to [his attorney], when [he] first received the first request" for these emails. (Docket Entry No. 314, Ex. 6, Deposition of Gary Bell, Vol. 1 at 16:24–17:2).  Bell testified that it was his custom to delete an email after completing the task for which he needed the email but that he might have saved some relevant, responsive emails on his personal computer until the related tasks were completed.  (*Id.* at 15:21–16:4).  When asked whether he still had that personal computer, Bell testified that he had donated it to charity in

2007, well after the litigation was underway.  (*Id.* at 16:11–:18).  When Bell was asked whether, when he sued Rimkus in Louisiana on November 15, 2006, he attempted to preserve emails, documents, calendar entries, or other information relevant to his departure from Rimkus to form a competing business, Bell testified as follows:

> A:   For my employment at Rimkus, I used the Rimkus E-mail system.  They would – you know, they would have everything there.  I didn't use my personal – but, you know, I – I – you know, I don't know what to tell you.  I – you know, I don't think I had anything.  I certainly wasn't trying to get rid of anything.  I think, it wasn't as, you know, planned as – as it could have been.
>
> Q.   At the time you instituted that legal action, did you have an understanding that you should endeavor, as best you could, to try to keep any relevant information?
>
> A.   I – if I thought there was something that – that, you know, was requested of me, I would – I would turn it over.  I didn't try to get rid of anything that I thought I shouldn't.

(*Id.* at 17:21–18:13).

Janowsky was deposed on March 9, 2009.  He testified that in response to the subpoena duces tecum, he looked in his desk, file cabinet, and computer.  (Docket Entry No. 314, Ex. 12, Deposition of William Janowsky at 16:2–:22).  Janowsky testified that he "went to Windows Explorer and searched the – the directories where I thought those things might have occurred," but he was unable to find responsive emails.  (*Id.* at 17:5–18:3).  Janowsky also searched his web-based email account with NetZero and found nothing responsive.  (*Id.* at 18:8–:13).  Janowsky acknowledged that he exchanged emails with Gary Bell using his

NetZero account while they were working on forming U.S. Forensic.  (*Id.* at 19:8–:11).

Janowsky's deposition testimony continued:

> Q.   And what did you do with them?
>
> A.   I deleted them.
>
> Q.   And when did you delete them?
>
> A.   I don't know.
>
> Q.   Did you ever print them?
>
> A.   No.
>
> Q.   What was – what is your routine or your normal practice with respect to either deleting or saving Emails?
>
> A.   I get rid of them very frequently. I get a lot of Emails and they fill up my box, so I go through on kind of a weekly basis and – and get rid of anything that's – that's not current, needs to be taken care of.

(*Id.* at 19:12–:25).  Janowsky testified that he did not participate in any discussion with Bell, Cammarata, or DeHarde about deleting emails related to forming U.S. Forensic.  Janowsky testified that there was no agreement to delete emails on a routine or regular basis.  (*Id.* at 40:24–41:10).  "I deleted my Emails out of convenience.  I'm not sure what the other guys did, if they deleted – but I didn't have any agreement to delete Emails about this interest."  (*Id.* at 41:14–:17).  Janowsky did not remember whether anyone had ever talked to him about preserving records related to the formation of U.S. Forensic.  (*Id.* at 26:1–:4).  He acknowledged that he had not tried to save any emails related to the formation of U.S. Forensic or with Bell, Cammarata, and DeHarde about U.S. Forensic.  (*Id.* at 26:5–:8).

DeHarde was deposed on April 1, 2009.  He testified that he had looked for "the emails that [he] and Mr. Bell exchanged concerning – forming a company to compete with Rimkus" but did not "recall" whether he was able to find those emails.  (Docket Entry No. 313, Ex. F, Deposition of Michael DeHarde at 13:10–:16).   The following exchange occurred:

> Q:    What did you do to try to find them?
>
> A:    I looked on my computer.
>
> Q:    And when did you do that, sir?
>
> A:    I don't recall.
>
> Q:    Can you give me an estimate of when you did it?
>
> A:    About 2007, 2008, something like that.
>
> Q:    Why did you do it?
>
> A:    Because I was requested to do that.
>
> Q:    And did you find any?
>
> A:    I don't recall.
>
> Q:    What would you have done with them after you found them?
>
> A:    Given them to Larry Demmons [counsel for defendants Bell and Cammarata].
>
> MR. WARD [counsel for Rimkus]:
>
>    Larry, do you have any emails from Mr. DeHarde?
>
> MR. DEMMONS:

46

Nothing other than what's been turned over.

MR. WARD:

I don't believe anything has been turned over from Mr. DeHarde.

MR. DEMMONS:

Then I didn't get anything from Mr. DeHarde.

(*Id.* at 13:17–14:17).    DeHarde testified that he deleted emails—including email communications with Bell, Cammarata, and Janowsky—because of concern about the storage capacity of his Yahoo! email account.  (*Id.* at 37:14–:20; 38:19–:25).  DeHarde testified that he did not delete emails on a regular or systematic basis.  (*Id.* at 22:2–:10).[28]

After this deposition, Rimkus asked this court to compel DeHarde to look for and produce documents and information responsive to the subpoena duces tecum.  This court ordered DeHarde to do so and to reappear for one hour of additional deposition questioning. Rimkus then subpoenaed several internet service providers seeking the defendants' emails. At a hearing held on May 1, 2009, this court permitted Rimkus to proceed with those subpoenas with limits based on relevance and privacy protection.[29]  The May 1, 2009 hearing revealed that the defendants' efforts to locate and retrieve electronically stored information,

---

[28]  Pages 22, 37, and 38 of the April 2009 deposition of Mike DeHarde are quoted in Rimkus's motions for contempt and sanctions and are identified in the motion as attached as Exhibit F.  (Docket Entry No. 313 at 13–14).  Exhibit F, however, contains only sporadic pages from the DeHarde deposition and does not include pages 22, 37, or 38.  The content of these passages of DeHarde's deposition have not been disputed.

[29]  The defendants objected to some of the subpoenas on the grounds that they would allow Rimkus to access private, irrelevant information as well as emails covered by attorney–client privilege.  This court required the subpoena notices to direct the ISPs to use search terms to avoid production of personal or privileged emails. This court also required the documents from some of the internet service providers to be submitted directly to the court for in camera review before production to Rimkus.

including emails, had been superficial. The defendants had looked for readily accessible emails that were still on the computers they still had. They had not identified any sources of relevant information that were not reasonably accessible. They had no information about whether any of the emails that had been deleted or were otherwise not reasonably accessible could be recovered and how much time and expense might be required. The defendants were ordered to conduct that inquiry and report the results.[30]

Rimkus deposed Allen Bostick, an information technology ("IT") consultant that U.S. Forensic used in the fall of 2006. Bostick's deposition revealed that Homestead Technologies web-hosted U.S. Forensic's email accounts beginning on November 15, 2006. On December 19, 2006, Bostick switched U.S. Forensic to an in-house email host using a small business server. U.S. Forensic used a series of external hard drives for backup storage. The documents on U.S. Forensic's network, including emails, were backed up every night using backup software and the external hard drives. On April 4, 2007, Bostick advised U.S. Forensic that the software for the type of hard drive U.S. Forensic was using was not meant to back up a small business server. According to Bostick, the hard drive was subsequently returned to the manufacturer as defective. On April 5, 2007, U.S. Forensic switched to different backup software. Every night, the software created a local copy on the server and saved a backup copy onto two external hard drives. Near the end of 2007, one of these drives

---

[30] *See* Fed. R. Civ. P. 26(b)(2)(b) ("A party need not provide discovery of electronically stored information from sources that the party identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the party from whom discovery is sought must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.").

failed.  Bostick testified that space on the external hard drives became a concern around late 2007.  (Docket Entry No. 314-9, Deposition of Allen Bostick at 148:1–:4).

In late 2007, U.S. Forensic began using three external hard drives and subsequently began using different backup software.  The new software did not create a backup image on the server.  Instead, the backup was directly to the external hard drive.  On May 28, 2009, the defendants reported that three backup images had been located.  Bostick was able to restore one of these images but two others were corrupted and U.S. Forensic no longer had the software to restore them.  According to the defendants, the hard drives had to be sent to the software company for any attempt at restoration.

The defendants reviewed the emails recovered from the restored backup image and determined that none were relevant  The defendants also retained Roddy Orgeron, an IT consultant, to determine the time, cost, and likelihood of obtaining information from the corrupted drives.  Orgeron could not open the files because the hard drive was damaged and because he did not have the necessary software.  According to Orgeron, there was some possibility that some backup files could be recovered, but it would cost between $2,000.00 and $10,000.00 and there was a slim likelihood of success because of the damage to the hard drive.

On May 29, 2009, Rimkus continued with DeHarde's deposition.  DeHarde produced several responsive emails that he had found in his Yahoo! mail account.  These emails were sent to DeHarde from other Rimkus employees while DeHarde still worked at Rimkus.  DeHarde received these emails at his Rimkus email address but forwarded them to his

49

personal Yahoo! account.  None of the emails was from Bell or Cammarata.  The following

exchange occurred:

> Q:   Is there any reason that you don't have any emails from
>       this same time frame from Mr. Cammarata?
>
> A.   Yes.
>
> Q.   Why is that?
>
> A.   We deleted them. We had a policy that we would delete
>       e-mails during the start-up after two weeks.

(Docket Entry No. 313, Ex. F, Deposition of Michael DeHarde at 18:14–:21).  DeHarde

testified that he, Bell, Cammarata, and Janowsky had agreed on this email-deletion policy.

According to DeHarde, this agreement was made "[s]ometime in the fall of 2006, fall or

summer, 2006," while he was still working at Rimkus.  (*Id.* at 34:24–:25).  DeHarde testified

that there was no discussion with Bell or Cammarata about suspending or modifying this

policy once they decided to file the Louisiana lawsuit or when they did so on November 15,

2006.  DeHarde acknowledged that he had deleted all emails that Cammarata sent to his

Yahoo! account.  The deposition continued:

> Q.   And those were emails that specifically related to
>       discussions you were having about leaving Rimkus and
>       forming a new business?
>
> A.   Yes.
>
> Q.   And part of the motivation for that was to make sure that
>       there wasn't evidence of those communications, correct?
>
> A.   We had a policy to delete the emails after two weeks, and
>       I followed the policy.

(*Id.* at 35:1–:9).  DeHarde testified that the policy remained in effect after the Louisiana state suit was filed.  (*Id.* at 34:9–:14).

On June 11, 2009, the defendants produced approximately 103 pages of emails sent in the fall of 2006.  The emails include communications among the defendants clearly responsive to long-standing Rimkus discovery requests.  These emails were forwarded from Gary Bell to defense counsel Larry Demmons on May 15, 2009.  These emails were only a portion of those sent or received by Bell, Cammarata, and DeHarde beginning in the fall of 2006, relating to U.S. Forensic.

Rimkus was able to obtain numerous additional emails via subpoena from the defendants' internet service providers and email providers.  Most were produced by Homestead.  These emails show that Bell and Cammarata contacted Rimkus clients in November and December 2006 to solicit business for U.S. Forensic.  The following emails were obtained from Homestead:

- On November 9, 2006, Bell emailed Doug Delaune of Southern Farm Bureau Casualty Insurance and attached U.S. Forensic's marketing materials.  (Docket Entry No. 324, Ex. F).  Bell asked for Delaune's help in getting U.S. Forensic on Farm Bureau's approved list and invited Delaune to meet.  (*Id.*).

- On November 15, 2006, Bell emailed Stephanie Jackson of Louisiana Citizens Property Insurance and attached "initial company information on U.S. Forensic."  (Docket Entry No. 321, Ex. L-2).  Bell thanked Jackson for "speaking with [him] last week" and asked for a meeting "some time next week" to "go over our capabilities, capacities, the company insurance coverages, and how we plan to improve on services to Citizens."  (*Id.*).  Bell stated that U.S. Forensic would be "officially open for business tomorrow" and that he "hope[d] we get a chance to continue working with you."  (*Id.*).

- On November 15, 2006, Bell emailed Don Livengood, a Fidelity National

51

representative with whom Bell and Cammarata had dealt while employed at Rimkus. (Docket Entry No. 321, Ex. L-1). Bell attached to the email "initial company information on U.S. Forensic" and asked to meet with Livengood to "go over the insurance coverages, the non compete agreement for Orleans Parish and our capacity to do jobs out of state." (*Id.*). Livengood responded that he would "be in touch with you next week about working our jobs." (*Id.*). Bell replied that he and Cammarata were "looking forward to working with you again." (*Id.*).

- On November 27, 2006, Bell emailed Bill Eckert of Ungarino Eckert and Tommy Dupuy of Cunningham Lindsey to introduce U.S. Forensic and solicit business. (Docket Entry No. 324, Exs. L, N). Ungarino Eckert and Cunningham Lindsey had been Rimkus clients and the record shows that Bill Eckert worked with Bell while he was still employed at Rimkus. (*Id.*, Ex. M).

- On December 1, 2006, Bell sent an email to "info@usforensic.com," with blind copies apparently addressed to numerous individuals. (*Id.*, Ex. P at 4). The email introduced U.S. Forensic, "a Louisiana and Mississippi licensed forensic engineering firm which specializes in evaluation of civil, structural and mechanical failures." (*Id.*). Bell highlighted the experience of U.S. Forensic's engineers and attached their resumes and U.S. Forensic brochures. The email included a link to U.S. Forensic's web site and invited recipients to contact Bell for more information. (*Id.*). Two recipients of that email were Cary Soileau of Allstate Insurance and Dianna Drewa of Fidelity National Insurance Company, both Rimkus clients. (Docket Entry No. 324, Exs. P, Q, R). Bell had worked with Soileau while employed by Rimkus. After Bell left Rimkus, he asked Soileau to provide contact information for Allstate employees Claudia Danesi and Julie Kron so that U.S. Forensic could "get on the Allstate approved list locally." (*Id.*, Ex. P).

- On December 11, 2006, Bell emailed Tim Krueger of Safeco Insurance. (*Id.*, Ex. S). Bell stated that he "really had no idea [he] was leaving [Rimkus] the day [he] did" and expressed hope that Krueger had been served well since his departure. (*Id.*). Bell asked Krueger to direct him to "any local claims people that might be looking for some local help" but noted that "*due to contractual obligations we would not be able to accept any assignments in New Orleans until October 2007.*" (*Id.* (emphasis added)).

- On December 12, 2006, Bell emailed Denise Milby of Scottsdale Insurance and D. Powell and Jeff Baker of Boulder Claims to introduce U.S. Forensic and its engineers and services. (*Id.*, Exs. T, V).

- On December 13, 2006, Bell emailed Sandra Carter with Lexington Insurance "to introduce U.S. Forensic, a Louisiana and Mississippi based forensic engineering firm which specializes in evaluation of civil, structural, electrical and mechanical failures." (Docket Entry No. 321, Ex. L-3). Bell continued: "You may remember me from my previous position as Central U.S. Operations Manager at Rimkus Consulting Group and my trip to Boston a couple of months back. I left with a couple of engineers from Rimkus and a couple from a competitor to form a new, leaner firm that focuses on decisive, cost effective reports with no more than a two week turnaround." (*Id.*). Bell stated that U.S. Forensic "would be pleased to work with you and Lexington Insurance." (*Id.*). Rimkus has submitted evidence that Carter's new contact information was contained in an email that Bell received from a coworker at Rimkus on October 1, 2006. Rimkus alleges that Bell forwarded this email on October 5, 2006, using his Rimkus email account, to an unknown email address. (*Id.*, Ex. Q).[31]

The belatedly produced emails show that in November and December 2006, Cammarata also contacted individuals he had dealt with while working at Rimkus. On November 30, 2006, Cammarata emailed Ken Mansfield about his new firm. (Docket Entry No. 324, Ex. Z). Cammarata referred to assignments they had worked on together at Rimkus and told Mansfield to let Rimkus know his requirements if he wanted Rimkus to continue providing forensic engineering services. (*Id.*). Cammarata gave Mansfield the contact information for the Rimkus New Orleans District Manager but also offered "to provide professional engineering services to you and your firm as you may require" and asked Mansfield to contact him. (*Id.*). On December 11, 2006, Cammarata emailed Bill Parsons of Gray Insurance to follow up on a phone conversation they had about an assignment Cammarata had been working on for Parsons before leaving Rimkus. (*Id.*, Ex. AA).

[31] The copy of the email submitted to the court does not clearly reflect a forward on October 5, 2006, but portions of the screen shot submitted are not legible. (Docket Entry No. 321, Ex. Q).

Cammarata told Parsons that it would be easier to have the file transferred from Rimkus to U.S. Forensic so that Cammarata could complete the work himself.  (*Id.*).  Cammarata told Parsons that if he wanted the file transferred, he should contact Rimkus's New Orleans District Manager.  (*Id.*).

The emails Rimkus recovered from the internet service providers were largely from November and December 2006, when Homestead was hosting U.S. Forensic's email.  The defendants had deleted these emails in late 2006, despite the fact that they had filed the Louisiana suit against Rimkus and despite the likelihood that Rimkus would sue them. Rimkus argues that because Bell and Cammarata had deleted these emails, and the emails were solicitations of former Rimkus clients, it is clear that Bell and Cammarata sent other similar emails, particularly after December 2006.  Rimkus contends that the record supports an inference that the deleted emails would have helped its case and that the pursuit of this case has been impaired by the inability to obtain those emails in discovery.

Rimkus also alleges that the defendants' testimony that they did not delete emails to cover up unfavorable evidence is perjurious.  Rimkus alleges that "there are other specific instances of perjury that have occurred in the testimony of Bell, Cammarata, Janowsky, DeHarde, and Darren Balentine that [also] justify the imposition of a severe sanction." (Docket Entry No. 313 at 24).  Rimkus argues that Bell's and Cammarata's testimony that they did not take confidential client information from Rimkus is false because the emails obtained from Homestead show that the defendants contacted Rimkus clients shortly after leaving Rimkus.  According to Rimkus, there is no way Bell and Cammarata could have

obtained that contact information so quickly unless they took it from Rimkus when they left.

At the August 6, 2009 motion hearing, this court allowed Rimkus to reopen the depositions of Bell and Cammarata and to supplement the summary judgment record. Rimkus filed a supplemental response, (Docket Entry No. 374), and the defendants filed a supplemental reply, (Docket Entry No. 376).  At a September 2, 2009 discovery conference, the parties presented arguments on the significance of the recently obtained evidence.  The new evidence included emails on Bell's personal email account with Google, reports created by the defendants for U.S. Forensic that Rimkus alleged contain its copyrighted materials, and the presence of Rimkus files on Cammarata's home computer.  The court allowed the parties another opportunity to supplement the record to include relevant, recently obtained evidence.  Rimkus filed supplements to its summary judgment responses and to its sanctions motions.  (Docket Entry No. 389, 393, 394).

The supplemental filings included emails Rimkus subpoenaed from Homestead showing that Cammarata used his personal email address in November and December 2006 to send Rimkus engineering data and reports to his U.S. Forensic email address.  (Docket Entry No. 393, Ex. C).  Cammarata testified that while he was working at Rimkus, he often transferred work and reports to his home computer.  (*Id.*, Ex. E, Deposition of Nickie Cammarata at 45:18–:24).  Rimkus also obtained an email showing that Cammarata copied part of a Rimkus vibration report that he had used when he worked at Rimkus and sent it to a U.S. Forensic Associates contract engineer to include in a project presentation.  (Docket Entry No. 393, Ex. C; Ex. E, Deposition of Nickie Cammarata at 16:13–17:23).  Cammarata

and Bell both testified that they obtained a copy of a Rimkus wind/hail powerpoint presentation to use at U.S. Forensic.  (*Id.* at 15:22–16:4; Docket Entry No. 389, Ex. I, Deposition of Gary Bell at 69:10–70:13).  Rimkus filed an amended complaint alleging that the use of the powerpoint presentation and other Rimkus materials constitutes copyright infringement.  (Docket Entry No. 403 at 13–14).

Cammarata testified that one of his clients at U.S. Forensic gave him photographs taken by Rimkus of a job in the Port Sulphur, Louisiana area because the client wanted Cammarata to continue working on that job at U.S. Forensic.  (Docket Entry No. 389, Ex. H, Deposition of Nickie Cammarata at 10:9–15:21).  Rimkus argues that Cammarata misappropriated these photographs from Rimkus and used them in preparing U.S. Forensic reports.  (Docket Entry No. 389 at 5).

On September 13, 2009, Cammarata produced, for the first time, fifteen disks of electronically stored information and numerous boxes of paper documents.  Rimkus reviewed these materials and "determined that [they] contained a significant amount of Rimkus correspondence, job photographs, job files, engagement letters, Terms and Conditions, client contact information, and Rimkus PowerPoint presentations."  (Docket Entry No. 389 at 5).  Rimkus points to Cammarata's October 4, 2007 deposition testimony that he only retained "some reports" in a box as further evidence of perjury and discovery obstruction.  (Docket Entry No. 393, Ex. K, Deposition of Nickie Cammarata at 122:17).

Rimkus also submitted evidence from its own forensic analysis of Bell's Rimkus laptop.  The analysis showed that on the day he resigned from Rimkus, Bell downloaded

financial information from the Rimkus server to the laptop.  This information includes financial spreadsheets for six Rimkus offices, including Chicago, Indianapolis, Jackson, Lafayette, New Orleans, and Pensacola.  These offices comprise Rimkus's Central Region, which had been Bell's responsibility.  Rimkus argues that there was no reason for Bell to download these documents from the server on the day he resigned other than to misappropriate them for use in his new competing business.

On September 30, 2006, Bell sent an email to his personal Gmail account containing financial data for four Rimkus offices.  Bell had downloaded this data from his Rimkus laptop.  In an earlier deposition, Bell had testified that he did not have a Gmail account during this period.  (Docket Entry No. 394, Ex. A, Deposition of Gary Bell at 450:10–451:11).  In his August 2009 deposition, Bell was asked about the belated disclosure that he had sent Rimkus information to a personal Gmail account:

> Q:  Now, do you remember me asking you in your prior deposition about all of the email accounts you had?
>
> A:  I believe you did.
>
> Q:  You didn't mention a G-mail account, did you?
>
> A:  Not that I recall.
>
> Q:  And I specifically asked you if you had a G-mail account, right?
>
> A:  I don't know if you specifically asked me.  I don't use the G-mail account.  I set it up during the hurricane right after I evacuated to Lafayette.  I got an invitation to set one up.  I set it up and it's really something I haven't really used.

(*Id.*, Ex. C, Deposition of Gary Bell at 10:9–:22).

Rimkus argues that Bell first tried to conceal, then distance himself from, the Gmail account because he used it to "go under the radar" to download and take confidential Rimkus financial information.   Bell testified in his deposition that he sent Rimkus financial documents to his BellSouth email account, not to use for U.S. Forensic but to help with the transition of the branch managers in the Central Region before he left Rimkus.   (*Id.* at 17:8–18:1).  But Bell sent this email on September 30, 2006, three days *after* he resigned from Rimkus.  Bell testified in his March 2009 deposition that he declined Rimkus's invitation to help with transition work at the branch offices and that he never worked for Rimkus after September 27, 2006.  (Docket Entry No. 394, Ex. A, Deposition of Gary Bell at 78:18–79:4; 80:19–:22; 81:16–:20).  Rimkus also argues that Bell did not need to email these documents to himself if he was using them for Rimkus work because they were contained on his Rimkus work laptop, which he could take with him until he was finished assisting with the transition.  Rimkus also notes that the September 30, 2006 email was not produced by BellSouth in response to a subpoena because Bell had previously deleted it.

On October 1, 2009, Rimkus filed its second supplemental memorandum of law in support of its motion for sanctions and response to the motion for summary judgment. (Docket Entry No. 410).  In the supplemental filing, Rimkus identified an email that had been produced in native format as required in this court's August 17, 2009 order.  (Docket Entry No. 411).  The defendants had previously produced this email in PDF format.  (Docket Entry No. 410, Ex. Supp. T).  The email was dated April 6, 2008 and labeled "From: Gary Bell"

and "To: Gary Bell," with no indication of the email addresses. (*Id.*). When the email was produced in native format, it showed six attachments not included in the original PDF version. (Docket Entry No. 411). Rimkus filed the attachments under seal. (*Id.*). The attachments contain contact information for Rimkus clients in Florida and for one client's national catastrophe manager in Minnesota. (Docket Entry No. 410 at 7). Rimkus asserts that the metadata shows that Darren Balentine created the documents at Rimkus on December 14, 2007 and April 2, 2008, while he was working for Rimkus. Balentine subsequently quit Rimkus to become a 50% owner of U.S. Forensic Associates. (*Id.* at 8). The metadata also shows that the documents were converted to PDF on April 2, 2008. (*Id.*).

On May 1, 2008, less than a month after the April 6, 2008 email with the client-contact information attached, Bell had testified in this court that he did not take or use confidential information when he left Rimkus and started U.S. Forensic. (Docket Entry No. 410, Ex. Supp. V at 80:16–:24). On October 6, 2009, Bell testified that he did not remember getting the April 2008 email until it was produced. He did not know whether he had received other Rimkus client information. (Docket Entry No. 430 at 12). Bell testified that he had never used the client-contact information in the email attachments. (*Id.* at 14). Bell also testified that he did not ask Balentine for the information and did not know why Balentine sent it to him. (*Id.* at 16). Bell's counsel, Demmons, stated that he had prepared and printed the emails for production and could not explain why the initial production not only failed to include the attachments but concealed their presence. (*Id.* at 36).

In his April 9, 2009 deposition, Balentine stated that he had not to his knowledge

transmitted any information he knew to be confidential Rimkus information.  (Docket Entry No. 410, Ex. Supp. W, Deposition of J. Darren Balentine at 60:10–:18).  Rimkus took a brief additional deposition on October 27, 2009.  In the October deposition, Balentine stated he did not recall sending Bell the client-contact information and that he was unable to find a record of sending Bell an email with the client information in April 2008.  (Docket Entry No. 445, Ex. B., Deposition of J. Darren Balentine at 35:7–:10, 39:11–:18, 51:1–:25, 97:6–98:4).

Rimkus filed a motion for a preliminary injunction on October 1, 2009, seeking, among other things, to require Bell and others to return all of Rimkus's confidential information and seeking to enjoin Bell and anyone at U.S. Forensic from using the information contained in the email attachments.  (Docket Entry No. 416).  At a hearing before this court on October 6, 2009, the parties agreed to certain provisions of the proposed injunction, and this court granted the preliminary injunction in part.  (Docket Entry No. 425).

In addition to the email attachments containing Rimkus customer information, Rimkus also points to a newly discovered email stating that Bell met with a real estate agent in August 2006, while he was still working at Rimkus, and on August 15, 2006 received a Letter of Intent to lease the space.  (Docket Entry No. 410, Ex. Supp. Q).  The Letter of Intent identified "U.S. Forensics, LLC" as the subtenant and noted that the "LLC [was] to be established in September, 2006."  (*Id.*).  Rimkus argues that the Letter of Intent naming U.S. Forensic contradicts Bell's earlier deposition testimony that Bell did not plan to leave Rimkus before he did so and that his only steps before leaving Rimkus was speaking to his brother about going to work for him.  (Docket Entry No. 410 at 13–23).

Rimkus filed a supplemental memorandum of law, arguing that it had discovered proof that Bell had used the Rimkus client information contained in the April 2008 email attachments. (Docket Entry No. 429). Rimkus submitted an affidavit from Michael Sanchez, a claims vendor manager for American Strategic Insurance Company. (*Id.*, Ex. Supp. Y). Sanchez's affidavit stated that Bell contacted him by email and phone, seeking to provide engineering services through U.S. Forensic. *Id.* at 2. Sanchez also stated that Balentine contacted him on September 9, 2009, seeking to provide engineering services through U.S. Forensic Associates, L.L.C. *Id.* Sanchez did not recall providing his contact information to Bell. *Id.* Rimkus alleges that Sanchez's affidavit establishes that Bell had used Rimkus confidential information, contradicting his statements under oath.

In response, the defendants noted that Sanchez's affidavit did not preclude the possibility that his contact information could have been obtained from a source other than Rimkus's client lists. (Docket Entry No. 435 at 9 n.3). The defendants offered a roster from a conference Bell attended in 2008 containing Sanchez's phone number and address as a possible source of the contact information. (*Id.* at 9). The defendants also attacked the language in the affidavit as "far from definitive" because Sanchez said "[t]o my knowledge" and "that I recall" when referring to communications from Bell. (*Id.*). The defendants also objected that Sanchez did not attach his call log showing the phone call from Bell or any emails from Bell. (*Id.*).

Rimkus filed a fourth supplemental memorandum on October 14, 2009. (Docket Entry No. 439). Rimkus argued that Sanchez's email address does not appear in the contact

61

information listed in the conference documents. (*Id.* at 2). Rimkus argued that the evidence of Bell's contact with Sanchez conflicts with Bell's testimony before this court that he had not contacted persons listed on the Rimkus client list. (*Id.*).

On November 5, 2009, the defendants filed a motion to strike Sanchez's affidavit, Rimkus's fourth supplement, and the supplemental responses to the motion for contempt. (Docket Entry No. 446).   The defendants argued that Sanchez's testimony in his November 2, 2009 deposition was different from his affidavit.   Sanchez testified in his deposition that Bell called him in June 2009; the affidavit states the date as June 2008.   Sanchez testified in his deposition that he never received an email from Bell; his affidavit states that Bell emailed him.   Sanchez testified in his deposition that his contact information was on lists in Bell's possession and that he believed he gave Bell a business card.   Sanchez also testified that he did not read through the whole affidavit after signing it. (*Id.*).   The defendants argued that this court should strike Rimkus's fourth supplement because it was filed after this court's October 14, 2009 deadline for filing supplemental pleadings. (*Id.* at 13 n.21).   Rimkus responded and argued that Sanchez's affidavit and deposition testimony both contradict Bell's October 6, 2009 testimony that he had not contacted any client on the Rimkus client list attached to the April 6, 2008 email. (Docket Entry No. 447).[32]

---

[32] The defendants' motion to strike, (Docket Entry No. 446), is denied.  Although Rimkus filed a supplement after this court's deadline for doing so passed, that supplement was filed to submit evidence from Balentine's October 27, 2009 deposition about the April 6, 2008 email attachments. (Docket Entry No. 445).  Rimkus could not have filed the evidence until after Balentine was deposed.  Rimkus filed the supplement three days after Balentine's deposition.  Given the circumstances, the Rimkus supplement was timely filed and will not be stricken.  The defendants' motion to strike the Sanchez affidavit, (Docket Entry No. 446), is also denied.  The inconsistencies between Sanchez's affidavit and his deposition testimony are appropriately treated as impeachment evidence but not as a basis for striking the affidavit.

After the October 6, 2009 hearing, the defendants produced 277 reports and other documents that contain data or language taken from Rimkus materials. (Docket Entry No. 431 at 6–7). Rimkus argued that the reports were further evidence of bad faith and discovery obstruction. (*Id.* at 7). Rimkus argued that in addition to the evidence of spoliation, this court should look to the defendants' delay in responding to discovery, their "formulaic and groundless objections," and their "chaotic production" to support a finding of contumacious conduct. (*Id.* at 10).

The parties' contentions are examined against the extensive evidence in the record, including the supplemental filings, and the applicable law.

## IV.    Rimkus's Motion for Sanctions and Contempt

### A.    The Parties' Contentions

Rimkus argues that the defendants intentionally deleted emails "in direct contravention of their legal duty to preserve electronically stored information when they anticipated they would be engaged in litigation with Rimkus." (Docket Entry No. 313 at 6). Rimkus contends that the duty to preserve arose before November 2006, when Bell, Cammarata, and DeHarde planned to sue Rimkus in Louisiana. Rimkus points to the November 11, 2006 email that Bell sent to Cammarata, DeHarde, and Janowsky stating that they needed to file suit in Louisiana and "serve [Rimkus] on Monday to prevent them from filing in Texas." (*Id.*). Rimkus argues that the defendants understood that their Louisiana suit seeking to invalidate the noncompetition and nonsolicitation clauses would be met with a countersuit seeking to enforce the provisions as well as the contractual and common-law

63

duty not to misappropriate propriety and confidential information. (*Id.* at 7).

Rimkus alleges that the defendants "scheme[d]" to destroy evidence showing the extent to which they took confidential information from Rimkus to use to set up, operate, and solicit business for U.S. Forensic. (*Id.*). The scheme, and the attempt to conceal it, included deleting emails showing that the defendants took information from Rimkus and used it for U.S. Forensic, donating or throwing away laptop computers from which such emails might be recovered, and lying about personal email accounts. According to Rimkus, the cover-up unraveled when DeHarde testified about the defendants' agreement to delete all emails more than two weeks old. Rimkus also points to the April 2008 email Gary Bell sent himself containing attachments with confidential Rimkus customer-contact information and the reports Cammarata produced containing language and data copied from Rimkus. (Docket Entry No. 431 at 6–7). Rimkus argues that these documents, withheld from production until recently, combined with Cammarata's and Bell's prior testimony, provide evidence of intentional, bad-faith efforts to withhold or destroy relevant information.

As a sanction for spoliation, Rimkus asks this court to strike the defendants' pleadings and enter a default judgment or, in the alternative, to give an adverse inference jury instruction at trial. Rimkus also seeks reimbursement of the costs and fees it incurred in discovering or attempting to discover spoliated evidence and in moving for sanctions.

The defendants respond that the deleted emails responsive to Rimkus's discovery requests—to produce "Cammarata's and Bell's communications with one another and with other U.S. Forensic, L.L.C. members concerning the creation and inception of U.S. Forensic,

64

L.L.C., their roles with the company, and contact with clients"—"only relate to Plaintiff's claim for breach of fiduciary duty against Mr. Bell, not the myriad of other claims in this litigation." (Docket Entry No. 345 at 13–14). The defendants argue that there was no duty to preserve these emails in November and December 2006 because they only planned to sue Rimkus for a declaratory judgment that the noncompetition and nonsolicitation provisions were unenforceable.

The defendants also argue that there is insufficient prejudice to Rimkus to warrant a default judgment or adverse inference instruction because Rimkus has been able to obtain some of the deleted emails from other sources and has sufficient evidence to argue its claims. The defendants contend that any emails or documents they destroyed that could not be obtained from other sources in discovery "would be merely cumulative of evidence already produced." (*Id.* at 15). The defendants assert that there is a "wealth" of evidence on the formation of U.S. Forensic and the defendants' preparations to form a competing business. They point to several documents that were produced earlier in this litigation that "could be deemed relevant to Plaintiff's claim for breach of fiduciary duty and the issue of Defendants' formation of U.S. Forensic." (*Id.* at 16).

The defendants admit that sanctions in the amount of reasonable costs and fees Rimkus incurred to obtain production of the April 2008 email Gary Bell sent himself containing attachments with Rimkus client-contact information and the reports with Rimkus language are appropriate. (Docket Entry No. 408 at 26). The defendants argue that other sanctions are not warranted because the failure to produce earlier was not due to intentional

wrongdoing but to "ineptitude" and that Rimkus is not prejudiced because "the vast majority of information requested by Plaintiff, and previously thought to be lost or destroyed, has now been produced." (*Id.* at 28).

>    2.    *The Duty to Preserve*

The record shows that no later than November 11, 2006, when the defendants were about to "preemptively" sue Rimkus, they had an obligation to preserve documents and information—including electronically stored information—relevant to these disputes. The disputes included whether Bell breached the fiduciary duty he owed Rimkus as an officer, whether Bell or Cammarata breached enforceable obligations under the noncompete and nonsolicitation provisions in the parties' contracts, and whether Bell or Cammarata breached contractual or common-law duties not to take or use Rimkus's confidential and proprietary information.

Bell sought the advice of counsel before leaving Rimkus. The November 11, 2006 email from Bell to Cammarata, DeHarde, and Janowsky discussing the final steps of the plan to sue Rimkus in Louisiana to challenge the noncompete and nonsolicitation provisions shows that the defendants knew that they would be suing Rimkus within days. The duty to preserve electronically stored information and documents relevant to that suit and reasonably anticipated related litigation was triggered no later than November 11, 2006.

The defendants' argument that their preservation obligation was limited to documents or emails related to breach of fiduciary obligation claims against Bell is unpersuasive. Bell, Cammarata, and DeHarde sued Rimkus in Louisiana seeking a declaratory judgment that the

noncompetition and nonsolicitation clauses were unenforceable so that they could operate U.S. Forensic to compete with Rimkus.   It was reasonable for Bell and Cammarata to anticipate that Rimkus would seek to enforce those contractual provisions as to all the U.S. Forensic employees who left Rimkus, as well as the contractual and common-law duty not to disclose Rimkus's confidential and proprietary information.   Emails and attachments and other documents relating to U.S. Forensic and its related company, to soliciting Rimkus clients or employees, and to obtaining or using Rimkus information were subject to a preservation obligation.   Such records were relevant to the claims involved in the Louisiana state court action that Cammarata, Bell, and DeHarde filed and to the reasonably anticipated claims that Rimkus would file, and involved the key players in the parties' litigation.

Rule 37(e), which precludes sanctions if the loss of the information arises from the routine operation of the party's computer system, operated in good faith, does not apply here. The evidence in the record shows that the defendants and other U.S. Forensic founders did not have emails deleted through the routine, good-faith operation of the U.S. Forensic computer system.   DeHarde testified that he, Bell, Cammarata, and Janowsky decided on a "policy" of deleting emails more than two weeks old.   Putting aside for the moment other evidence in the record inconsistent with this testimony, a policy put into place after a duty to preserve had arisen, that applies almost exclusively to emails subject to that duty to preserve, is not a routine, good-faith operation of a computer system.   Moreover, the evidence shows that the founders of U.S. Forensic manually and selectively deleted emails, after the duty to preserve arose.   The selective, manual deletions continued well after Rimkus

filed suit in January and February 2007.

Despite the fact that the founders of U.S. Forensic had sought and obtained legal advice on many aspects of their departure from Rimkus and their formation and operation of the competing business, they made *no* effort to preserve relevant documents, even after the Louisiana and Texas suits had been filed.  To the contrary, the evidence shows affirmative steps to delete potentially relevant documents.  Even assuming that there was an email destruction policy as DeHarde testified, it was selectively implemented.  The deleted documents included emails and attachments relevant to the disputes with Rimkus—the emails and attachments showing what information U.S. Forensic's founders took from Rimkus to use in the competing business, including to solicit business from Rimkus clients, and how they solicited those clients.

The record shows that the electronically stored information that the defendants deleted or destroyed after the duty to preserve arose was relevant to the issues involving both Bell and Cammarata, not limited to a breach of fiduciary claim against Bell.  The deleted emails and attachments related not only to setting up U.S. Forensic but also to obtaining information from Rimkus, including copyrighted materials, financial documents, and customer lists; using at least some of that information to operate U.S. Forensic in competition with Rimkus; and soliciting business for U.S. Forensic.  The evidence shows that by deleting emails relating to forming U.S. Forensic and to using information from Rimkus for U.S. Forensic, by failing to preserve such emails, and by giving away or destroying laptops with such emails, the defendants destroyed potentially relevant evidence.

68

3.      *The Degree of Culpability*

Destruction or deletion of information subject to a preservation obligation is not sufficient for sanctions.  Bad faith is required.  A severe sanction such as a default judgment or an adverse inference instruction requires bad faith and prejudice.  *See Condrey v. SunTrust Bank of Ga.*, 431 F.3d 191, 203 (5th Cir. 2005); *see also Whitt v. Stephens County*, 529 F.3d 278, 284 (5th Cir. 2008) ("[A] jury may draw an adverse inference 'that party who intentionally destroys important evidence in bad faith did so because the contents of those documents were unfavorable to that party.'" (quoting *Russell v. Univ. of Tex. of the Permian Basin*, 234 F. App'x 195, 207 (5th Cir.2007) (unpublished))).[33]

---

[33]   Two cases illustrate the range of culpability.  In *GE Harris Railway Electronics, L.L.C. v. Westinghouse Air Brake Co.*, No. 99-070-GMS, 2004 WL 5702740 (D. Del. Mar. 29, 2004), the court concluded that the defendant's employee acted in bad faith by destroying documents that were potentially incriminating, *id.* at *4.  The plaintiff had sued the defendant and its employee for patent infringement and trade secret misappropriation.  *Id.* at *1.  The parties settled the case and a consent order was entered prohibiting the employee for three years from involvement in selling any radio-based distributed power product manufactured by his employer.  *Id.*  It was undisputed that the employee was aware of this prohibition.  *Id.* at *2.  During that three-year period, the employee participated in a proposal to sell the product.  *Id.*  After the plaintiff learned about this proposal, it moved for a contempt order.  *Id.* at *1.  The parties did not dispute that the employee deleted computer files related to the proposal when he became aware that the plaintiff might have concerns.  *Id.* at *2.  The court concluded that the employee's destruction was "clearly motivated by an intent to eliminate evidence that could potentially incriminate [his employer] in a contempt claim."  *Id.* at *4.  The court held that dismissal was improper because the prejudice to the innocent party was minimal but adopted an adverse inference against the spoliating party.  *Id.* at *4–5.

By contrast, in *Pandora Jewelry, LLC v. Chamilia, LLC*, No. CCB-06-3041, 2008 WL 4533902 (D. Md. Sept. 30, 2008), there was insufficient evidence that the defendant deliberately deleted emails to find bad faith.  After the plaintiff filed suit, the court granted the defendant's motion to quash a subpoena for records.  *Id.* at *1.  The defendant then sent a letter to a number of the plaintiff's customers.  *Id.*  The letter purportedly misrepresented the court's order granting the defendant's motion to quash.  *Id.*  The defendant also sent this "letter via email to a number of blind copy recipients."  *Id.*  After the plaintiff filed additional claims, the defendant contended that it no longer possessed the emails because it "changed its electronic server twice during the litigation period or due to its email system forcing users to delete or archive emails every ninety days."  *Id.* at *2.  The court rejected the plaintiff's motion for sanctions for spoliation.  *Id.* at *6.  There was no evidence, "other than [the defendant's] failure to retain the emails, that [the defendant] deliberately deleted or destroyed evidence."  *Id.* at *9.  Although the loss of the emails violated the preservation obligation, this did not "necessitate a finding of willful or bad faith destruction."  *Id.*  The court held that the defendant was merely "grossly negligent in its failure to preserve evidence" but declined to impose an adverse inference instruction or grant summary judgment because the innocent party failed to show that the lost documents were

The defendants' proffered reasons and explanations for deleting or destroying the emails and attachments are inconsistent and lack record support. Bell testified that he deleted emails for "space concerns," Janowsky testified that he deleted emails on a weekly basis because he got a lot of emails and they "fill up [his] box," and DeHarde testified in his first deposition that he deleted emails on an ad hoc basis because he was concerned about storage capacity in his in-box. The defendants also asserted that they deleted emails about preparations to form U.S. Forensic for fear of retaliation by Rimkus if they ended up staying on at Rimkus. Allen Bostick, the IT consultant, testified that lack of space on U.S. Forensic's server and external hard drives did not become an issue until late 2007, well after this litigation began. The fact that DeHarde did not reveal the "policy" of deleting all emails more than two weeks old until after Rimkus was able to subpoena DeHarde's Yahoo! account is another reason for questioning the truthfulness of this explanation. Fear of retaliation by Rimkus might explain the deletions that occurred before the defendants resigned, but not after.

Some of the emails the defendants deleted were obtained from a Rule 45 subpoena issued to one of the internet service providers, Homestead. These emails show the defendants making preparations to form U.S. Forensic in September, October, and November 2006, and soliciting clients with whom they worked while at Rimkus in late November and early December 2006. Other emails, obtained not from the defendants but through forensic analysis of the laptop Bell used at Rimkus, show that Bell downloaded and transmitted

---

relevant. *Id.*

financial spreadsheets for specific Rimkus offices *after* his resignation.  Emails obtained from Homestead show that Cammarata forwarded language in Rimkus reports from his home email account to his U.S. Forensic email account; Cammarata admitted giving the language from a Rimkus report to a U.S. Forensic Associates engineer for use on a project.  Still another email from Bell to himself, which the defendants did not originally produce with the attachments, shows that Bell was in possession of Rimkus client-contact information in April 2008.

The evidence that the defendants knew about the litigation with Rimkus when they deleted the emails; the inconsistencies in the explanations for deleting the emails; the failure to disclose information about personal email accounts that were later revealed as having been used to obtain and disseminate information from Rimkus; and the fact that some of the emails reveal what the defendants had previously denied—that they took information from Rimkus and used at least some of it in competing with Rimkus—support the conclusion that there is sufficient evidence for a reasonable jury to find that the defendants intentionally and in bad faith deleted emails relevant to setting up and operating U.S. Forensic, to obtaining information from Rimkus and using it for U.S. Forensic, and to soliciting Rimkus clients, to prevent the use of these emails in litigation in Louisiana or Texas.

### 4.    *Relevance and Prejudice*

Despite the evidence of spoliation and efforts to conceal it, the record also shows that Rimkus was able to obtain a significant amount of evidence.  Rimkus had the laptop Bell used during his employment, although Rimkus delayed in examining it.  That laptop revealed

71

useful information about records Bell took from Rimkus.  Although they deleted or destroyed the relevant emails, attachments, and documents on other computers, the defendants also produced numerous documents and emails relating to their communications and preparations to form U.S. Forensic.  Rimkus was also able to obtain numerous emails from Homestead, which hosted all U.S. Forensic's emails between November 15, 2006 and December 19, 2006.  And the defendants have subsequently, if belatedly, produced numerous responsive emails and documents relating to the formation of U.S. Forensic and the solicitation of Rimkus clients.

Between the records the defendants did produce, the deleted records Rimkus obtained from other sources, and other evidence of the contents of deleted lost records, Rimkus has extensive evidence it can present.  The evidence of the contents of the lost records shows that some would have been favorable to Rimkus.  There is prejudice to Rimkus, but it is far from irreparable.  Rimkus's demand that this court strike the defendants' pleadings and enter a default judgment is not appropriate.  The sanction of dismissal or default judgment is appropriate only if the spoliation or destruction of evidence resulted in "irreparable prejudice" and no lesser sanction would suffice.  *See Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 593–94 (4th Cir. 2001) (affirming dismissal as a sanction when the alterations to the plaintiff's vehicle were tantamount to destroying the central piece of evidence in the case, which denied the defendant "access to the only evidence from which it could develop its defenses adequately," causing "irreparable prejudice").

Although a terminating sanction is not appropriate, a lesser sanction of a form of

72

adverse inference instruction is warranted to level the evidentiary playing field and sanction the improper conduct. *See Russell v. Univ. of Tex. of the Permian Basin*, 234 F. App'x 195, 207 (5th Cir. 2007) (unpublished) ("A spoliation instruction entitles the jury to draw an inference that a party who intentionally destroys important documents did so because the contents of those documents were unfavorable to that party."); *Turner v. Pub. Serv. Co. of Colo.*, 563 F.3d 1136, 1149 (10th Cir. 2009) ( intentional destruction of records may "support an inference of consciousness of a weak case" (quoting *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1407 (10th Cir. 1997)).

The evidence of the contents of the deleted emails and attachments shows that deleted and unrecoverable emails and attachments were relevant and that some would have been helpful to Rimkus. Emails that Rimkus was able to obtain from Homestead and other sources show the defendants obtaining and using confidential or copyrighted Rimkus information for the benefit of U.S. Forensic. The confidential information includes Rimkus financial data. The copyrighted information includes portions of engineering reports and powerpoint presentations. Rimkus did not receive from Bell in discovery the September 30, 2006 email that Bell forwarded from his BellSouth email account to his Gmail account, with confidential Rimkus information attached. Rimkus was able to obtain this information as a result of analyzing its own computer systems; it was not produced in discovery. Rimkus did not receive in discovery the April 6, 2008 email Bell sent to himself with attachments containing Rimkus customer contact information. Rimkus was only able to obtain this information as a result of this court's order to conduct additional review of the information restored from

external disk drives and later order to produce the emails in native format.

The marketing emails from U.S. Forensic that Rimkus has recovered from third-party internet service providers show that at least during November and December 2006, Bell and Cammarata were soliciting Rimkus clients for U.S. Forensic.  Some of the post-December 2006 emails that Rimkus has recovered from third parties are similar to the Homestead emails and show Bell and Cammarata soliciting business from Rimkus clients.  Similar marketing emails sent or received after December 2006 were deleted by the defendants, but the extent of the missing emails remains unknown.  DeHarde testified that the founding members of U.S. Forensic deleted emails that were more than two weeks old beginning in the fall of 2006.  Bell testified in his deposition that he deleted all U.S. Forensic marketing-related emails.  The record supports an inference that emails soliciting Rimkus clients were deleted by the defendants and that some of these emails will never be recovered.

Some deleted emails, later discussed in detail, show that Bell was contacting Rimkus clients whose information was not listed in the 2006 Casualty Adjuster's Guide and that Bell did not have the Guide before December 2006.  Even if this contact information was available on the internet in 2008, the record does not show that it was available in 2006.  The emails to Rimkus clients whose contact information may not have been available in the Casualty Adjuster's Guide or on the internet is relevant to whether Bell obtained the contact information from Rimkus.

The emails that have been recovered by Rimkus, through great effort and expense, include some that support Rimkus's claims, contradict testimony the defendants gave, and

are unfavorable to the defendants.  Rimkus has shown that it has been prejudiced by the inability to obtain the deleted emails for use in the litigation.  To level the evidentiary playing field and to sanction the defendants' bad-faith conduct, Rimkus is entitled to a form of adverse inference instruction with respect to deleted emails.

At the same time, it is important that Rimkus has extensive evidence to use in this case.  And some of the emails that the defendants deleted and that were later recovered are *consistent* with their positions in this lawsuit and *helpful* to their defense.  For example, the Homestead production revealed emails Bell sent to Rimkus clients soliciting business for U.S. Forensic stating that Bell intended to comply with his contractual obligations not to compete with Rimkus.  In a November 15, 2006 email to Don Livengood at Fidelity, Bell stated that he would like to meet with Livengood to "go over the insurance coverages, the non compete agreement for Orleans Parish and [the] capacity to do jobs out of state." (Docket Entry No. 394, Ex. F).  Bell emailed Cary Soileau at Allstate on December 4, 2006 asking for the contact information for two other Allstate employees because he "was contractually obligated to leave all client info behind at Rimkus." (*Id.*).  In an email to Tim Krueger of Safeco Insurance on December 11, 2006, Bell stated that he was looking for the name of a local claims person, but Bell stated, "[p]lease keep in mind that due to contractual obligations we would not be able to accept any assignments in New Orleans until October 2007." (*Id.*).

Given this record, it is appropriate to allow the jury to hear the evidence about the deletion of emails and attachments and about discovery responses that concealed and delayed

75

revealing the deletions.  The jury will receive an instruction that in and after November 2006,

the defendants had a duty to preserve emails and other information they knew to be relevant

to anticipated and pending litigation.  If the jury finds that the defendants deleted emails to

prevent their use in litigation with Rimkus, the jury will be instructed that it may, but is not

required to, infer that the content of the deleted lost emails would have been unfavorable to

the defendants.[34]  In making this determination, the jury is to consider the evidence about the

conduct of the defendants in deleting emails after the duty to preserve had arisen and the

evidence about the content of the deleted emails that cannot be recovered.

---

[34] *Cf. Stevenson v. Union Pac. R.R. Co.*, 354 F.3d 739, 746 (8th Cir. 2004) (affirming in part an instruction that read that "[y]ou may, but are not required to, assume that the contents of the [destroyed evidence] would have been adverse, or detrimental, to the defendant" but holding that the district court erred in preventing the spoliating party from offering rebuttal evidence (alteration in original)); *Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 383 (2d Cir. 2001) ("If you find that the defendant could have produced these records, and that the records were within their control, and that these records would have been material in deciding facts in dispute in this case, then you are permitted, but not required, to infer that this evidence would have been unfavorable to the defendant.  In deciding whether to draw this inference you should consider whether the evidence not produced would merely have duplicated other evidence already before you.  You may also consider whether the defendant had a reason for not producing this evidence, which was explained to your satisfaction."); *Cyntegra, Inc. v. Idexx Labs., Inc.*, No. CV 06-4170 PSG, 2007 WL 5193736, at *6 (C.D. Cal. Sept. 21, 2007) (granting a motion for spoliation sanctions in the form of an adverse inference jury instruction, which the defendant proposed should read: "You have heard that in presenting this case, Cyntegra did not preserve certain materials that IDEXX alleges relate to its defense against Cyntegra's claims.  Where evidence that would properly be part of a case is within the control of, or available to, the party whose interest it would naturally be to produce it, and that party fails to do so without a satisfactory explanation, the inference may be drawn that, if produced, such evidence would be unfavorable to that party, which it [sic] the case with Cyntegra."), *aff'd*, 322 F. App'x 569 (9th Cir. 2009); *Mosaid Techs. Inc. v. Samsung Elecs. Co.*, 348 F. Supp. 2d 332, 334 (D.N.J. 2004) (approving an adverse inference jury instruction that stated, among other things, "[i]f you find that defendants could have produced these e-mails, and that the evidence was within their control, and that the e-mails would have been relevant in deciding disputed facts in this case, you are permitted, but not required, to infer that the evidence would have been unfavorable to defendants.  In deciding whether to draw this inference you may consider whether these e-mails would merely have duplicated other evidence already before you.  You may also consider whether you are satisfied that defendants' failure to produce this information was reasonable.  Again, any inference you decide to draw should be based on all the facts and circumstances of this case."); 3 KEVIN F. O'MALLEY, JAY E. GRENING & WILLIAM C. LEE, FEDERAL JURY PRACTICE AND INSTRUCTIONS § 104.27 ("If you should find that a party willfully *[suppressed][hid][destroyed]* evidence in order to prevent its being presented at this trial, you may consider such *[suppression][hiding][destruction]* in determining what inferences to draw from the evidence or facts in the case." (alterations in original)).

The record also supports the sanction of requiring the defendants to pay Rimkus the reasonable costs and attorneys' fees required to identify and respond to the spoliation. The defendants agree that this sanction is appropriate. (Docket Entry No. 408 at 26). Rimkus has spent considerable time and money attempting to determine the existence and extent of the spoliation, hampered by the defendants' inconsistent and untruthful answers to questions about internet accounts and retention and destruction practices. The defendants failed to produce documents in compliance with court orders. Rimkus also expended significant time and effort to obtain some of the deleted emails and attachments.

Like an adverse inference instruction, an award of costs and fees deters spoliation and compensates the opposing party for the additional costs incurred. These costs may arise from additional discovery needed after a finding that evidence was spoliated, the discovery necessary to identify alternative sources of information, or the investigation and litigation of the document destruction itself.[35] Rimkus is entitled to recover its costs and attorneys' fees

---

[35] *See*, *e.g.*, *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, No. 05 Civ. 9016, 2010 WL 184312, at *24 (S.D.N.Y. Jan. 15, 2010) (awarding reasonable costs and attorneys' fees associated with investigating the spoliation and filing the motion for sanctions); *Cache La Poudre Feeds, LLC v. Land O'Lakes, Inc.*, 244 F.R.D. 614, 636–37 (D. Colo. 2007) (requiring the defendant to pay the costs associated with the plaintiff taking a deposition and filing a motion for relief after defendant "interfered with the judicial process" by wiping clean computer hard drives); *Leon v. IDX Sys. Corp.*, No. C03-1158P, 2004 WL 5571412, at *5 (W.D. Wash. Sept. 30, 2004) (requiring the plaintiff to pay the defendant the reasonable expenses it "incurred investigating and litigating the issue of [the plaintiff's] spoliation"), *aff'd*, 464 F.3d 951 (9th Cir. 2006); *Zubulake v. UBS Warburg LLC* (*Zubulake IV*), 220 F.R.D. 212, 222 (S.D.N.Y. 2003) (ordering the defendant to "bear [the plaintiff's] costs for re-deposing certain witnesses for the limited purpose of inquiring into issues raised by the destruction of evidence and any newly discovered e-mails"); *Trigon Ins. Co. v. United States*, 234 F. Supp. 2d 592, 593–94 (E.D. Va. 2002) (ordering the defendant to pay for the plaintiff's "expenses and fees incurred in its efforts to discern the scope, magnitude and direction of the spoliation of evidence, to participate in the recovery process, and to follow up with depositions to help prepare its own case and to meet the defense of the [defendant]"). Courts finding bad-faith spoliation also often award the moving party reasonable expenses incurred in moving for sanctions, including attorneys' fees. *See*, *e.g.*, *Chan v. Triple 8 Palace, Inc.*, No. 03CIV6048(GEL)(JCF), 2005 WL 1925579, at *10 (S.D.N.Y. Aug. 11, 2005) ("The plaintiffs are also entitled to an award of the costs, including attorneys' fees, that they

77

reasonably incurred in investigating the spoliation, obtaining emails from third-party subpoenas, and taking the additional depositions of Bell and Cammarata on the issues of email deletion.  No later than **March 1, 2010**, Rimkus must provide affidavits and supporting bills and related documents showing and supporting the amount of those costs and fees.

### C.     The Perjury Allegations

Rimkus alleges that Bell and Cammarata perjured themselves during their depositions.[36]  Perjury is offering "false testimony concerning a material matter with the willful intent to provide false testimony, rather than a as result of confusion, mistake, or faulty memory." *United States v. Dunnigan*, 507 U.S. 87, 94 (1993).  Perjury is not established by mere contradictory testimony from witnesses or inconsistencies in a witness's testimony.  *See Koch v. Puckett*, 907 F.2d 524, 531 (5th Cir. 1990).

Rimkus argues that inconsistencies between Bell's deposition testimony and documents produced in this case establish that he committed perjury.  Rimkus cites Bell's deposition testimony that he did not take customer information or other confidential Rimkus information when he left the company and emails Bell sent in November and December 2006 soliciting work from individuals he dealt with while at Rimkus.  Rimkus also points to the

---

incurred in connection with this motion."); *Broccoli v. Echostar Commc'ns Corp.*, 229 F.R.D. 506, 512–13 (D. Md. 2005) (ordering the defendant to pay "reasonable costs and attorneys' fees," including those for "client, third party and intra-office meetings" and "time charged for drafting and editing the motion" but reducing the amount sought).

[36]   Rimkus also alleges that DeHarde, Janowsky, and Darren Balentine of U.S. Forensic Associates, LLC, gave false testimony in their depositions.  These individuals are not parties and did not testify as a party representative.  The Rule 30(b)(6) witness for U.S. Forensic was Gary Bell.  Rimkus does not allege, and there is no basis to conclude, that DeHarde, Janowsky, or Balentine gave testimony on behalf of U.S. Forensic.  The testimony of these third parties, false or not, does not provide a basis for sanctioning the party defendants in this case.

recently produced April 2008 email Bell sent himself that contained Rimkus customer information that appeared to have been created by Balentine while he was still employed at Rimkus and Bell's testimony that he did not use Rimkus customer information in soliciting U.S. Forensic clients.  Rimkus argues that Bell could not have obtained contact information for these individuals without using Rimkus customer lists and that Bell's "denial of the use of Rimkus's confidential client information in soliciting clients therefore is outright false." (Docket Entry No. 313 at 25).

Rimkus's arguments do not take into account Bell's deposition testimony about how he obtained contact information and who he attempted to contact after he left Rimkus.  Bell testified that when he first began soliciting business for U.S. Forensic, the internet was his primary source for obtaining contact information.  He also used the Casualty Adjuster's Guide.  Bell testified that he "tried to get work from anybody that would send us work.  It didn't matter to me if they were a Rimkus customer, if they weren't a Rimkus customer, I -- I had to do it on my own -- and, you know, many of the people that don't use Rimkus were exactly the people we wanted to target."  (*Id.*, Ex. D, Deposition of Gary Bell, Vol. II at 62:15–:21).  Although many of the emails show that U.S. Forensic focused its solicitation efforts on former Rimkus clients the U.S. Forensic founders knew, which is inconsistent with Bell's testimony, the record is not sufficient to show that Bell committed perjury when he stated that he did not take Rimkus's confidential customer contact information.

Rimkus argues that the April 2008 email Bell sent himself, with Rimkus client-contact information attached, makes Bell's prior testimony that he did not take or use Rimkus client-

contact information false.  Although the April 2008 email is evidence that Bell had Rimkus client information after he left Rimkus, it does not establish that Bell took the information when he left Rimkus.  Rimkus argues that Bell obtained the information from Balentine after Bell left Rimkus.  Nor does it establish that Bell *used* this client-contact information to solicit Rimkus customers for U.S. Forensic.  Sanchez's affidavit also does not compel the conclusion that Bell used the contact information contained in the attachments to the April 2008 email because Sanchez's affidavit and deposition testimony do not show that the only source of the contact information was the information contained in the email attachments or other Rimkus sources.

Rimkus also cites Bell's deposition testimony about when he began telling potential clients about U.S. Forensic and soliciting business from them.  Rimkus argues that this testimony is contradicted by the dates of emails from Bell to potential clients.  Rimkus points to the following exchange in Bell's deposition:

> Q.    Okay.  Prior to November 16th, the date you began formal operations of U.S. Forensic --
>
> A.    Uh-huh.
>
> Q.    -- did you have communications with any person that you knew to provide business to Rimkus Consulting Group about your starting a competing business?
>
> A.    I don't believe so.
>
> Q.    Well, you would know; wouldn't you?
>
> A.    No.
>
> Q.    So, as you sit here today, you can't tell the ladies and

> gentlemen of the jury whether or not you contacted somebody or not?  You just don't know?
>
> A.    I think, I didn't. We didn't have insurance. We didn't have engineers.

(*Id.* at 63:13–64:4).  Rimkus contrasts this testimony with two November 15, 2006 emails Bell sent Rimkus clients to tell them he was starting a new company.  These emails do not prove perjury.  Bell clearly testified that although he did not believe that he had contacted Rimkus clients about his new company before November 15, 2006, he was not sure.  Given Bell's uncertainty about when he contacted Rimkus clients on behalf of U.S. Forensic, the fact that two emails were sent one day before the date Bell was asked about does not establish that he intentionally gave false testimony.

Rimkus also argues that Bell falsely testified that he took precautions not to contact customers he knew to be Rimkus clients.  Rimkus points to an email from Cammarata telling a former client that if he wanted Cammarata to work on the project to ask Rimkus to send the file but asking him not to forward the email to Rimkus and emails Bell sent in December 2006 to individuals Bell had worked with at Rimkus.  (Docket Entry No. 394, Ex. F).  These emails do not establish perjury.  Bell testified that he "*generally* tried to avoid sending" marketing emails to Rimkus clients.  (Docket Entry No. 313, Ex. D, Deposition of Gary Bell, Vol. II at 57:20).  The fact that some of the hundreds of marketing emails Bell sent on behalf of U.S. Forensic were sent to people Bell knew were Rimkus clients is not inconsistent with Bell's testimony.

Rimkus also points to a recently produced email dated August 15, 2006, with a letter

of intent to sublease office space in Louisiana, which states that Bell was in the process of separating from his company and was planning to use the space for four employees and to grow over five years.  (Docket Entry No. 410, Ex. Supp. Q).  Rimkus points to Bell's previous testimony that he did not know he was leaving Rimkus and that he did not have a firm plan to form U.S. Forensic until after he left Rimkus.  According to Rimkus, the letter of intent establishes that Bell's earlier testimony that he did not have a firm plan prior to leaving Rimkus was false.  (Docket Entry No. 410 at 13–23).

The passages of Bell's deposition testimony that Rimkus cites do not show perjury.  The testimony Rimkus points to shows that Bell did not provide a firm date on which the lease began or when he found the office space; Bell testified that it was "something like" November 5, but he did not know the exact date.  (Docket Entry No. 410 at 20).  Bell responded "maybe so" to a question asking if the lease started in October.  (*Id.* at 21).  Bell also testified that even if a lease was in place by October, there still was not a firm plan to form U.S. Forensic.  (*Id.* at 22).  Bell's testimony is insufficient to show perjury.

Finally, Rimkus argues that Bell falsely testified that he did not use personal email accounts for "purposes related to Rimkus or U.S. Forensic" and that he did not try to get rid of evidence.  (Docket Entry No. 313 at 27).  Bell testified that during his "employment at Rimkus," he used the Rimkus email system for Rimkus work, not a personal email account.  (*Id.*, Ex. D, Deposition of Gary Bell, Vol. I at 17:21–25).  When Rimkus completed a forensic analysis of its own computer system, it found a "cookie" showing that Bell accessed his BellSouth e-mail address on his Rimkus computer to forward documents to

82

garylbell@gmail.com.  Bell had previously specifically denied having a Gmail account.
(Docket Entry No. 314, Deposition of Gary Bell, Vol. II at 247:20–248:1).  Bell was not
asked, and did not testify about, whether he used a personal email account for U.S. Forensic
business.

When asked about deleting emails, Bell testified that he "didn't try to get rid of
anything that [he] thought [he] shouldn't."  (*Id.*, Deposition of Gary Bell, Vol. I at 18:1–13).
Later in his deposition, Bell admitted deleting all U.S. Forensic marketing-related emails.
(*Id.*, Vol. II at 342:3–5).  He also testified that he deleted some, but not all, of the emails on
his computer to conserve server space, (*Id.*, Vol. I at 55:8), and that his deletion wasn't "as,
you know, planned as--as it could have been," (*Id.* at 18:3–4).  That is inconsistent with
DeHarde's testimony that some time in the summer or fall 2006, but before November 15,
2006, the founding members of U.S. Forensic agreed to delete all emails after two weeks in
part out of space concerns.  (Docket Entry No. 313, Ex F, Deposition of Michael DeHarde
at 34:21–25, 45:16–25).

Evidence in the  record shows that Bell did delete emails relevant to his disputes with
Rimkus, emails that he had a duty to preserve.  The deletions occurred after Bell and others
had decided to sue Rimkus and continued after they filed suit in Louisiana and were sued in
Texas.  The record shows that Bell's testimony that he was not trying to delete emails
relevant to this case was inconsistent and included some false information.  The testimony
delayed discovery and made it even more difficult and costly for Rimkus to obtain
information that Bell deleted and destroyed from other sources.  This testimony provides

additional support for the adverse inference jury instruction and for the award of Rimkus's fees and costs in identifying and litigating the spoliation. *See, e.g.*, *Belak v. Am. Eagle*, *Inc.*, 99-3524-CIV, 2001 WL 253608, at *6 (S.D. Fla. Mar. 12, 2001) (awarding the defendant the attorneys' fees incurred in moving to strike a pleading that contained false testimony). Rimkus is entitled to the fees and costs it incurred in attempting to recover the deleted emails from other sources and in redeposing the witnesses after those attempts. In addition, Rimkus is entitled to recover the reasonable costs and attorneys' fees incurred in moving for sanctions based on Bell's false testimony about getting rid of evidence.

Rimkus also alleges that Cammarata committed perjury. According to Rimkus, Cammarata falsely testified that he did not solicit Rimkus customers on behalf of U.S. Forensic. Rimkus argues that emails Cammarata sent to clients he worked with while employed at Rimkus show that his testimony was false. This argument is unpersuasive. Cammarata testified that he has "called people that used to be a client of [his] at Rimkus" since starting U.S. Forensic but that he did not recall sending marketing emails to such clients. (Docket Entry No. 314, Deposition of Nickie G. Cammarata at 114:25–115:1; 134:14–17). Cammarata testified that he "communicate[s] with some clients that way. A given client, I might do it regularly, but I don't regularly communicate with all the clients via email." (*Id.* at 134:18–23). The emails Rimkus cites were the subject of specific questions at Cammarata's deposition. Cammarata testified that the emails were only to clients for whom he had open files when he resigned from Rimkus. Cammarata testified that after he gave Rimkus his two-week notice, "at least two, possibly three clients were pursuing my

continuance on these files while I was at Rimkus.  And within the two-week period I felt a duty to those clients, on behalf of their interest and Rimkus' interest, to inform them that by November 15th I would no longer be with Rimkus." (*Id.* at 112:16–23).  The emails Rimkus relies on show that the clients contacted Cammarata to discuss open files. (Docket Entry No. 313, Exs. L, M).  Cammarata responded by stating that he was with a new company but that if the client wanted him to continue working on the file, it could be transferred from Rimkus if the client contacted Rimkus to make those arrangements.  Cammarata gave his new contact information and brief information about U.S. Forensic.  These emails are consistent with Cammarata's deposition testimony that he did not recall sending marketing emails to clients but that he did communicate with some existing clients about open files.  These emails do not show that Cammarata provided false testimony.

Rimkus also alleges that Bell and Cammarata falsely testified that they did not have concrete plans to start U.S. Forensic until November 2006.  Rimkus points to the evidence that before leaving Rimkus, Bell registered U.S. Forensic's web site, met with his attorney, applied for a trademark, created a U.S. Forensic logo, created resumes on U.S. Forensic letterhead, and received a letter of intent to lease office space for U.S. Forensic.  Corporate formation documents for U.S. Forensic were filed in October 2006, shortly after Bell resigned.  Rimkus asserts that this evidence shows "there were definite plans being communicated among the members in direct contradiction to their testimony." (Docket Entry No. 313 at 36).

The law is clear that taking preparatory steps to compete with an employer while still

working for that employer is not actionable.  *See Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 284 (5th Cir. 2007) ("[U]nder Texas law, an at-will employee may properly plan to go into competition with his employer and may take active steps to do so while still employed. . . . . Even the existence of a fiduciary relationship between employee and employer does not preclude the fiduciary from making preparations for a future competing business venture; nor do such preparations necessarily constitute a breach of fiduciary duties." (quotation marks and citations omitted)); *Ameristar Jet Charter, Inc. v. Cobbs*, 184 S.W.3d 369, 374 (Tex. App.—Dallas 2006, no pet.) (holding there was no breach of fiduciary duty when an employee formed a competing business while still employed but did not actually compete with the employer until he resigned); *Abetter Trucking Co. v. Arizpe*, 113 S.W.3d 503, 510 (Tex. App.—Houston [1st Dist.] 2003, no pet.) ("An at-will employee may properly plan to compete with his employer, and may take active steps to do so while still employed.  The employee has no general duty to disclose his plans and may secretly join with other employees in the endeavor without violating any duty to the employer." (citation omitted)); *see id.* at 511 ("To form his own company, Arizpe had to incorporate or otherwise establish a business entity, obtain permits, and obtain insurance.  These were permissible preparations to compete, not breaches of a fiduciary duty.").

A review of the deposition testimony Rimkus relies on does not reveal false statements.  Bell did not testify that he did not take steps to form U.S. Forensic before leaving Rimkus.  Bell testified that he and Cammarata, DeHarde, and Janowsky had vague discussions about going into business with one another and that there was no agreement to

form U.S. Forensic until after Bell had left Rimkus.  But there is no evidence that before Bell resigned, he communicated his preparations to Cammarata, DeHarde, or Janowsky. Cammarata testified that he was not asked to take any steps to organize information related to U.S. Forensic before leaving Rimkus on November 15, 2006.  The record evidence is consistent with the deposition testimony of Bell and Cammarata.  Bell took the preparatory steps to form U.S. Forensic.  Bell and Cammarata did not testify falsely about when they agreed to form U.S. Forensic.

In sum, with one exception, the grounds Rimkus cites to urge this court to find that Bell and Cammarata committed perjury do not support such a finding.

### D.    The Additional Allegations of Failures to Comply with Court Orders and to Respond to Discovery Requests

Rimkus alleges that in addition to the spoliation allegations analyzed above, the defendants failed to comply with this court's orders to produce reasonably accessible, relevant, nonprivileged electronically stored information and to determine the feasibility, costs, and burdens of retrieving electronically stored information that is not reasonably accessible.  At the August 6, 2009 hearing, this court ordered the defendants to search the accessible sources and to produce electronically stored information relating to marketing efforts on behalf of U.S. Forensic or information obtained from Rimkus.  On August 13, 2009, the defendants informed the court of their efforts to retrieve the information.  This court held a hearing on August 17, 2009, and determined that considering the scant likelihood of recovering further responsive electronically stored information, the potential benefits of further retrieval efforts were outweighed by the costs and burdens.  The

defendants complied with this order.

The defendants' failures to respond to discovery, as outlined in Rimkus's motion for sanctions, were addressed at several hearings, and orders for further responses entered addressed the defendants' objections to many of the discovery requests. Those issues were resolved and the defendants made further responses. Many of the defendants' discovery responses were incomplete and untimely. But it is only fair to note that defense counsel was inundated with fourteen sets of requests for production, six sets of interrogatories, and seven sets of requests for admission. Some of Rimkus's discovery requests were repetitive of previous requests. The alleged additional discovery deficiencies support the sanctions already imposed but do not justify additional measures.

### E.    Conclusion

There is evidence in the record showing that the defendants intentionally deleted emails after a duty to preserve had clearly arisen. There is evidence in the record showing that at least some of this lost evidence would have been relevant and favorable to Rimkus's case. The loss of the evidence prejudiced Rimkus, though not irreparably. These failures have imposed significant costs on the parties and the court. Sanctions are appropriate. Accordingly, the court will allow the jury to hear the evidence of the defendants' deletion of emails and attachments, and inconsistent testimony about the emails, the concealment of email accounts, and the delays in producing records and information sought in discovery. The jury will be instructed that if it decides that the defendants intentionally deleted emails to prevent their use in litigation against Rimkus, the jury may, but need not, infer that the

deleted emails that cannot be produced would have been adverse to the defendants.  Rimkus is also entitled to an award of attorneys' fees and costs reasonably incurred in investigating the spoliation, obtaining emails from third-party subpoenas, taking additional depositions of Cammarata and Bell, and moving for sanctions based on the deleted emails and on Bell's false testimony.

## V.      Rimkus's Motion to Extend the Pretrial Motions Deadline

Rimkus has moved to extend the pretrial motions deadline on the basis that "discovery remains incomplete." (Docket Entry No. 306 at 5).  The discovery issues Rimkus complains about have been resolved.  Yahoo! produced the subpoenaed information to this court on July 20, 2009.  This court's *in camera* review of the Yahoo! emails did not reveal any emails relevant to the defendants' preparations to leave Rimkus and form U.S. Forensic or to any marketing or soliciting efforts by the defendants on its behalf.  Rimkus's outstanding discovery requests and the defendants' responses to them have been fully heard and addressed.

The discovery in this case has been extensive.  In addition to the litigation over the deleted emails and attachments, the parties have propounded numerous written discovery requests and taken dozens of depositions.  Rimkus does not assert that it will file more motions if the deadline for doing so is extended or that it needs additional discovery in specific areas.  Rimkus did not move for a continuance under Rule 56(f) in response to the defendants' summary judgment motion.  Instead, Rimkus argued that the evidence already in the record is sufficient to create fact issues precluding summary judgment.  Since filing

its motion to extend the pretrial motions deadlines, Rimkus has had additional opportunities

to conduct discovery and supplement the summary judgment record.  Since the motions for

summary judgment were filed in July 2009, this court has held several discovery conferences

and allowed further discovery and supplemental briefs and evidence.  The record does not

provide a basis to grant the relief Rimkus seeks.  The motion to extend the pretrial motions

filing deadline is denied.

## VI.    The Defendants' Motion for Summary Judgment

### A.    The Legal Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the

moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  "The movant

bears the burden of identifying those portions of the record it believes demonstrate the

absence of a genuine issue of material fact." *Triple Tee Golf*, *Inc. v. Nike*, *Inc.*, 485 F.3d 253,

261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).  If the

burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial

burden by "'showing'—that is, pointing out to the district court—that there is an absence of

evidence to support the nonmoving party's case." *See Celotex*, 477 U.S. at 325.  While the

party moving for summary judgment must demonstrate the absence of a genuine issue of

material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux*

*v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005).  "A fact is 'material' if its resolution

in favor of one party might affect the outcome of the lawsuit under governing law."

*Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted),

*petition for cert. filed*, 77 U.S.L.W. 3251 (U.S. Nov. 2, 2009) (No. 08-1438). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam)).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075). In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

### B.   Claim Preclusion

The defendants argue that this entire suit should be dismissed because of the May 11, 2009 Louisiana state-court decision granting summary judgment on Rimkus's reconventional demand. The defendants argue that the Louisiana state-court judgment in favor of Bell, Cammarata, and DeHarde on Rimkus's claims for breach of the covenant not to take or use Rimkus's proprietary or trade secret information, breach of fiduciary duty, and disparagement was based on Texas law. The defendants argue that this decision precludes

relitigation of any claims that were or could have been raised in Rimkus's reconventional demands and requires dismissal of this suit.

The Full Faith and Credit Clause of the United States Constitution and its implementing statute, 28 U.S.C. § 1738, govern the preclusive effect of a state-court judgment in a subsequent federal action.[37]  Final judgments of state courts "have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken."  28 U.S.C. § 1738.  Under Full Faith and Credit, "[a] final judgment in one State, if rendered by a court with adjudicatory authority over the subject matter and persons governed by the judgment, qualifies for recognition throughout the land.  For claim and issue preclusion (res judicata) purposes, in other words, the judgment of the rendering State gains nationwide force."  *Baker ex rel. Thomas v. Gen. Motors Corp.*, 522 U.S. 222, 233 (1998) (footnote omitted).

A federal court applies the rendering state's law to determine the preclusive effect of a state court's final judgment.  *See* 28 U.S.C. § 1738; *Migra v. Warren City Sch. Dist. Bd.*

---

[37]   The Full Faith and Credit Clause states:

> Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State.  And the Congress may by general Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof.

U.S. CONST. art IV, § 1.  Title 28 U.S.C. § 1738 states in relevant part:

> The records and judicial proceedings of any court of any . . . State, Territory or Possession . . . shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken.

92

*of Educ.*, 465 U.S. 75, 81 (1984); *see also Norris v. Hearst Trust*, 500 F.3d 454, 460–61 (5th Cir. 2007).  This rule applies even if the rendering state's judgment is based on public policy offensive to the enforcing state.  *Baker*, 522 U.S. at 233–34.  Because enforcing states decide the scope of a judgment, a rendering state can "determine the extraterritorial effect of its judgment . . . only . . . indirectly by prescribing the effect of its judgments within the State." *Thomas v. Wash. Gas Light Co.*, 448 U.S. 261, 270 (1980).  "To vest the power of determining the extraterritorial effect of a State's own . . . judgments in the State itself risks the very kind of parochial entrenchment on the interests of other States that it was the purpose of the Full Faith and Credit Clause and other provisions of Art. IV of the Constitution to prevent."  *Id*. at 272.

The Louisiana *res judicata* statute states:

> Except as otherwise provided by law, a valid and final judgment is conclusive between the same parties, except on appeal or other direct review, to the following extent:
>
> (1)   If the judgment is in favor of the plaintiff, all causes of action existing at the time of final judgment arising out of the transaction or occurrence that is the subject matter of the litigation are extinguished and merged in the judgment.
>
> (2)   If the judgment is in favor of the defendant, all causes of action existing at the time of final judgment arising out of the transaction or occurrence that is the subject matter of the litigation are extinguished and the judgment bars a subsequent action on those causes of action.
>
> (3)   A judgment in favor of either the plaintiff or the defendant is conclusive, in any subsequent action between them, with respect to any issue actually litigated and determined if its determination was essential to that

judgment.

LA. REV. STAT. § 13:4231.  Louisiana courts have observed that this statute "embraces the

broad usage of the phrase *res judicata* to include both claim preclusion (*res judicata*) and

issue preclusion (collateral estoppel)."  *Am. Med. Enters., Inc. v. Audubon Ins. Co.*, 2005-

2006, p. 6 (La. App. 1 Cir. 6/8/07); 964 So. 2d 1022, 1028.

> Under claim preclusion, the *res judicata* effect of a final
> judgment on the merits precludes the parties from relitigating
> matters that were or could have been raised in that action.
> Under issue preclusion or collateral estoppel, however, once a
> court decides an issue of fact or law necessary to its judgment,
> that decision precludes relitigation of the same issue in a
> different cause of action between the same parties.  Thus, *res
> judicata* used in the broad sense has two different aspects:
> (1) foreclosure of relitigating matters that have never been
> litigated, but should have been advanced in the earlier suit; and
> (2) foreclosure of relitigating matters that have been previously
> litigated and decided.

*Id.*  (citing *Five N Company, L.L.C. v. Stewart*, 02-0181, p.15 (La. App. 1 Cir. 7/2/03); 850

So. 2d 51, 61).

     The claim preclusion aspect of *res judicata* applies under Louisiana law "when all of

the following are satisfied: (1) the judgment is valid; (2) the judgment is final; (3) the parties

in the two matters are the same; (4) the cause or causes of action asserted in the second suit

existed at the time of the final judgment in the first litigation; and (5) the cause or causes of

action asserted in the second suit arose out of the transaction or occurrence that was the

subject matter of the first litigation."  *Smith v. State*, 04-1317, p. 22 (La. 3/11/05); 899 So.

2d 516, 529–30.

          1.     *Finality*

94

Rimkus argues that the summary judgment ruling in Louisiana is not final for purposes of preclusion because it is "subject to vacation and revision" on appeal, (Docket Entry No. 321-1 at 1), "such that this litigation does not constitute an impermissible collateral attack on a decision already made." (*Id.* at 7). Rimkus argues that the Louisiana *res judicata* statute provides that "a valid and final judgment is conclusive between the same parties, except on appeal or other direct review." (Docket Entry No. 353 at 2). As a result, according to Rimkus, a state court decision on appeal cannot be a final judgment for *res judicata* purposes.

Courts applying Louisiana law have rejected the argument that a pending appeal from a trial court's judgment defeats finality for preclusion purposes. In *Fidelity Standard Life Insurance Co. v. First National Bank & Trust Co. of Vidalia, Georgia*, 510 F.2d 272, 273 (5th Cir. 1975) (per curiam), the plaintiff sued in federal district court to enforce a judgment against the defendant obtained in Louisiana state court. The federal district court held that the Louisiana judgment was entitled to full faith and credit. *Id.* On appeal, the Fifth Circuit rejected the contention that the Louisiana judgment was not final for *res judicata* purposes because it was on appeal in the state courts. *Id.* The court held that "[a] case pending appeal is res judicata and entitled to full faith and credit unless and until reversed on appeal." *Id.*

Similarly, in *Energy Development Corp. v. St. Martin*, 296 F.3d 356, 360–61 (5th Cir. 2002), the Fifth Circuit analyzed Louisiana's *res judicata* statute and held that a state court judgment is final for *res judicata* purposes when the trial court enters judgment. The Fifth Circuit relied on comment (d) of the Louisiana statute, which provides that the "preclusive

95

effect of a judgment attaches once a final judgment has been signed by the trial court and would bar any action filed thereafter unless the judgment is reversed on appeal." *Id.* (quoting LA. REV. STAT. § 13:4231, comment (d)). In *Maples v. LeBlanc, Maples & Waddell, LLC*, No. Civ. A. 02-3662, 2003 WL 21467540 (E.D. La. June 20, 2003), the plaintiff argued that a prior Louisiana state court decision was not final because it was on appeal and the Louisiana *res judicata* statute provides that "a valid and final judgment is conclusive between the same parties, *except on appeal or other direct review*," *id.* at *3. The court rejected this interpretation of the statute because it was inconsistent with the case law and with comment (d) of the Louisiana *res judicata* statute. *Id.* at *4.

One Louisiana court has held that a judgment is not final while an appeal is pending. *See Dupre v. Floyd*, 01-2399, p. 4 (La. App. 1 Cir. 7/1/02); 825 So. 2d 1238, 1240. But that court relied on "[t]wo older cases under prior law," *Mente & Co. v. Anciens Etablissements Verdier-Dufour & Cie*, 149 So. 492, 493 (La. 1933), and *Richmond v. Newson*, 24 So. 2d 174, 175 (La. App. 2 Cir. 1945), which involved a narrower version of Louisiana preclusion law. Before the 1991 statutory amendments, Louisiana law on *res judicata* was substantially narrower than federal law. *See Terrebonne Fuel & Lube*, *Inc. v. Placid Refining Co.*, 95-0654  (La. 1/16/96); 666 So. 2d 624, 631. The original Louisiana doctrine of *res judicata* was based on presuming the correctness of the prior judgment rather than on extinguishing the causes of action that might have been raised in the litigation that led to that judgment. *See id.* at 631–32. The court in *Dupre* relied on cases that were based on that presumption of correctness, ignoring the fact that the current version of Louisiana *res judicata* law is more

like federal law in using the transaction-or-occurrence test to determine the preclusive effect of a prior judgment. Under federal law, a final judgment of a federal trial court is preclusive until that judgment is modified or reversed. "[T]he established rule in the federal courts [is] that a final judgment retains all of its *res judicata* consequences pending decision of the appeal . . . [.]" *Pharmacia & Upjohn Co. v. Mylan Pharms., Inc.*, 170 F.3d 1373, 1381 (Fed. Cir. 1999) (third alteration and omission in original) (quoting *Warwick Corp. v. Md. Dep't of Transp.*, 573 F. Supp. 1011, 1014 (D. Md. 1983), *aff'd*, 735 F.2d 1359 (4th Cir. 1984)).

The *Restatement (Second) of Judgments* recognizes this view of finality—that the pendency of an appeal should not suspend the operation of a judgment for purposes of *res judicata* or collateral estoppel—as "[t]he better view." RESTATEMENT (SECOND) OF JUDGMENTS § 13, cmt. f (1982); *see also* 18A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 4433, at 94 (2d ed. 2002) ("Despite the manifest risks of resting preclusion on a judgment that is being appealed, the alternative of retrying the common claims, defenses, or issues is even worse. All of the values served by *res judicata* are threatened or destroyed by the burdens of retrial, the potential for inconsistent results, and the occasionally bizarre problems of achieving repose and finality that may arise.").

The cases make clear that a pending appeal does not affect the finality of a Louisiana state trial court's judgment for *res judicata* purposes. *See Tolis v. Bd. of Supervisors of La. State Univ.*, 95-1529 (La. 10/16/95); 660 So. 2d 1206, 1206–07 (per curiam) ("A final judgment is conclusive between the parties except on direct review. LA. REV. STAT. 13:4231 . . . . Once a final judgment acquires the authority of the thing adjudged, no court

97

has jurisdiction, in the sense of power and authority, to modify, revise or reverse the judgment, regardless of the magnitude of the error in the final judgment.").[38]  The part of the Louisiana *res judicata* statute that Rimkus quotes—"a valid and final judgment is conclusive between the same parties, except on appeal or other direct review"—means that a trial court's final judgment has preclusive effect except in those courts reviewing the judgment on direct appeal or collateral challenge.  The May 11, 2009 Louisiana state-court judgment dismissing on summary judgment the claims in Rimkus's reconventional demand is a final judgment for preclusion purposes.

### 2.     *Identity of Parties*

Rimkus also argues that the parties in the two suits are not the same because U.S. Forensic, a defendant in this suit, was not involved in the Louisiana state-court litigation. The defendants respond that U.S. Forensic is in privity with Bell and Cammarata, who were parties to the Louisiana litigation.  The identity of parties requirement is satisfied "whenever the same parties, their successors, or others appear, as long as they share the same quality as parties or there is privity between the parties."  *Austin v. Markey*, 08-381, p. 5 (La. App. 5 Cir. 11/25/08); 2 So. 3d 438, 440 (quoting *Smith v. Parish of Jefferson*, 04-860 (La. App. 5 Cir. 12/28/04); 889 So. 2d 1284, 1287); *see also Burguieres v. Pollingue*, 02-1385, p. 8 n.3 (La. 2/25/03); 843 So. 2d 1049, 1054 n. 3.  In general, "'privity' is the mutual or successive relationship to the same right of property, or such an identification in interest of one person

---

[38]   *See also Segal v. Smith, Jones & Fawer, L.L.P.*, 02-1448, pp. 7–8 (La. App. 4 Cir. 1/29/03); 838 So. 2d 62, 66 ("Although SJF argues that the September 12, 2001 judgment is currently on appeal before the First Circuit, the judgment is final for res judicata purposes unless it is reversed on appeal and was, therefore, final at the time the Civil District Court judgment was rendered.").

with another as to represent the same legal right." *Five N Company*, *L.L.C. v. Stewart*, 2002-0181, p. 16 (La. App. 1 Cir. 7/2/03); 850 So. 2d 51, 61.   Privity exists for *res judicata* purposes: "(1) where the non-party is the successor in interest to a party's interest in property; (2) where the non-party controlled the prior litigation; and (3) where the non-party's interests were adequately represented by a party to the original suit." *Condrey v. Howard*, No. 28442-CA, p. 5 (La. App. 2 Cir. 8/21/96); 679 So. 2d 563, 567.

The record shows an identity of interest between Bell and Cammarata on the one hand and U.S. Forensic on the other.   Bell, Cammarata, and DeHarde, the plaintiffs in the Louisiana litigation, own 75% of U.S. Forensic.   The actions of Bell and Cammarata—the defendants in this federal case—in leaving Rimkus, forming U.S. Forensic, and competing with Rimkus are the basis of both the Louisiana litigation and this case.   Rimkus seeks to hold U.S. Forensic liable with Bell and Cammarata for these actions.   Bell and Cammarata represented U.S. Forensic's interests in the Louisiana litigation in seeking to have the noncompetition and nonsolicitation covenants declared unenforceable.   The identity of parties requirement for preclusion is met.

### 3.   *The Relationship of the Claims*

Rimkus contends that the claims in this suit and the Louisiana suit do not arise out of the same transaction or occurrence because the Louisiana state-court judgment did not involve Rimkus's federal claims for cyberpiracy and trademark infringement, (Docket Entry No. 321-1 at 8–9), and the Louisiana court could not decide the Texas contract and tort claims Rimkus raised, (Docket Entry No. 324 at 12).   Rimkus argues that, notwithstanding

99

that both it and Bell and Cammarata argued Texas (as well as Louisiana) law in the briefs they filed on the Bell and Cammarata motion for summary judgment, the Louisiana court "could not evaluate the issues in dispute under Texas law." (*Id.*).

Claim preclusion applies to bar in a subsequent suit all "claims that were or could have been litigated in a previous lawsuit." *Horacek v. Watson*, 06-210, p. 3 (La. App. 3 Cir. 7/5/06); 934 So. 2d 908, 910 (quoting *Walker v. Howell*, 04-246, p.2 (La. App. 3 Cir. 12/15/04); 896 So. 2d 110, 112).   Under Louisiana law, a defendant is required to "assert in a reconventional demand all causes of action that he may have against the plaintiff that arise out of the transaction or occurrence that is the subject matter of the principal action." LA. CODE CIV. PROC. art. 1061(B).   Rimkus asserted its claims for breach of the noncompetition and nonsolicitation covenants in its reconventional demands.   The Louisiana court ruled that, despite the Texas forum-selection and choice-of-law provision in the Employment Agreement, Louisiana law applied to invalidate the covenants.   Louisiana law prevented Rimkus from litigating the noncompetition and nonsolicitation claims under Texas law in the Louisiana court.   As this court previously held, the Louisiana court's ruling that Louisiana law applies in Louisiana to invalidate the Texas forum-selection and choice-of-law provisions in the Employment Agreement does not invalidate those provisions in all states. Because Rimkus could not have litigated its Texas-law claims for breach of the noncompetition and nonsolicitation covenants in the Louisiana state court, claim preclusion does not apply to those claims.   The defendants' motion for summary judgment dismissing this case based on claim preclusion is denied.

100

As discussed below, the Louisiana court entered a valid and final judgment under Texas law on Rimkus's reconventional demand for misappropriation of trade secrets, breach of fiduciary duty, and disparagement, satisfying the Louisiana elements for preclusion. *See Smith v. State*, 04-1317, p. 22 (La. 3/11/05); 899 So. 2d 516, 529–30. However, whether analyzed under issue or claim preclusion, the defendants' spoliation of evidence warrants applying the Louisiana statutory exception to *res judicata*. The defendants' spoliation prevented Rimkus from litigating its misappropriation and related claims in Louisiana. The spoliation justifies granting Rimkus relief from preclusion under the statute.

## C.   Issue Preclusion

The defendants alternatively argue issue preclusion. Each of the allegedly precluded issues is analyzed below.

### 1.   Noncompetition and Nonsolicitation Covenants

On January 4, 2008, the Louisiana state appellate court ruled that the noncompetition clause in Bell's Stock Purchase Agreement was invalid and unenforceable because it was contrary to Louisiana law and public policy. (Docket Entry No. 309, Ex. N). On March 17, 2008, the Louisiana state trial court ruled that the nonsolicitation of employees clause in the defendants' employment agreements was unenforceable. (*Id.*, Ex. Q). The defendants argue that issue preclusion bars relitigation of Rimkus's claims for breach of these covenants. Rimkus responds that "[t]his court is obligated to apply Texas law to the enforcement of the non-solicitation of employees provision . . . which is not the same issue that the Louisiana court had to decide in ruling on the enforceability of the provision in the Louisiana action."

(Docket Entry No. 324 at 22).

The January and March 2008 Louisiana state-court judgments are entitled to the same preclusive effect as the July 26, 2007 Louisiana state-court judgment declaring the noncompetition and nonsolicitation covenants unenforceable under Louisiana law. The Louisiana court's determination that in Louisiana, the noncompetition covenant in the Stock Purchase Agreement and the nonsolicitation of employees provision in the Employment Agreement are unenforceable under Louisiana law is entitled to preclusive effect in this court. The Louisiana court's ruling, however, does not invalidate the noncompetition and nonsolicitation provisions in all states and does not preclude this court from considering the enforceability of the noncompetition and nonsolicitation covenants under Texas law—which the parties specified in their agreements—for activities outside Louisiana that allegedly breached those covenants.

> 2. *Misappropriation of Trade Secrets, Breach of Fiduciary Duty, and Disparagement*

The defendants argue that Rimkus litigated its claims for misappropriation of trade secrets, breach of fiduciary duty, and disparagement in the Louisiana court and that the May 11, 2009 judgment dismissing Rimkus's reconventional demand disposed of these claims. The defendants argue that this judgment is entitled to preclusive effect in this court with respect to these issues, which were actually litigated in the Louisiana case. Rimkus responds that issue preclusion does not apply because "there is no way to determine what issue or issues the Louisiana court must have considered in disposing of Rimkus' reconventional demand." (Docket Entry No. 324 at 20). Rimkus contends that the May 11, 2009 Louisiana

102

judgment does not show that the claims for misappropriation of trade secrets, breach of fiduciary duty, and disparagement asserted in Rimkus's reconventional demand were "actually litigated and finally adjudged." (*Id.*). Rimkus also argues that the Louisiana court could not have applied Texas law to those claims because that court had previously held that under Louisiana law, the Texas choice-of-law provision in the Employment Agreement was invalid. In its supplemental response, Rimkus argues that the misappropriation claim was not litigated in Louisiana because the reconventional demand did not plead a tort cause of action for misappropriation. Instead, Rimkus contends that the reconventional contract claim was based on a breach of the confidentiality provision in the Employment Agreement. Rimkus contends that the reconventional demand's factual allegations do "not support a conclusion of a trade secret cause of action being pled" because there are no "allegations enumerating the existence of confidential information or Cammarata's taking of that information." (Docket Entry No. 362 at 4).

Under Louisiana law, the three requirements for issue preclusion are: "(1) a valid and final judgment; (2) identity of the parties; and (3) an issue that has been actually litigated and determined if its determination was essential to the prior judgment." *Sanchez v. Ga. Gulf Corp.*, 02-1617, p. 14 (La. App. 1 Cir. 8/13/03); 853 So. 2d 697, 706. "Issue preclusion does not bar re-litigation of what might have been litigated and determined, but only those matters in controversy upon which the prior judgment or verdict was actually based." *Goodman v. Spillers*, 28933-CA, p. 10–11 (La. App. 2 Cir. 12/23/96); 686 So. 2d 160, 167 (emphasis omitted).

103

Rimkus's argument that preclusion does not apply because the Louisiana lawsuit involved a breach-of-contract claim and not a tort claim for misappropriation of confidential information is unpersuasive. "Trade secrets are in the nature of property rights that the law protects through both tort and contract principles." *Mabrey v. SandStream, Inc.*, 124 S.W.3d 302, 310 (Tex. App.—Fort Worth 2003, no pet.). A misappropriation claims may be brought as a claim for breach of a contractual duty, breach of confidence, or in tort. *See Murrco Agency*, *Inc. v. Ryan*, 800 S.W.2d 600, 605 n.8 (Tex. App.—Dallas 1990, no writ) (breach of contract and breach of confidence); *Avera v. Clark Moulding*, 791 S.W.2d 144, 145 (Tex. App.—Dallas 1990, no writ) (misappropriation of trade secrets). "A person is liable for disclosure or use of trade secrets if he either (a) discovers the secret by improper means or (b) his disclosure or use, after properly acquiring knowledge of the secret, constitutes a breach of a confidence reposed in him." *Mabrey*, 124 S.W.3d at 310.

Whether a misappropriation claim is brought in contract or tort, the test for determining whether the information at issue is protectable is the same. Texas courts analyze the six relevant nonexclusive factors set out in the *Restatement of Torts*: (1) the extent to which the information is known outside the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken to safeguard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended in developing the information; and (6) the ease or difficulty with which others could properly acquire or duplicate the information. *In re Bass*, 113 S.W.3d 735, 739 (Tex. 2003).

Contrary to Rimkus's argument, the Louisiana reconventional demand alleged "the existence of confidential information" and the defendants' "taking of that information." Rimkus alleged that Bell and Cammarata violated the "Proprietary Information/Trade Secrets" covenants, which stated that Rimkus client data and workpapers are valuable, confidential, proprietary, or trade secret information and obtained by Rimkus at considerable expense.   In the Employment Agreement, Bell and Cammarata agreed not to remove any Rimkus confidential, proprietary, or trade secret information from the premises except in the performance of their job duties; to return any such information in their possession to Rimkus within twenty-four hours after their employment ended; and that "so long as such confidential information or trade secrets may remain confidential, secret, or otherwise totally or partially protectable or proprietary," they would "not use or divulge such information." To determine whether Bell or Cammarata violated this contractual provision, a court would have to  determine whether they took information from Rimkus; whether that information qualified as confidential, proprietary, or trade secret information; and whether that information was used or divulged in violation of the Employment Agreement. *See Murrco Agency*, 800 S.W.2d at 605 (analyzing a misappropriation-of-trade-secrets claim brought as a breach-of-contract action under cases that used common-law standards to decide whether the information at issue was confidential, proprietary, or a trade secret).  The legal and factual questions involved—whether the claim is in contract or tort—are the same in both the Louisiana and Texas lawsuits.  Rimkus's misappropriation claim satisfies the elements of issue preclusion.

To the extent the breach of fiduciary duty claim against Bell is based on misappropriation, it also satisfies the elements of preclusion. The May 11, 2009 judgment is valid and final and the parties in both suits are the same. Rimkus's argument that the issues were not actually litigated in Louisiana because the Louisiana court applied Louisiana law is not supported by the record. The Louisiana court held applied Louisiana law to "the claims of the plaintiffs"—Cammarata, Bell, and DeHarde. The Louisiana court stated that it invalidated the Texas choice-of-law provision and the noncompetition and nonsolicitation covenants in the Employment Agreement under Louisiana law. But the Louisiana court did not state that it applied Louisiana law to Rimkus's claims involving the misappropriation of confidential, proprietary, and trade secret information or to the claims for breach of fiduciary duty and disparagement. Rimkus asked the Louisiana court to apply Texas law to its reconventional demand. The motion for summary judgment Cammarata, Bell, and DeHarde filed to dismiss the claims in Rimkus's reconventional demand did not deal with noncompetition or nonsolicitation claims, which had been decided by the Louisiana court in 2007, but rather with Rimkus's claims for misappropriation of trade secrets or proprietary information, breach of fiduciary duty, and disparagement. Both sides briefed these issues in the motion for summary judgment under Texas law. In oral argument on these issues, counsel relied on Texas law. The Louisiana court's order states that it was based on a review of "the evidence, the law and the arguments of counsel." (Docket Entry No. 309, Ex. G).

Rimkus also argues that issue preclusion does not apply because the Louisiana court "did not express any basis" for its ruling on the misappropriation, breach of fiduciary duty,

106

or disparagement claims.  Rimkus cites *Goodman v. Spillers*, 28933-CA, p. 11 (La. App. 2 Cir. 12/23/96); 686 So. 2d 160, 167, in which the court stated that "[i]t is generally not sufficient for purposes of *issue* preclusion to simply prove that a party to prior litigation argued numerous issues and lost his case.  Issue preclusion requires the issue to be precluded to have been a dispositive issue which the prior court *must have considered* in a contest between the same parties."  (Docket Entry No. 324 at 19–20).  Rimkus argues that there is no way to determine what issues the Louisiana court considered when it granted the motion for summary judgment on Rimkus's reconventional demand.  Rimkus contends that although it pleaded several claims in its reconventional demand, the defendants have not shown that the these claims were actually litigated and decided in the Louisiana court's May 11, 2009 judgment.  Rimkus also cites *Lamana v. LeBlanc*, 526 So. 2d 1107, 1109 (La. 1988), which stated that "[a]n issue presented by the pleadings in a cause, but eliminated from the judgment of the court, cannot be invoked in support of res judicata."  But issue preclusion does not require that a judgment be accompanied by a statement of the reasons or basis for the decision.  And the Louisiana court clearly stated that its decision on these claims was based on "the arguments of counsel," which only raised Texas law.

The concerns addressed in the cases Rimkus cites are not present in this case.  In *Goodman*, a corporation sued its former directors for breach of fiduciary duty.  28933-CV, p. 1; 686 So. 2d at 162–63.  One of the directors asserted a reconventional demand for unfair trade practices based on the filing of the suit.  28933-CV, p. 1; 686 So. 2d at 162.  The court granted a directed verdict dismissing the unfair trade practices claim.  *Id.*  The director then

107

brought a separate suit for malicious prosecution.  *Id.*  The corporation argued that issue preclusion applied to essential elements of the malicious-prosecution claim.  28933-CV, p. 9; 686 So. 2d at 166.  The court rejected this argument, holding that the directed verdict in the previous suit—which was essentially a finding that no unfair trade practice occurred—did not equate to a finding about whether the corporation had engaged in fraud, deception, or misrepresentation.  28933-CV, p. 10; 686 So. 2d at 167.  The court held that the previous judgment was not entitled to preclusive effect because the court was unable to determine the basis on which that litigation was resolved.  28933-CV, p. 11; 686 So. 2d at 167.  By contrast, Bell and Cammarata moved  under Texas law for summary judgment in Louisiana on Rimkus's reconventional demand claims for misappropriation of confidential, proprietary, or trade secret information, breach of fiduciary duty, and disparagement.  The Louisiana court granted the motion for summary judgment on these claims after reviewing the evidence, the law, and the parties' arguments, which were all under Texas law.  The court stated the basis for its judgment.  Rimkus's reliance on *Lamana* is also unavailing because in contrast to the facts in that case, the claims pleaded in Rimkus's reconventional demand were not "eliminated" from the Louisiana court's judgment.

The Louisiana court expressly granted the motion for summary judgment on all claims asserted in the reconventional demand.  But this court is not precluded from reconsidering these issues because a statutory exception applies.

### D.    Exception to Preclusion under Louisiana Law

In Louisiana, "[a] judgment does not bar another action by the plaintiff . . . [w]hen

exceptional circumstances justify relief from the res judicata effect of the judgment." LA. REV. STAT. § 13:4232.[39]  This statute was designed to "allow the court to balance the principle of res judicata with the interests of justice." *Id.* cmt. 1990; *see also Jenkins v. State*, 615 So. 2d 405, 406 (La. Ct. App. 1993).

Louisiana's position is consistent with the *Restatement (Second) of Judgments*.  The *Restatement* provides that fraud, concealment, or misrepresentation provide a basis to depart from claim preclusion.  *See* RESTATEMENT (SECOND) OF JUDGMENTS § 26(f); *id.* cmt. *j*; *see also* 18 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 4415, at 359–61 & 360 n.17 (2d ed. 2002).  As to issue preclusion, the *Restatement* states that "[a]lthough an issue is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, relitigation of the issue in a subsequent action between the parties is not precluded" when:

> [t]here is a clear and convincing need for a new determination of the issue . . . because the party sought to be precluded, as a result of the conduct of his adversary or other special circumstances, did not have an adequate opportunity or incentive to obtain a full and fair adjudication in the initial action.

RESTATEMENT (SECOND) OF JUDGMENTS § 28(5).  Issue preclusion does not apply when one party "conceal[s] from the other information that would materially affect the outcome of the case." *Id.* cmt. j.  In such circumstances,

> the court in the second proceeding may conclude that issue

---

[39]  Louisiana courts have interpreted "*res judicata*" in Louisiana statutes to encompass both claim and issue preclusion.  *See Am. Med. Enters., Inc. v. Audubon Ins. Co.*, 2005- 2006, p. 6 (La. App. 1 Cir. 6/8/07); 964 So. 2d 1022, 1028.

> preclusion should not apply because the party sought to be
> bound did not have an adequate opportunity or incentive to
> obtain a full and fair adjudication in the first proceeding. Such
> a refusal to give the first judgment preclusive effect should not
> occur without a compelling showing of unfairness, nor should
> it be based simply on a conclusion that the first determination
> was patently erroneous. But confined within proper limits,
> discretion to deny preclusive effect to a determination under the
> circumstances stated is central to the fair administration of
> preclusion doctrine.

*Id.*; *see also Metro. Sav. & Loan Ass'n v. Tarter*, 730 S.W.2d 1, 5 (Tex. App.—Dallas 1987, writ granted) (citing § 28(5) for the rule that an issue is not precluded if there is a clear need for redetermination due to misconduct on the part of an opposing party that prevented a full and fair adjudication of the original action)*, rev'd on other grounds*, 744 S.W.2d 926 (Tex. 1988). The Louisiana Supreme Court has cited the *Restatement* for the proposition that preclusion[40] does not apply, even when the elements are met, "if it is clearly and convincingly shown that the policies favoring preclusion of a second action are overcome for an extraordinary reason." *Terrebonne Fuel & Lube*, *Inc. v. Placid Refining Co.*, 95-0654 (La. 1/16/96); 666 So. 2d 624, 632 (La. 1996) (citing RESTATEMENT (SECOND) OF JUDGMENTS § 26).

In the present case, weighing the policies underlying preclusion law against the evidence that the defendants spoliated evidence relevant to the misappropriation claims, this

---

[40]   In *Terrebonne*, the Louisiana Supreme Court identified the question as issue preclusion but cited the *Restatement (Second) of Judgments* section applicable to claim preclusion. *See* 666 So. 2d at 632. In any event, Louisiana law considers both under the umbrella of "*res judicata*." Courts have interpreted "*res judicata*" in Louisiana statutes to encompass both claim and issue preclusion. *See Am. Med. Enters., Inc. v. Audubon Ins. Co.*, 2005- 2006, p. 6 (La. App. 1 Cir. 6/8/07); 964 So. 2d 1022, 1028. In *Terrebonne*, the court referred only to the "common law theory of res judicata." *See Terrebonne*, 666 So.2d at 632.

court concludes that exceptional circumstances exist such that preclusion does not apply to those claims. The record shows that the defendants deleted emails and attachments and delayed producing documents in discovery showing information taken from Rimkus and used for U.S. Forensic. The record also shows that the defendants delayed providing information or provided incomplete information that would have revealed the deletions. Rimkus was able to obtain some deleted emails and attachments from third parties. Some of the recovered documents show that the defendants solicited Rimkus clients, including individuals with whom Bell and Cammarata had worked while at Rimkus, shortly after forming U.S. Forensic. Some of the recovered documents support Rimkus's allegations that the defendants had Rimkus client information, financial information, and copyrighted information and used the information for U.S. Forensic. The September 30, 2006 email Bell forwarded himself containing confidential Rimkus information, including income/loss statements for several Rimkus offices, emails showing that Cammarata forwarded Rimkus reports to a private email account, and the April 6, 2008 email Bell sent himself with attachments containing Rimkus client-contact information are among the items that were only recently discovered, despite Rimkus's vigorous efforts to obtain them much earlier. None of this evidence was available to Rimkus to litigate the misappropriation claim in the Louisiana lawsuit.

Generally, newly discovered evidence does not affect the preclusive effect of a judgment. *In re Howe*, 913 F.2d 1138, 1147 (5th Cir. 1990). The information Rimkus has recently obtained, however, is not merely "new" evidence. Rather, the record contains evidence that would permit a reasonable jury to conclude that this newly obtained

information was previously unavailable to Rimkus because the defendants deleted it in bad faith. By deleting relevant emails, by providing information in discovery that concealed their existence and deletion, and by delaying discovery responses, the defendants "conceal[ed] from [Rimkus] information that would materially affect the outcome of the case." The policies underlying preclusion law—conserving judicial resources and protecting litigants from multiple lawsuits—are not served by applying issue preclusion to the misappropriation and related claims in this case. The defendants' conduct prevented a full and fair opportunity for Rimkus to litigate the misappropriation, breach of fiduciary duty, and disparagement claims in the Louisiana lawsuit. The facts of this case call for denying the application of issue and claim preclusion. Rimkus's claims for misappropriation, breach of fiduciary duty, and disparagement are not barred by the May 11, 2009 Louisiana state court judgment granting summary judgment on the claims in Rimkus's reconventional demand.

The defendants have also moved for summary judgment on these claims on grounds other than preclusion. Those grounds are examined below.

**E.      The Merits of the Defendants' Motion for Summary Judgment on Rimkus's Claims**

*1.      Misappropriation of Confidential, Proprietary, and Trade Secret Information*

The defendants argue that the record does not raise a fact issue as to Rimkus's misappropriation claim. According to the defendants, the names and contact information of Rimkus's clients are not confidential, proprietary, or trade secret information because they are generally known or readily accessible in industry guides and publications and on the

internet.  The defendants assert that Rimkus's pricing information is not entitled to protection because Rimkus shares that information with its clients.  The defendants further contend that there is no evidence in the record that they took or used Rimkus's client, pricing, financial, or business plan information.

Rimkus responds by pointing to this court's August 13, 2008 opinion, which stated that Rimkus's "customer database, pricing information, and annual business plan are entitled to trade secret protection."  (Docket Entry No. 159 at 49).  Rimkus argues that the contact information for many of the Rimkus clients the defendants solicited in November and December 2006 was not publicly available at that time.  Rimkus contends that the evidence in the record raises a fact issue as to where the defendants obtained the names and email addresses and whether that information was entitled to protection as Rimkus's confidential, proprietary, or trade secret information.  Rimkus argues that the evidence in the record, including the September 30, 2006 and April 6, 2008 emails Bell forwarded to himself, raises fact issues as to whether the defendants took and used confidential Rimkus information.

Texas law defines a "trade secret" as a "formula, pattern, device or compilation of information used in a business, which gives the owner an opportunity to obtain an advantage over his competitors who do not know or use it."  *Triple Tee Golf*, *Inc. v.  Nike*, *Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (quoting *Taco Cabana Int'l, Inc. v. Two Pesos*, *Inc.*, 932 F.2d 1113, 1123 (5th Cir. 1991)).  "To state a claim for trade secret misappropriation under Texas law, a plaintiff must (1) establish that a trade secret existed; (2) demonstrate that the trade secret was acquired by the defendant through a breach of a confidential relationship or

discovered by improper means; and (3) show that the defendant used the trade secret without authorization from the plaintiff." *Gen. Univ. Sys.*, *Inc. v. Lee*, 379 F.3d 131, 149–50 (5th Cir. 2004). To determine whether information is a trade secret protected from disclosure or use, a court must examine six "relevant but nonexclusive" criteria: "(1) the extent to which the information is known outside the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken to safeguard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." *Id.* at 150 (citing *In re Bass*, 113 S.W.3d 735, 739–40 (Tex. 2003)); *T-N-T Motorsports*, *Inc. v. Hennessey Motorsports*, *Inc.*, 965 S.W.2d 18, 22 (Tex. App.—Houston [1st Dist.] 1998, pet. dism'd). All six factors need not be satisfied "because trade secrets do not fit neatly into each factor every time." *Gen. Univ. Sys.*, 379 F.3d at 150 (quoting *Bass*, 113 S.W.3d at 740).

Courts in Texas identify trade secrets, proprietary information, and confidential information separately but provide them similar protection if the requirements—including that of secrecy—are met.[41] "Use" of a trade secret refers to "commercial use" and occurs

---

[41] *See, e.g.*, *Gallagher Healthcare Ins. Servs. v. Vogelsang*, --- S.W.3d ----, 2009 WL 2633304, at *10 (Tex. App.—Houston [1 Dist.] 2009, no pet. hist.) ("Moreover, a covenant not to compete is enforceable not only to protect trade secrets but also to protect proprietary and confidential information."); *Norwood v. Norwood*, No. 2-07-244-CV, 2008 WL 4926008, at *8 (Tex. App.—Fort Worth 2008, no pet.) (mem. op.) ("But a former employee may not use confidential or proprietary information or trade secrets the employee learned in the course of employment for the employee's own advantage and to the detriment of the employer."); *Bluebonnet Petroleum, Inc. v. Kolkhorst Petroleum Co.*, No. 14-07-00380-CV, 2008 WL 4527709, at *5 (Tex. App.—Houston [14 Dist.] 2008, pet. denied) (mem. op.) ("The issue, therefore, is whether the mere identity of the potential accounts with which Robinson was working when he left Bluebonnet is a trade secret, or even merely proprietary information accorded similar protection. To decide whether the information qualifies as a trade secret we must consult the six factors listed above."); *SP Midtown, Ltd. v. Urban Storage,*

whenever "a person seeks to profit from the use of the secret."[42]

Under Texas law, customer lists may be protected as trade secrets.  *See Sharma v. Vinmar Int'l, Ltd.*, 231 S.W.3d 405, 425 & n.14 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (collecting cases).  But "[a] customer list of readily ascertainable names and addresses will not be protected as a trade secret."  *Guy Carpenter & Co. v. Provenzale*, 334 F.3d 459, 467 (5th Cir. 2003) (citing *Gaal v. BASF Wyandotte Corp.*, 533 S.W.2d 152, 155 (Tex. Civ. App.—Houston [14th Dist.] 1976, no writ)).[43]  Texas courts consider three factors to

---

*L.P.*, No. 14-07-00717-CV, 2008 WL 1991747, at *5 n.5 (Tex. App.—Houston [14 Dist.] 2008, pet. denied) (mem. op.) ("In its brief, Space Place argues the common law tort of misappropriation does not solely depend on the existence of a trade secret.  Essentially, Space Place argues a claim of misappropriation of confidential information can survive even if the information does not constitute a trade secret.  We disagree.  There is no cause of action for misappropriation of confidential information that is not either secret, or at least substantially secret."); *Shoreline Gas, Inc. v. McGaughey*, No. 13-07-364-CV, 2008 WL 1747624, at *7 (Tex. App.—Corpus Christi 2008, no pet.) (mem. op.) ("Examples of such legitimate, protectable interests [in a noncompete covenant] include business goodwill, trade secrets, and other confidential or proprietary information."); TEX. JUR. *Trademark* § 54 ("There is no cause of action for misappropriation of confidential information that is not either secret or at least substantially secret.").  At least one court collapsed them under the heading "trade secret."  *See Parker Barber & Beauty Supply, Inc. v. The Wella Corp.*, 03-04-00623-CV, 2006 WL 2918571, at *14 n.14 (Tex App.—Austin 2006, no pet.) ("The parties alternatively used each of these terms [trade secret and confidential and proprietary information] at various times.  For ease, we will refer to such information simply as 'trade secrets.'").

[42]  *Gen. Univ. Sys., Inc. v. HAL, Inc.*, 500 F.3d 444, 450 (5th Cir. 2007) (quoting *Trilogy Software, Inc. v. Callidus Software, Inc.*, 143 S.W.3d 452, 464 (Tex. App.—Austin 2004, no pet.)).  "Use" is "any exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant." *Id.* at 451 (quoting RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 40).  "Any misappropriation of trade secrets, followed by an exercise of control and domination, is considered a commercial use."  *Carbo Ceramics, Inc. v. Keefe*, 166 F. App'x 714, 721 (5th Cir. 2006) (unpublished) (citing *Univ. Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 542 (5th Cir. 1974), and *Garth v. Staktek Corp.*, 876 S.W.2d 545, 548 (Tex. App.—Austin 1994, writ dism'd)).

[43]  *See Adco Indus. v. Metro Label Corp.*, No. 05-99-01128-CV, 2000 WL 1196337, at *4 (Tex. App.—Dallas 2000, no pet.) (not designated for publication) (affirming the trial court's conclusion that customer lists and other information were not trade secrets because the defendant was able to purchase a new customer list and duplicate the process he followed at the plaintiff company to yield information); *Miller Paper Co. v. Roberts Paper Co.*, 901 S.W.2d 593, 602 (Tex. App.—Amarillo 1995, no writ) (affirming a temporary injunction preventing the use of a customer list even though "some information contained [in the list] may have been susceptible to discovery through independent investigation of public material" because "the record [did] not establish that the appellants so gathered it"); *see also Inflight Newspapers, Inc. v.*

determine whether a customer list is a trade secret: "(1) what steps, if any, an employer has taken to maintain the confidentiality of a customer list; (2) whether a departing employee acknowledges that the customer list is confidential; and (3) whether the content of the list is readily ascertainable." *Guy Carpenter & Co. v. Provenzale*, 334 F.3d 459, 467 (5th Cir. 2003). In considering whether information was readily ascertainable, courts have considered the expense of compiling it. *See Zoecon Indus. v. Am. Stockman Tag Co.*, 713 F.2d 1174, 1179 (5th Cir. 1983) ("Even if the names and addresses were readily ascertainable through trade journals as the defendants allege, the other information could be compiled only at considerable expense.").[44]   Other Texas courts focus on the method used to acquire the customer information. Even if the information is readily available in the industry, it will be protected if the competitor obtained it working for the former employer. *See Brummerhop*, 840 S.W.2d at 633; *Am. Precision Vibrator Co. v. Nat'l Air Vibrator Co.*, 764 S.W.2d 274, 277 (Tex. App.—Houston [1st Dist.] 1988, no writ) ("In Texas, courts condemn the

---

*Magazines In-Flight, LLC*, 990 F. Supp. 119, 129–30 (E.D.N.Y. 1997) (holding that the plaintiff's customer lists were not trade secrets because the customer identity could be easily found through publicly available means, such as the internet, trade shows, trade directories, and telephone books, or were imbedded in the defendant's memory); *Millet v. Loyd Crump*, 96-CA-639, pp. 5–6 (La. App. 5 Cir. 12/30/96); 687 So. 2d 132, 136 (holding that the trial court erred in concluding that customer lists were trade secrets under the Uniform Unfair Trade Secrets Act because the defendant had monthly access to the files to complete an ongoing audit, the defendant could obtain client information when clients contacted her directly, and insurance companies and policy holders also had the information alleged to be confidential).

[44]   *See also Crouch v. Swing Machinery Co.*, 468 S.W.2d 604, 607 (Tex. Civ. App.—San Antonio 1971, no writ) ("[T]here is evidence to the effect that the important information relates not to the identity of particular businesses which might purchase plaintiff's products, but the identity of officers or other employees of such concerns who make the decisions concerning the purchase of such equipment. There is also evidence which at least tends to show that ascertaining the identity of such key personnel requires the expenditure of considerable time and money."). Courts have also considered the difficulty of compiling the customer list to determine whether it is confidential. *See M.N. Dannenbaum, Inc. v. Brummerhop*, 840 S.W.2d 624, 632 (Tex. App.—Houston [14th Dist.] 1992, writ denied).

employment of improper means to procure trade secrets.  The question is not, 'How could

he have secured the knowledge?' but 'How did he?'" (citations and internal quotation marks

omitted)), *withdrawn and stayed on other grounds*, 771 S.W.2d 562 (Tex. App.—Houston

[1st Dist.] 1989, no writ).[45]

Based on the evidence presented at the injunction hearing held in 2008, this court

concluded that Rimkus's client database, pricing information, and business plan were the

type of information that courts had recognized as entitled to trade secret protection.  Rimkus

claims that its customer lists are trade secrets.  The defendants argue that the Rimkus client-

contact information is not a trade secret because it is publicly available in industry guides like

the Louisiana Casualty Adjuster's Guide and on the internet.  But, as Rimkus points out,

nearly all the individuals Bell and Cammarata solicited in November and December 2006 are

not listed in the 2006 Louisiana Casualty Adjuster's Guide.  The record also shows that Bell

did not have a copy of the Guide until after December 10, 2006, after he had sent multiple

solicitation emails on behalf of U.S. Forensic.  The full list of recipients of Bell's December

1, 2006 solicitation email remains unknown.  Bell submitted an affidavit showing that many

of the insurance adjusters he sent marketing emails to in 2008 had their contact information

available on the internet.  But there is no evidence that the contact information for these

adjusters was available on the internet in 2006.  Moreover, the client-contact information Bell

---

[45] *See also Jeter v. Associated Rack Corp.*, 607 S.W.2d 272, 276 (Tex. Civ. App.—Texarkana 1980, writ
ref'd n.r.e.) ("The fact that [the information the plaintiff claimed was confidential] might have been available
on the open market is not determinative.  The primary issue is whether the [defendants] engaged in a course
of conduct to obtain access to confidential business information from the premises of [the plaintiff], without
permission in order to facilitate the forming of their new corporation.").

was able to find on the internet in 2008 does not account for all the Rimkus clients Bell and Cammarata emailed in November and December 2006. The record shows that Bell and Cammarata sent multiple solicitation emails on behalf of U.S. Forensic in the first few weeks and months of operation. Nearly all the solicitation emails recovered by Rimkus were sent by Bell or Cammarata to individuals with whom they worked while at Rimkus. The record raises fact issues as to whether the contact information for the clients U.S. Forensic solicited in late 2006 was publicly available and whether the defendants obtained it from client lists and similar information they took from Rimkus.

The defendants' argument that Rimkus's pricing information is not a trade secret because Rimkus shares that information with its prospective or actual clients is also unpersuasive. Disclosure does not destroy the protection given to a trade secret if, when it is disclosed, the owner of that secret obligates the party receiving it not to disclose or use it. *See Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1123–24 (5th Cir. 1991) (holding that the plaintiff's disclosure to contractors of the architectural plans for its restaurants did not extinguish the confidential nature of those plans); *see also Metallurgical Indus. Inc. v. Fourtek, Inc.*, 790 F.2d 1195, 1200 (5th Cir. 1986) (trade secrets remained confidential when they were disclosed only to businesses with whom the plaintiff dealt with the expectation of profit). Rimkus did not publicly announce its pricing information, particularly not to its competitors. Instead, Rimkus disclosed the information only to prospective or actual clients and did not reveal how the prices charged to one compared with prices charged to others. Even if Rimkus gave its clients pricing information, Rimkus took

118

steps to prevent competitors from learning it.  Rimkus's pricing information, which Rimkus safeguards and which would give a competitor an advantage, is entitled to trade secret protection.  The record raises disputed fact issues mmaterial to determining whether the defendants took Rimkus pricing information and used it on behalf of U.S. Forensic.

The record also raises fact issues material to determining whether the defendants took or used Rimkus business plan information, Rimkus financial information, and other Rimkus information.  Bell forwarded himself an email containing confidential Rimkus income/loss statements.  Bell downloaded other Rimkus financial information from the Rimkus server to his work laptop on the day he resigned.  Cammarata emailed himself Rimkus reports.  Bell and Cammarata obtained a Rimkus powerpoint from a former Rimkus client and used it in their work for U.S. Forensic.  And Cammarata retained multiple boxes of documents containing Rimkus information and only recently disclosed the existence of these materials. The evidence in the record raises disputed fact issues precluding summary judgment on the misappropriation claim.  The defendants' motion for summary judgment on this claim is denied.

### 2. *Breach of Fiduciary Duty*

Rimkus alleges that Bell breached his fiduciary duty as an officer of Rimkus by preparing to form U.S. Forensic before he left Rimkus, misappropriating confidential Rimkus information, and soliciting Rimkus customers and employees.  Under Texas law, the elements of a breach of fiduciary duty claim are: (1) the plaintiff and defendant had a fiduciary relationship; (2) the defendant breached its fiduciary duty to the plaintiffs; and

(3) the defendant's breach resulted in injury to the plaintiff or benefit to the defendant. *Navigant Consulting*, *Inc. v. Wilkinson*, 508 F.3d 277, 283 (5th Cir. 2007); *see also Jones v. Blume*, 196 S.W.3d 440, 447 (Tex. App.—Dallas 2006, pet. denied). An employee may prepare to go into competition with his employer—before resigning—without breaching fiduciary duties owed to that employer. *Navigant Consulting*, *Inc.*, 508 F.3d at 284.[46] But an employee "may not appropriate his employer's trade secrets" or "carry away certain information, such as lists of customers." *Id.* at 284 (quoting *Johnson v. Brewer & Pritchard*, *P.C.*, 73 S.W.3d 193, 202 (Tex. 2002)). In *Navigant Consulting*, the court concluded that the defendant's disclosure of detailed business information to competitors, "including revenue projections, backlog estimates, margin rates, [and] descriptions of current and potential engagements," was part of the defendant's breach of fiduciary duty. *Id.* at 286.

Contrary to Rimkus's argument, the evidence of Bell's preparations to form Rimkus does not, as a matter of law, provide a basis for a breach of fiduciary duty claim. The evidence of misappropriation does, however, raise disputed fact iissues as to whether Bell breached his fiduciary duty to Rimkus by misappropriating confidential, proprietary, or trade secret information obtained while he was an officer of Rimkus and by using that information

---

[46] *Ameristar Jet Charter, Inc. v. Cobbs*, 184 S.W.3d 369, 374 (Tex. App.—Dallas 2006, no pet.) (no breach of fiduciary duty when an employee formed a competing business while still employed but did not actually compete with the employer until he resigned); *Abetter Trucking Co. v. Arizpe*, 113 S.W.3d 503, 510 (Tex. App.—Houston [1st Dist.] 2003, no pet.) ("An at-will employee may properly plan to compete with his employer, and may take active steps to do so while still employed. The employee has no general duty to disclose his plans and may secretly join with other employees in the endeavor without violating any duty to the employer." (citation omitted)); *see id.* at 511 ("To form his own company, Arizpe had to incorporate or otherwise establish a business entity, obtain permits, and obtain insurance. These were permissible preparations to compete, not breaches of fiduciary duty.").

to solicit Rimkus customers and compete against Rimkus.  Bell's motion for summary judgment on this aspect of the breach of fiduciary duty claim is denied.

### 3.    Disparagement

In the amended complaint, Rimkus alleged that Bell made disparaging statements about Rimkus to third parties, causing harm to its reputation and a loss of business.  Bell argues that there is no evidence in the record to support Rimkus's disparagement claim.  In its initial response to Bell's summary judgment motion, Rimkus conceded that, at the time, it had no proof that Bell disparaged Rimkus.  (Docket Entry No. 321 at 24).  Rimkus asserted that it lacked such evidence because Bell had deleted emails and asked this court to delay ruling on the summary judgment motion until "after the dust settle[d] regarding the email production."  (*Id.*).

On August 24, 2009, Rimkus filed a supplemental brief and evidence, including previously undisclosed emails that were belatedly produced pursuant to court order.  Rimkus contends that these emails provide evidence of disparagement.  Rimkus "believes there are similar documents which Mr. Bell has destroyed and . . . has not produced."  (Docket Entry No. 374 at 2).  Bell replies that Rimkus still lacks evidence to support any elements of a business disparagement claim.  (Docket Entry No. 377 at 4–6).

Rimkus relies on two email exchanges between Bell and individuals who worked for Rimkus clients who had worked with Bell while he was at Rimkus.[47]  The first email, sent

---

[47]    Rimkus also submitted email conversations between Bell and other Rimkus employees that allegedly contain disparaging comments.  A plaintiff alleging business disparagement must prove that false statements of fact were made to third parties.  *Advanced Modular Power Sys.*, *Inc. v. E-One N.Y.*, *Inc.*, No. 01-06-00607-

121

on November 5, 2007, states that Bell and other engineers left their "old companies" to "create a smaller, honest, cost effective engineering alternative for the insurance claims industry that responds to the needs of the clients in terms of cost and timeliness of reports." (Docket Entry No. 371; Docket Entry No. 374, Ex. U).  Rimkus argues that this sentence is disparaging because it "suggests rather pointedly that Rimkus is neither honest nor cost effective."  (Docket Entry No. 374 at 3).  Rimkus argues that it is clear Bell is referring to Rimkus because he closes the email by stating, "I hope we can work together again." (Docket Entry No. 371; Docket Entry No. 374, Ex. U).  The second email, which Bell sent to a Rimkus client on August 1, 2007, states: "We have never been a target of the media, the plaintiff's bar, or investigated by a government entity." (Docket Entry No. 372; Docket Entry No. 374, Ex. Z).  Bell continues: "[W]e are currently being used by attorneys for [Client] that appreciate the difference between us and the big clearinghouse engineering firms."  (*Id.*). Rimkus argues that this email is disparaging because it "impl[ies] that Rimkus has done something wrong since it has been discussed in the news, that it has been sued – without doubt by a plaintiff, or that the work of its engineers was investigated in the aftermath of Hurricane Katrina."  (Docket Entry No. 374 at 6).

Under Texas law, business disparagement requires publication by the defendant of statements that are false, maliciously stated, not privileged, and result in special damages. *C.P. Interests*, *Inc. v. Cal. Pools*, *Inc.*, 238 F.3d 690, 694–95 (5th Cir. 2001); *see KLN Steel*

---

CV, 2008 WL 963007, at *4 (Tex. App.—Houston [1 Dist.] 2008, no pet.) (mem. op.) ("The false statement of fact must be published to a third party.").  These emails do not support the disparagement claim.

*Prods. Co. v. CNA Ins. Cos.*, 278 S.W.3d 429, 438 n.8 (Tex. App.—San Antonio 2008, pet.

denied) ("[A] business disparagement claim . . . requires proof of four elements: (1) the

defendant published a false, defamatory statement of fact about the plaintiff, (2) with malice,

(3) without privilege, (4) that resulted in special damages to the plaintiff." (citing *Forbes Inc.*

*v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 170 (Tex. 2003))).   Unlike defamation, a

claim for business disparagement always requires a plaintiff to prove actual malice.  *See*

*Hurlbut v. Gulf Atl. Life Ins. Co.*, 749 S.W.2d 762, 766 (Tex. 1987).  A plaintiff must show

that the defendant knew its statements were false or acted with reckless disregard for their

falsity; acted with ill will or with an intent to interfere in the plaintiff's economic interests;

and had no privilege to do so.  *Id.*  To prove special damages, a plaintiff must provide

evidence "that the disparaging communication played a substantial part in inducing third

parties not to deal with the plaintiff, resulting in a direct pecuniary loss that has been realized

or liquidated, such as specific lost sales, loss of trade, or loss of other dealings."  *Astoria*

*Indus. of Iowa*, *Inc. v. SNF*, *Inc.*, 223 S.W.3d 616, 628 (Tex. App.—Fort Worth 2007, pet.

denied); *see also Johnson v. Hosp. Corp. of Am.*, 95 F.3d 383, 391(5th Cir. 1996); *Hurlbut*,

749 S.W.2d at 767.

The record, including the recently produced emails, as a matter of law fails to show

any basis to find disparagement.   "To support a claim for business disparagement, the

published statements must be, at a minimum, defamatory."  *Granada Biosciences*, *Inc. v.*

*Forbes*, *Inc.*, 49 S.W.3d 610, 616 (Tex. App.—Houston [14 Dist.] 2001, pet. granted), *rev'd*

*on other grounds*, 124 S.W.3d 167 (Tex. 2003).  "[T]o maintain an action for an alleged

defamatory statement, it must appear that [the plaintiff] is the person with reference to whom the statement was made." *Kaufman v. Islamic Soc'y of Arlington*, 291 S.W.3d 130, 144 (Tex. App.—Fort Worth 2009, pet. denied) (quoting *Newspapers, Inc. v. Matthews*, 339 S.W.2d 890, 893 (Tex. 1960)). "It is 'not necessary that the individual referred to be named if those who knew and were acquainted with the plaintiff understand from reading the publication that it referred to [the] plaintiff'; however, the 'settled law requires that the false statement point to the plaintiff and to no one else.'" *Id.* (alteration in original) (quoting *Matthews*, 339 S.W.2d at 894). Whether a plaintiff is referred to in a statement is "a question of law for the court." *Ledig v. Duke Energy Corp.*, 193 S.W.3d 167, 180 (Tex. App.—Houston [1st Dist.] 2006, no pet.). A "claimed implication" is insufficient to refer to a defamation plaintiff when it is not consistent with the "plain language" and the "full import" of a defendant's statement. *Matthews*, 339 S.W.2d at 894.

Rimkus's argument that the emails clearly refer to it and it alone as a dishonest and expensive engineering firm involved in lawsuits and government investigations is unpersuasive. The November 5, 2007 email begins by stating that a "group of us from *three different engineering firms* left our old *companies* and formed U.S. Forensic." (Docket Entry No. 371; Docket Entry No. 374, Ex. U) (emphasis added). Bell refers to U.S. Forensic as an "alternative" for the insurance industry and then states that we would put "our guys' experience up against *anyone else*." (*Id.*) (emphasis added). The August 1, 2007 email states that attorneys for clients of U.S. Forensic "appreciate the difference between us and the big *clearinghouse engineering firms*." (Docket Entry No. 372; Docket Entry No. 374, Ex. Z)

124

(emphasis added).  Bell does not name Rimkus or any other engineering firm in these emails. The content and context of these emails show that the purpose of the challenged statements was to highlight the difference between U.S. Forensic and large forensic engineering firms in general, including but not limited to Rimkus.  A reasonable reader, including a Rimkus client, would not automatically associate these statements with Rimkus and ignore the reference to multiple engineering firms and companies in general.  There is no basis to conclude that the implications of Bell's statements "point to [Rimkus] and to no one else."

In addition, there is no evidence in the record of special damages.[48]  There is no evidence that any of the allegedly disparaging statements played a substantial part in causing third parties not to do business with Rimkus.  Rimkus does not assert that it has lost any specific client as a result of Bell's disparaging statements.

This court's rulings on spoliation do not change this analysis.  The evidence in the record does not show that emails deleted by the defendants would be relevant to the disparagement claim or that Rimkus has been prejudiced in its ability to litigate the disparagement claim because of the defendants' spoliation.  The emails Rimkus relies on—dated November 5, 2007 and August 21, 2007—do not provide evidence of disparagement.  There is no basis to conclude that any of the unrecovered emails would contain anything different than the emails Rimkus already has in its possession.  Summary

---

[48]  For this reason, Rimkus's supplemental response to the defendants' summary judgment motion, which contains other similar emails, do not raise a fact issue as to disparagement.  (Docket Entry No. 389, Ex. K; Docket Entry No. 392).  There is no evidence that the sending of these emails caused Rimkus to suffer special damages.

judgment is granted on the disparagement claim.

> 4. *Rimkus's Damages for Breach of the Noncompetition and Nonsolicitation Covenants*

Cammarata moved for summary judgment on Rimkus's claim for damages for the alleged breach of the covenants not to compete and not to solicit customers. Cammarata cites Texas Business and Commercial Code § 15.51(c) for the proposition that when, as in this case, the court finds that the covenant's limitations as to time, geographical scope, and the activity to be restrained are unreasonable and greater than necessary to protect the employer's business interests, damages for breach are only available after the court reforms the covenant. Cammarata argues that because this court has not reformed the covenants and the noncompetition period has expired, Rimkus is not entitled to damages for any alleged breach of the covenants not to compete and not to solicit customers.

Rimkus responds that § 15.51(c) does not foreclose damages in this case but only requires that reformation of the noncompetition covenant precede any damages award. Rimkus contends that this court may reform the covenant and award Rimkus damages for breach of the reformed covenant. Rimkus argues that "the source of . . . damages for Cammarata's breach of his covenant not to compete is not merely statutory, but contractual as well." (Docket Entry No. 324 at 52).

Rimkus's argument that it may rely on the Employment Agreement as a source of its damages, even if the contractual noncompetition clause is overbroad under § 15.51, is unpersuasive. Under Texas law, "the procedures and remedies in an action to enforce a

covenant not to compete provided by Section 15.51 of [the Texas Business and Commerce Code] are *exclusive* and *preempt* any other criteria for enforceability of a covenant not to compete or procedures and remedies in an action to enforce a covenant not to compete under common law or otherwise." TEX. BUS. & COM. CODE § 15.52 (emphasis added). Under this provision, remedies for breach of a covenant not to compete are limited to the remedies available under § 15.51(c). *See Light v. Centel Cellular Co. of Tex.*, 883 S.W.2d 642, 644 (Tex. 1994) ("Section 15.52 makes clear that the Legislature intended the Covenants Not to Compete Act to largely supplant the Texas common law relating to enforcement of covenants not to compete. Thus, we apply the Covenants Not to Compete Act to the facts of this case, in lieu of 'any other criteria for enforceability of a covenant not to compete or procedures and remedies in an action to enforce a covenant not to compete under common law or otherwise.'"), *abrogated in part on other grounds by Sheshunoff Mgmt. Servs, L.P. v. Johnson*, 209 S.W.3d 644, 651 (Tex. 2006); *Perez v. Tex. Disposal Sys., Inc.*, 103 S.W.3d 591, 593–94 (Tex. App.—San Antonio 2003, pet. denied) ("Just as the Act's criteria for enforcing a covenant not to compete preempt other law, so do the remedies provided under the Act."). Rimkus may only seek damages under § 15.51(c).

Rimkus is not entitled to damages under § 15.51(c) for Cammarata's alleallege breach of the noncompetition and nonsolicitation covenants. That section "precludes a damages award for conduct prior to any necessary reformation of the scope of the covenant." *Mann Frankfort Stein & Lipp Advisors*, *Inc. v. Fielding*, 289 S.W.3d 844, 855 (Tex. 2009) (Hecht, J., concurring); *see also Safeworks, LLC v. Max Access, Inc.*, No. H-08-2860, 2009

127

WL 959969, at *5 (S.D. Tex. Apr. 8, 2009) ("If a court reforms a covenant not to compete in order to make it reasonable and enforceable, 'the court may not award the promisee damages for a breach of the covenant before its reformation and the relief granted to the promisee shall be *limited to injunctive relief*.'" (quoting TEX. BUS. & COM. CODE § 1551(c))); *Peat Marwick Main & Co. v. Haass*, 818 S.W.2d 381, 388 (Tex. 1991) ("Since MH obtained no reformation of the covenant before Haass' actions for which it sought damages, [Texas Business & Commerce Code § 15.51] would *prohibit* MH from obtaining damages."); *Butler v. Arrow Mirror & Glass, Inc.*, 51 S.W.3d 787, 796 (Tex. App.—Houston [1st Dist.] 2001, no pet.) ("Applying section 15.51 to this case, once the trial judge reformed the covenant, money damages were precluded.  No damages can be awarded for breach prior to the reformation; after reformation, the current injunction was in place preventing ReGlaze from competing with, and thus, harming Arrow.").  "If the covenant meets the criteria for enforceability set forth in Section 15.50, a court may award an employer damages, injunctive relief, or both damages and injunctive relief.  If the covenant not to compete does not meet the Section 15.50 criteria and the trial court reforms the covenant, a court may award an employer injunctive relief only."  *Perez v. Tex. Disposal Sys., Inc.*, 53 S.W.3d 480, 482 (Tex. App.—San Antonio 2001, pet. granted), *rev'd on other grounds*, 80 S.W.3d 593 (Tex. 2002).

On August 13, 2008, after an extensive evidentiary hearing, this court held that "[b]ecause the Employment Agreement covers many areas outside Louisiana where Cammarata did not work while employed by Rimkus, under Texas law the noncompetition covenant is broader in geographical scope than necessary to protect Rimkus's legitimate

business interests." (Docket Entry No. 159, August 13, 2008 Memorandum and Opinion at 36). This court concluded that "to be reasonable, the geographic range of a reformed noncompetition covenant would be limited to certain cities in Mississippi and Florida." (*Id.* at 37). With respect to the nonsolicitation covenant, this court concluded that "[b]ecause the covenant not to solicit customers extends to all Rimkus clients, the covenant is broader than necessary to protect Rimkus's legitimate business interest in protecting its client base and is unenforceable." (*Id.* at 46). The record before this court did not "support this court's reformation of the nonsolicitation covenant" to include Louisiana because "Cammarata's work for Rimkus involved primarily Louisiana clients and the nonsolicitation prohibition is unenforceable in Louisiana." (*Id.*). Because Rimkus had delayed in seeking an injunction and the period for injunctive relief had expired, this court did not extend or reform the noncompetition or nonsolicitation covenants. (*Id.* at 37, 42). Rimkus's motion for a preliminary injunction to enforce the covenants was denied. (*Id.* at 46).

Under § 15.51(c), the cases interpreting it, and the evidence in this record, Rimkus is not entitled to damages for Cammarata's alleged breach of the noncompetition and nonsolicitation covenants in his Employment Agreement. Cammarata's motion for summary judgment on Rimkus's claim for damages for breach of the noncompetition and nonsolicitation covenants is granted.

### 5. *Tortious Interference*

The defendants argue that Rimkus's tortious interference claim fails because there is no evidence of a contract with which the defendants interfered. According to the defendants,

129

Rimkus does not have a contractual relationship with its clients but rather operates on a job-to-job basis with each client.  The defendants assert that none of Rimkus's clients use it for forensic engineering services on an exclusive basis.  The clients are free to use a different forensic engineering firm whenever they choose.  The defendants also contend that Rimkus's tortious interference claims fail because there is no evidence in the record that the defendants acted willfully or intentionally to interfere with any existing Rimkus contractual or prospective business relationship.  Rimkus responds that it "enters into a contract with each one of its clients that governs the terms and conditions upon which Rimkus will perform its work."  (Docket Entry No. 324 at 43–44).  Rimkus contends that the evidence in the record shows that the defendants emailed and contacted Rimkus clients after leaving to form U.S. Forensic, knowing that "their interference with those clients would result in Rimkus [losing] the relationship with the client."  (*Id.* at 44).  Rimkus also argues that it need not show loss of an existing client because a defendant may be liable for tortious interference with prospective business relations.  (*Id.*).

To establish tortious interference with an existing contract, a plaintiff must show: "(1) an existing contract subject to interference, (2) a willful and intentional act of interference with the contract, (3) that proximately caused the plaintiff's injury, and (4) caused actual damages or loss."  *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000); *see also Amigo Broad., LP v. Spanish Broad. Sys., Inc.*, 521 F.3d 472, 489 (5th Cir. 2008).  The party alleging tortious interference has the burden of proving each element of the claim.  *Dunn v. Calahan*, No. 03-05-00426-CV, 2008 WL 5264886, at *3 (Tex.

App.—Austin Dec. 17, 2008, pet. denied) (mem. op.).   A cause of action for tortious interference with a contract will not lie in the absence of a contract.   *Ski River Dev., Inc. v. McCalla*, 167 S.W.3d 121, 140 (Tex. App.—Waco 2005, pet. denied); *S&A Marinas*, *Inc. v. Leonard Marine Corp.*, 875 S.W.2d 766, 768 (Tex. App.—Austin 1994, writ denied).

A plaintiff alleging tortious interference with contract must produce some evidence that the defendant knowingly induced one of the contracting parties to breach its contract obligations.   *See John Paul Mitchell Sys. v. Randalls Food Mkts., Inc.*, 17 S.W.3d 721, 730 (Tex. App.—Austin 2000, pet. denied); *Davis v. HydPro*, *Inc.*, 839 S.W.2d 137, 139–40 (Tex. App.—Eastland 1992, writ denied); *see also Dunn*, 2008 WL 5264886, at *3.   The plaintiff must present evidence that a contract provision was breached.   *See N.Y. Life Ins. Co. v. Miller*, 114 S.W.3d 114, 125 (Tex. App.—Austin 2003, no pet.); *Archives of Am.*, *Inc. v. Archive Litig. Servs., Inc.*, 992 S.W.2d 665, 667–68 (Tex. App.—Texarkana 1999, pet. denied).   General claims of interference with a business relationship are insufficient to establish a tortious interference with contract claim.   *See Playboy Enters., Inc. v. Editorial Caballero, S.A. de C.V.*, 202 S.W.3d 250, 265 (Tex. App.—Corpus Christi 2006, pet. denied).

Rimkus has failed to present or identify evidence that could support an inference that the defendants tortiously interfered with an existing contract between Rimkus and a client. Rimkus has not identified a written or an enforceable oral contract with a client with which the defendants interfered.   There is no evidence that Rimkus's customers or clients had a contractual obligation to continue using Rimkus's services.   Nor is there evidence that the

defendants induced any Rimkus customer or client to breach any such obligation under a contract with Rimkus.  The defendants' motion for summary judgment on Rimkus's claim for tortious interference with existing contracts is granted.

Tortious interference with contract and tortious interference with prospective business relations are separate causes of action.  *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 716–21, 725, 727 (Tex. 2001).  To establish a claim for tortious interference with prospective business relations, the plaintiff must prove that: (1) there was a reasonable probability that the plaintiff would have entered into a contract; (2) the defendant committed an intentional act, with the purpose of harming the plaintiff; and (3) actual harm or damage resulted from the defendant's interference, i.e., that the defendant's actions prevented the relationship from occurring.  *See Bradford v. Vento*, 48 S.W.3d 749, 757 (Tex. 2001); *Martin v. Kroger Co.*, 65 F. Supp. 2d 516, 563 (S.D. Tex. 1999).  The plaintiff must show that the defendant's conduct was either independently tortious or unlawful, that is, that the conduct violated some other recognized tort duty. *See Sturges*, 52 S.W.3d at 726; *Astoria Indus. of Iowa*, *Inc. v. SNF, Inc.*, 223 S.W.3d 616, 632 (Tex. App.—Fort Worth 2007, pet. denied).  The "prevented the relationship from occurring" element requires "at minimum, that the tortious conduct constitute a cause in fact that prevented the prospective business relationship from coming to fruition in the form of a contractual agreement.  The test for cause in fact, or 'but for' causation,' is whether the act or omission was a substantial factor in causing the injury 'without which the harm would not have occurred.'" *COC Servs., Ltd. v. CompUSA, Inc.*, 150 S.W.3d 654, 679 (Tex. App.—Dallas 2004, pet. filed) (quoting *Doe v. Boys Clubs of Greater*

*Dallas, Inc.*, 907 S.W.2d 472, 477 (Tex. 1995)).

Rimkus relies on the alleged misappropriation of trade secrets by the defendants as the independently tortious act required for a claim of tortious interference with prospective business relations.  Misappropriation of trade secrets is a common-law tort cause of action under Texas law.  *Trilogy Software*, *Inc. v. Callidus Software, Inc.*, 143 S.W.3d 452, 463 (Tex. App.—Austin 2004, pet. denied).  Rimkus has alleged that the defendants committed an independently tortious act.  The evidence in the record, however, does not raise a fact issue material to determining whether the defendants' actions prevented a contractual relationship between Rimkus and a customer from forming.

A plaintiff seeking to recover for tortious interference with prospective business relationships must establish proximate causation and damages with evidence rising above mere suspicion or speculation.  *See B. Cantrell Oil Co. v. Hino Gas Sales, Inc.*, 756 S.W.2d 781, 784 (Tex. App.—Corpus Christi 1988, no writ), *superseded by statute on other grounds*.[49]  Absent some evidence that the defendants' actions prevented Rimkus from entering into a business relationship with clients who instead did business with the defendants, Rimkus cannot raise a fact issue as to its claim for tortious interference with prospective business relations.  Rimkus does not identify any evidence of a client with which it would have done business but for the defendants' conduct.  There is no evidence in the summary

---

[49]  *See also Slaughter-Cooper v. Kelsey Seybold Med. Group P.A.*, 379 F.3d 285, 292 (5th Cir. 2004) (doctor who had been terminated from a clinic failed to establish that she suffered actual harm or damage when the tortious interference with prospective business relations claim rested on the speculative contention that her patients would have "sought her out" once she opened her own practice four months later had the clinic not represented to former patients that she had resigned to pursue other professional interests).

judgment record that the defendants' competition against Rimkus, use of Rimkus's business information, or solicitation of Rimkus clients resulted in that client giving business to the defendants that it would otherwise have given to Rimkus.  Summary judgment is granted dismissing Rimkus's claim for tortious interference with prospective bubusiness relations.

### 6.    *Unfair Competition and Civil Conspiracy*

Civil conspiracy is defined as "a combination of two or more persons to accomplish an unlawful purpose, or to accomplish a lawful purpose by unlawful means." *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996); *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*, 435 S.W.2d 854, 856 (Tex. 1968). "Unfair competition under Texas law 'is the umbrella for all statutory and nonstatutory causes of action arising out of business conduct which is contrary to honest practice in industrial or commercial matters.'" *Taylor Publ'g Co. v. Jostens, Inc.*, 216 F.3d 465, 486 (5th Cir. 2000) (quoting *Am. Heritage Life Ins. Co. v. Heritage Life Ins. Co.*, 494 F.2d 3, 14 (5th Cir.1974)). This tort requires a plaintiff to show that the defendants engaged in an illegal act that interfered with the plaintiff's ability to conduct its business. *Id.* "Although the illegal act need not necessarily violate criminal law, it must at least be an independent tort." *Id.*

The defendants argue that Rimkus's claims for unfair competition and civil conspiracy fail as a matter of law because there is no underlying tort liability.  Unfair competition and civil conspiracy are derivative torts. *See Meadows v. Hartford Life Ins. Co.*, 492 F.3d 634, 640 (5th Cir. 2007) (civil conspiracy); *Taylor Publ'g Co.*, 216 F.3d at 486 (unfair competition).  Because Rimkus's claim for misappropriation of trade secrets survives

summary judgment, the defendants' argument is moot.

The defendants also argue that the civil conspiracy claim fails because "there is no evidence of any collusion or agreement between Mr. Cammarata, Mr. Bell and/or U.S. Forensic." (Docket Entry No. 309-2 at 61). This argument is unpersuasive. The record raises fact issues as to whether the defendants agreed to take confidential information from Rimkus to use on behalf of U.S. Forensic. Summary judgment is denied on the conspiracy and unfair competition claims.

## VI.    The Cross-Motions for Summary Judgment on the Defendants' Counterclaims for Attorneys' Fees

Cammarata and Bell counterclaimed for attorneys' fees under § 15.51 of the Texas Business and Commerce Code. *See* TEX. BUS. & COM. CODE § 15.51(c). Under this provision, a court may award costs and attorneys' fees incurred by an employee in defending an action to enforce covenants not to compete and covenants not to solicit clients if:

(a)    the primary purpose of the agreement to which the covenant is ancillary is to obligate the promisor to render personal services;

(b)    the employer knew, at the time the agreement was executed, that the agreement did not contain reasonable limitations as to time, geographical area, and scope of activity to be restrained;

(c)    the limitations were unreasonable; and

(d)    the employer sought to enforce the agreement to a greater extent than necessary to protect its goodwill or business interests.

*See id.* Rimkus has moved for summary judgment on both counterclaims. Cammarata has also moved for summary judgment on his counterclaim for attorneys' fees.

135

### A.    Bell's Counterclaim

Rimkus argues that Bell is not entitled to attorneys' fees under this statute as a matter

of law.  When Rimkus filed this suit, it sought to enforce the covenants not to compete and

not to solicit clients contained in the July 14, 2005 Common Stock Purchase Agreement

between Rimkus and Bell.  The Agreement states in pertinent part:

> WHEREAS, for good and valuable consideration, the
> Corporation and the Shareholders have agreed to impose certain
> restrictions on said capital stock; and
>
> WHEREAS, the Shareholders mutually agree that it is to their
> mutual benefit and in the best interests of the Corporation to
> restrict the assignability of the capital stock of the Corporation,
> to provide for the control and disposition of the Corporation, to
> provide for the orderly transition of ownership in the event of
> death, disability or retirement of a Shareholder or other
> termination of a Shareholder's interest in the Corporation, to
> provide for the purchase of a Shareholder's capital stock under
> specified conditions and to provide the funds necessary to carry
> out such purchases.
>
> NOW, THEREFORE, in consideration of the mutual agreements
> contained herein and for other valuable consideration, the
> sufficiency and receipt of which is hereby acknowledged, it is
> mutually agreed by and among the parties to this Agreement as
> follows . . . .

(Docket Entry No. 302, Ex. 1 at 1).  Rimkus asserts that the primary purpose of this

Agreement was to place conditions on the sale of Rimkus stock to Bell, not to obligate Bell

to render personal services.

Bell responds that Rimkus never sold stock to him.  Instead, John Culberson sold Bell

the stock.  Bell contends that because Rimkus itself did not provide consideration in the form

of stock for this Agreement, "it can be argued that the primary purpose of the Stock Purchase Agreement was to obligate [him] to render personal services in the form of the covenant not to compete contained in the Stock Agreement."  (Docket Entry No. 317 at 2).

Bell's argument is unpersuasive.  The primary purpose of the Agreement was not to obligate Bell to work for Rimkus but to place restrictions on the ownership and transferability of the stock Bell was acquiring.  The language of the Agreement shows that the primary purpose was not to obligate Bell to render services to Rimkus.  Section 1551(c) states that it applies only if the *primary* purpose of the agreement is to obligate the promisor to render personal services.  Summary judgment is granted dismissing Bell's counterclaim.

### B.      Cammarata's Counterclaim

Rimkus ararrgues that Cammarata is not entitled to attorneys' fees under § 15.51(c) because there is no evidence that Rimkus knew that the limitations on time, geographic area, and scope of activity were unreasonable when Cammarata's Employment Agreement was executed.  Rimkus contends that Cammarata has failed to establish that Rimkus knew or was on notice that these covenants were unreasonable.  Rimkus cites *In re Nolle*, 265 S.W.3d 487 (Tex. App.—Houston [1st Dist.] 2008, orig. proceeding), for the proposition that for an employer to be liable for fees under § 15.51(c), a court or fact finder must have first determined that the noncompetition and nonsolicitation covenants were unenforceable.

Cammarata argues that Rimkus was aware of the case law, which was clear in 1996, that an employer cannot enforce a noncompetition agreement against an employee outside the geographical area in which that employee actually worked.  Cammarata contends that Rimkus

137

knew in 1996 that it had eight offices in four different states and that as a result, Rimkus knew that Cammarata "would never be able to work in every geographical area in which Plaintiff had performed five (5) jobs in the five (5) previous years." (Docket Entry No. 322 at 10). Cammarata contends that although Rimkus knew such a limitation was unreasonable, Rimkus required him to sign an employment agreement restricting postemployment competition outside the areas where Cammarata would work during his employment.

Cammarata's argument that Rimkus knew in 1996 that the covenants were unenforceable is not persuasive. Evidence that Rimkus knew about Cammarata's responsibilities and location is insufficient to establish that Rimkus knew that the noncompetition and nonsolicitation provisions of the Agreement contained unreasonable prprovisions. Although Texas case law on noncompetition and nonsolicitation restrictions was clear in 1996, there is no evidence that Rimkus knew that the relevant provisions of Cammarata's Employment Agreement were unreasonable under Texas law. *See Safeworks*, *LLC v. Max Access, Inc.*, No. H-08-2860, 2009 WL 959969, at *7 (S.D. Tex. Apr. 8, 2009) (granting summary judgment on a claim for attorneys' fees under § 15.51 because even though Texas law was clear, there was "no evidence that Safeworks representatives actually *knew* that the relevant non-solicitation provisions were unreasonable under Texas law"). The reasonableness of the limits in part depended on Cammarata's work during his employment with Rimkus. Cammarata has failed to raise a disputed fact issue material to determining whether Rimkus knew in October 1996 that the posttermination restrictions on competition in his Employment Agreement were unreasonable. This court grants Rimkus's motion for

summary judgment dismissing Cammarata's counterclaim.  Cammarata's motion for summary judgment to recover on his counterclaim is denied.

## VII.  Conclusion

Rimkus's motions for sanctions are granted in part and denied in part.  Rimkus is not entitled to an order striking the defendants' pleadings and entering a default judgment.  Based on the defendants' spoliation of evidence, Rimkus is entitled to an adverse inference instruction at trial.  Rimkus is also entitled to the reasonable costs and fees it incurred in investigating the spoliation, obtaining emails via third-party subpoenas, moving for sanctions, and taking the additional depositions of Bell and Cammarata.  By March 1, 2010, Rimkus will submit evidence of the costs and attorneys' fees.

The defendants' motion for summary judgment is granted in part and denied in part.  Summary judgment is granted dismissing Rimkus's claims for disparagement, tortious interference, and damages for breach of the noncompetition and nonsolicitation provisions.  Summary judgment is denied on Rimkus's claims for misappropriation of trade secrets, breach of fiduciary duty to the extent it is based on misappropriation, unfair competition, and civil conspiracy.  With respect to the counterclaim for attorneys' fees, Cammarata's motion for summary judgment is denied and Rimkus's motions for summary judgment are granted.  A status conference is set for **February 26, 2010, at 10:00 a.m.**

SIGNED on February 19, 2010, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

139